## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br><br>*Plaintiff,* )<br><br>v. )<br><br>STATE OF MINNESOTA and )<br>KEITH ELLISON, in his official capacity )<br>as Minnesota Attorney General )<br><br><br>*Defendants.* ) | Civil Action No. |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1. This case "presents 'a clash over [who] regulat[es] worldwide greenhouse gas emissions.'" *Minnesota by Ellison v. Am. Petroleum Instit.*, 63 F.4th 703, 717 (8th Cir. 2023) (Stras, J., concurring). Minnesota unilaterally claimed such regulatory authority when it sued national energy producers in state court for alleged violations of state law. Through its lawsuit, "Minnesota does not even try" to "hid[e] the obvious": "it seeks a global remedy for a global issue" involving global "climate change." *Id*. And there is no mistaking that Minnesota is using its state-law lawsuit to "effectively regulate" that global issue. *City of New York v. Chevron Corp.*, 993 F.3d 81, 91–93 (2d Cir. 2021) (holding that the state-law lawsuit—a form of "regulation"—was preempted).

2. But federal law, not state law, exclusively governs regulation of global greenhouse gas emissions. State law is preempted in this area due to the "'overriding need for a uniform rule of decision' on matters influencing national energy and environmental policy" and the "basic interests of federalism" enshrined in our Constitution. *Id*. at 91–92 (cleaned up). Minnesota's state-law claims are thus preempted, and its reactivated litigation in state court today is currently thwarting the United States' exclusive authority to regulate interstate air pollution, administer federal law, and conduct foreign affairs.

3. The United States therefore sues Minnesota to vindicate the su-

2

premacy of federal law in matters concerning the regulation of global green-house gas emissions and to redress its irreparable injuries. By usurping exclusive federal authority to regulate global greenhouse gas emissions in a "clear" attempt to "change [national energy] companies' behavior on a global scale," Minnesota violates federal law in multiple ways. *Minnesota,* 63 F.4th at 719.

4.      First, the Constitution precludes Minnesota from regulating global greenhouse gas emissions through state-law claims, because such emissions implicate uniquely federal interests. Under our constitutional structure, federal law "reigns . . . supreme" in disputes over interstate (and international) pollution. *Minnesota,* 63 F.4th at 718. Minnesota's lawsuit is preempted because it seeks to use state law where federal law controls the rule of decision.

5.      Second, the Constitution's separation of powers prohibits Minnesota from imposing liability or projecting its law into other jurisdictions. *See, e.g., Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 & n.1 (2023); *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 14 (2025) ("State sovereign authority is bounded by the States' respective borders."). Yet Minnesota "has attempted, in essence, to unilaterally impose its moral and policy preferences for" energy production "on the rest of the Nation." *Pork Producers*, 598 U.S. at 407 (Kavanaugh, J., concurring in part and dissenting in part). Even worse, Minnesota's unconstitutional overreach to impose liability for out-of-state conduct and emissions has ignited a conflict among the States, prompting its neighbor

to pass a law to *limit* "civil or criminal liability for any alleged actual or potential effect on climate caused wholly or partly by a greenhouse gas emission." Iowa Code § 673B.2 (2026).[1] The Constitution does not tolerate such a conflict. Nor does it allow Minnesota to nationalize its regulatory powers.

6.   Third, the Clean Air Act forecloses the sprawling lawsuit that Minnesota is pursuing in state court. *See City of New York*, 993 F.3d at 90–100.

7.   Fourth, the lawsuit is preempted under the Foreign Affairs doctrine. The Constitution forbids actions by States that exceed their traditional areas of responsibility and interfere, even incidentally, with national foreign policy. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003). Because Minnesota's lawsuit "seeks a global remedy for a global issue," it falls outside traditional state interests, *Minnesota*, 63 F.4th at 717, and it interferes with the United States' foreign policy described below.

8.   Finally, because the lawsuit discriminates against interstate commerce and regulates extraterritorial conduct, it violates the Commerce Clause.

9.   The President holds "the mandate of the people to exercise his executive power." *Myers v. United States*, 272 U.S. 52, 123 (1926). The Executive Branch exists to carry out his policies. Here, President Trump has issued significant policies to support an "affordable and reliable domestic energy supply,"

---

[1] *See* Iowa Governor Kim Reynolds Ltr (Apr. 30, 2026), *available at* https://www.legis.iowa.gov/legislation/BillBook?ga=91&ba=HF2527.

4

which is "essential to the national and economic security of the United States, as well as our foreign policy." *Protecting American Energy From State Overreach*, Exec. Order No. 14260, §§ 1–2, 90 Fed. Reg. 15513, 15513 (Apr. 8, 2025). "American energy dominance is threatened," however, when States "seek to regulate energy beyond their constitutional or statutory authorities," as with Minnesota's climate change lawsuit in state court challenged here. *Id*.

10. At bottom, efforts by Minnesota to usurp exclusive federal authority to regulate global greenhouse gas emissions (in whatever form) and to obstruct the United States from administering a federal statute and conducting foreign affairs—so that Minnesota can brazenly "attempt to set national energy policy through its own consumer-protection laws," *Minnesota*, 63 F4th at 703—irreparably injures the United States. To prevent further irreparable injury, the United States will be seeking preliminary injunctive relief. This Court should preliminarily and permanently enjoin Minnesota from regulating global greenhouse gas emissions through its lawsuit—*Minnesota v. American Petroleum Inst., et al.*, No. 62-cv-20-3837 (Minn. Dist. Ct.), Index 1 ("Complaint") (Ex. A)—and declare its lawsuit preempted and unlawful.

## JURISDICTION AND VENUE

11. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1345.

12. This Court has authority to provide the relief under the U.S. Con-

stitution, 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent legal and equitable powers. *See Leiter Mins., Inc. v. United States*, 352 U.S. 220, 225 (1957) ("There can be no doubt . . . of the right of the United States to enjoin state court proceedings whenever the prerequisites for relief by way of injunction be present.").

13. The United States has standing to vindicate its sovereign and parens patriae interests. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387 (2012); *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000); *United States v. Missouri*, 114 F.4th 980, 984–95 (8th Cir. 2024).

14. The United States has a legally protected interest in enforcing federal law, conducting foreign affairs, and preventing conflict among the States. The United States' sovereign interests include ensuring that States do not usurp and interfere with its exclusive authority to regulate global greenhouse gas emissions, to determine a uniform national approach to regulation of those emissions, and to set national energy policy. *See, e.g.*, *Minnesota*, 63 F.4th at 717–19. State actions that interfere with these interests, regulate out-of-state conduct, or nationalize local policy goals restrict and impair the United States' sovereign interests and responsibilities.

15. The United States Environmental Protection Agency (EPA) administers the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, which governs interstate air pollutants and any regulation of "domestic greenhouse gas emissions." *City*

*of New York*, 993 F.3d at 95. State actions against global greenhouse gas emissions (*e.g.*, state-law lawsuits or regulations) interfere with EPA's ability to administer the Clean Air Act. State actions against those emissions also interfere with the United States' conduct in foreign policy and ability to speak with one voice when conducting relations with foreign nations.

16.     The United States has parens patriae standing to protect the economic wellbeing of its citizens and the national energy market from Minnesota's efforts to impose extraterritorial and excessive burdens on national energy producers. Minnesota's lawsuit raises energy costs for consumers nationwide and disrupts the uniform regulation of global greenhouse gases. These harms affect a substantial segment of the population, and individual litigants, such as energy producers, cannot fully address the nationwide economic and constitutional injuries caused by Minnesota's overreach.

17.     This Court has personal jurisdiction over Defendants because they reside in or conduct a substantial portion of their official business in Minnesota. *See* Fed. R. Civ. P. 4(k)(1).

18.     Venue is proper in the District of Minnesota pursuant to 28 U.S.C. § 1391, because at least one Defendant resides in the District and because a substantial part of the acts giving rise to this suit occurred within the District.

## PARTIES

19.    Plaintiff United States sues on its own behalf, on behalf of its citizens, and on behalf of its executive departments and agencies. One of its executive agencies is EPA, which is the agency with responsibility for administering the Clean Air Act, including decisions regulating greenhouse gas emissions, and implementing national environmental policies while considering economic growth, trade, and energy implications. Another executive department is the United States Department of State, which is the department with responsibility for conducting foreign affairs.

20.    Defendant State of Minnesota is a State of the United States.

21.    Defendant Keith Ellison is the Attorney General of Minnesota. He is responsible for *Minnesota v. American Petroleum Inst., et al.*, No. 62-cv-20-3837 (Minn. Dist. Ct.). He is sued in his official capacity.

## FACTUAL ALLEGATIONS

### I.  Minnesota's Efforts to Regulate Global Greenhouse Gas Emissions and Out-of-State Conduct in Support of Its Local Energy Policies

22.    "Minnesota has no fossil fuel reserves or production." U.S. Energy Information Administration, U.S. Dep't of Energy, *Minnesota* (Oct. 16, 2025), https://perma.cc/A9D5-F9S9.[2] It also does not have: "any crude oil reserves or

---

[2] "The U.S. Energy Information Administration (EIA) is the statistical and

production," "any natural gas reserves or production," or "any operating coal mines or economically recoverable reserves." *Id*. Rather than promote fossil fuel use, Minnesota uses "significant renewable resources," such as "wind, solar, biomass, and hydropower." *Id*. And it "consumes about four times more energy than it produces." *Id*.

23.    Notwithstanding its minimal fossil fuel activities, on June 24, 2020, Minnesota sued national energy companies in state court for alleged state law violations in an effort to regulate global greenhouse gas emissions. *See* Complaint, *Minnesota,* No. 62-cv-20-3837, Index 1 (Ex. A).[3]

24.    The defendants include a trade association and energy producers headquartered and doing substantial business activity (including extraction and refining petroleum products) outside of Minnesota:

    a.    American Petroleum Institute: Incorporated in Washington, D.C. with principal place of business in Washington, D.C.[4]

---

analytical agency within the U.S. Department of Energy. EIA collects, analyzes, and disseminates independent and impartial energy information to promote sound policymaking, efficient markets, and public understanding of energy and its interaction with the economy and the environment." U.S. Energy Info. Admin., About EIA, Mission and Overview, https://perma.cc/WM39-5E4W. EIA's "data, analyses, and forecasts are independent of approval by any other officer or employee of the U.S. government." *Id.*

[3] The filings for the state case can be found at https://publicaccess.courts.state.mn.us/CaseSearch.

[4] *American Petroleum Institute*, Office of the MN Secretary of State, *available at* https://perma.cc/25U8-HMUZ.

b.  Exxon Mobil Corporation: Incorporated in New Jersey with principal place of business in Texas.[5]

c.  ExxonMobil Oil Corporation: Incorporated in New York with principal place of business in Texas.[6]

d.  Koch Industries: Incorporated in Kansas with principal place of business in Kansas.[7]

e.  Flint Hills Resources, LP: Incorporated in Delaware with principal place of business in Kansas.[8]

f.  Flint Hills Resources Pine Bend, LLC: Incorporated in Delaware with principal place of business in Kansas.[9]

25.  The Complaint includes five claims: (Count I) prevention of consumer fraud act violation, (Count II) failure to warn – strict and negligent liability, (Count III) fraud and misrepresentation, (Count IV) deceptive trade practices, and (Count V) violation of false statements in advertising act. *See*

---

[5] Exxon Mobil Corporation, Office of the MN Secretary of State, *available at* https://perma.cc/QD8D-8QR3.

[6] ExxonMobil Oil Corporation, Office of the MN Secretary of State, *available at* https://perma.cc/3YBC-LDRM.

[7] Koch Industries, U.S. Securities and Exchange Commission, *available at* https://perma.cc/RX7N-ZG7E.

[8] Flint Hills Resources, LP, Office of the MN Secretary of State, *available at* https://perma.cc/LN4D-24F8.

[9] Flint Hills Resources Pine Bend, LLC, Office of the MN Secretary of State, *available at* https://perma.cc/V523-7C79.

Complaint ¶¶ 184–242.

26.     In support of its claims, Minnesota alleges that "energy production has 'caused a substantial portion of *global* atmospheric greenhouse-gas concentrations.'" *Minnesota*, 63 F.4th at 717 (citing Complaint ¶ 175) (emphasis added). "Those gases," Minnesota contends, have resulted in "climate change"—"a label that appears in the complaint over 200 times." *Id*. The relief Minnesota seeks is "ambitious": "a far-reaching injunction, restitution, and disgorgement of 'all profits made as a result of the companies' [allegedly] unlawful conduct." *Id*. (describing Complaint ¶¶ 243–51).

27.     Through its lawsuit, "[t]here is no hiding the obvious, and Minnesota does not even try: it seeks a global remedy for a global issue." *Id*.

28.     Minnesota, in other words, seeks to set national energy policy through its lawsuit that would "'effectively override the policy choices made by' the federal government and other states." *Id*. at 719 (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 495 (1987)). Minnesota also attempts to regulate energy producers' behavior and global greenhouse gas emissions that extend far beyond its borders. *See City of New York*, 993 F.3d at 92. For example, by imposing liability for Koch Industries' conduct in Kansas, Minnesota seeks to regulate behavior occurring there. *See supra* ¶ 24 (describing where a substantial portion of the defendants' activities occur).

29.     In July 2020, the energy company defendants removed the case to

11

the U.S. District Court for the District of Minnesota, arguing that Minnesota's case arises under federal common law, federal regulations, and federal statutes and thus belongs in federal court. *See Minnesota*, 63 F.4th at 708.

30.   In January 2021, Minnesota conceded in a hearing on its motion for remand that global greenhouse gas emissions cannot be isolated to Minnesota. *See Minnesota*, No. 20-cv-1636, Dkt. 67, Remand Hearing Tr. 10:8–14 (D. Minn. Jan. 19, 2021) (conceding that "greenhouse gases mix in the atmosphere" and that "[c]limate change is a global phenomenon, and so you can't separate out necessarily how much climate change has worsened in Minnesota versus Wisconsin, for example").

31.   Minnesota does not disclaim that it is seeking relief, or imposing liability, for lawful global greenhouse gas emissions occurring beyond its borders. *See, e.g.*, *id.* at 62:5–10 ("To the extent that the damages that Minnesota has suffered as a result of the misrepresentations are indistinguishable from the damages that we've suffered as a result of lawful emissions of greenhouse gases, then we still are entitled to equitable relief if we can prove that defendants violated the Minnesota Prevention of Consumer Fraud Act.").

32.   In March 2021, the federal district court granted Minnesota's motion to remand. The court reasoned that it lacked original jurisdiction and that the claims didn't have sufficient connection to the defendants' federally directed activities. *See Minnesota*, 63 F.4th at 708.

12

33.    In March 2022, the Eighth Circuit heard oral argument on the district court's order remanding the case. At the hearing, Minnesota revealed that it could not separate global activities from Minnesota's activities concerning global greenhouse gas emissions. *See Minnesota*, No. 21-1752, Oral Argument Tr. at 20:30–21:15 (8th Cir. Mar. 15, 2022), *available at* https://media-oa.ca8.uscourts.gov/OAaudio/2022/3/211752.MP3.

34.    In March 2023, the Eighth Circuit affirmed the remand order, concluding that Minnesota's claims are not removable under the general removal statute, the federal officer removal statute, or certain federal statutes. *Minnesota*, 63 F.4th at 717. Judge Stras concurred in that opinion, writing separately to explain why Minnesota's lawsuit should arise under federal law.

35.    In June 2024, after remand, the defendants moved to dismiss Minnesota's state court complaint on multiple grounds. All the defendants filed a joint motion arguing that the complaint, which is based on alleged harms caused by interstate emissions, is preempted by federal law. Koch Industries and Flint Hills Resources filed a separate motion under Minnesota's anti-SLAAP statute, arguing that the complaint should be dismissed because it arises from constitutionally protected speech and activity and because it fails to state a claim. The American Petroleum Institute also filed a separate motion under Minnesota's anti-SLAAP statute and a motion for failure to state a claim and for lack of personal jurisdiction. ExxonMobil moved to dismiss for lack of

personal jurisdiction and for failure to state a claim, and it also raised statute of limitations and First Amendment defenses.

36.    In February 2025, the state district court denied most of the motions to dismiss. *See* Order, *Minnesota*, No. 62-CV-20-3837, Index No. 158.

37.    In March 2025, the defendants appealed the state district court's order denying their motions to dismiss on issues that were automatically appealable. For example, Koch Industries and the Flint Hills Resources appealed the anti-SLAAP ruling, while Exxon Mobil Corporation appealed the personal jurisdiction ruling.

38.    On April 8, 2025, the defendants moved for a stay of the state district court proceedings while they exhausted their appeals. *See* Notice of Motion and Motion, *Minnesota*, No. 62-CV-20-3837, Index No. 178.

39.    In June 2025, the state district court granted the defendants' motion and stayed all proceedings "until fourteen (14) days after final disposition of [the defendants'] personal-jurisdiction and anti-SLAAP appeals before the Minnesota Court of Appeals and the Minnesota Supreme Court." Order, *Minnesota*, No. 62-CV-20-3837, Index No. 206.

40.    Due to the stay, Minnesota could not enforce its energy policy goals related to global greenhouse gas emissions or regulate those emissions through its state court proceedings. Nor could it seek to regulate energy producers' behavior and conduct beyond its borders while the case was stayed.

41.    On April 15, 2026, the defendants exhausted their appeals when the Minnesota Supreme Court denied their petitions for review. *Id*. Index No. 233.

42.    On April 20, 2026, the state court of appeals entered judgment. *Id*. Index No. 234. That judgment triggered a two-week period before the state district court dissolved its stay. *See Id*. Index No. 206 ¶ 2 ("All proceedings in [the state district court] shall be stayed until fourteen (14) days after final disposition of [the defendants'] personal-jurisdiction and anti-SLAPP appeals before the Minnesota Court of Appeals and the Minnesota Supreme Court.").

43.    On May 4, 2026, the state court's stay dissolved. Minnesota then reactivated its litigation and proceeded to seek a global remedy for a global issue in state court related to its regulation of global greenhouse gas emissions and out-of-state conduct.

44.    Due to Minnesota's renewed efforts to unlawfully attempt to regulate global greenhouse gas emissions, interfere with the United States' sovereign authority and interests, and obstruct the United States' foreign policy, the United States immediately sued the day the state court's stay dissolved.

## II. The United States' Interests

### A. The United States' Interests and National Energy Policy

45.    Before 2020, local efforts to regulate global greenhouse gas emissions or out-of-state conduct through climate change lawsuits were rare. Back

15

then, by many estimates, fewer than a dozen States and municipalities sought

to regulate global greenhouse gas emissions or out-of-state conduct through

global climate change lawsuits.[10]

46.    Since 2020, dozens of additional cases have been filed, with novel

and speculative legal theories emerging on a regular basis.[11] For example, in

---

[10] *See, e.g.*, *Mayor & City Council of Baltimore v. BP P.L.C.*, No. 24-C-18-0004219 (Md. Cir. Ct.) (filed July 20, 2018), *dismissal aff'd* No. 11 (Md. Mar. 24, 2026); *Cnty. Commissioners of Boulder v. Suncor Energy (U.S.A.) Inc.*, No. 2018CV30349 (Colo. Dist. Ct.) (filed Apr. 17, 2018), *cert. granted sub nom. Suncor Energy (U.S.A.) Inc. v. Cnty. Commissioners of Boulder Cnty.*, No. 25-170 (U.S. Feb. 23, 2026); *City of Oakland v. BP P.L.C.*, No. RG17875889 (Cal. Super. Ct.) (filed 2017).

[11] *See, e.g.*, *City of Annapolis v. BP P.L.C.*, No. C-02-CV-21-000250 (Md. Cir. Ct.) (filed Feb. 22, 2021), *dismissal aff'd* No. 11 (Md. Mar. 24, 2026); *Anne Arundel Cnty. v. BP P.L.C.*, No. C-02-CV-21-000565 (Md. Cir. Ct.) (filed Apr. 26, 2021), *dismissal aff'd* No. 11 (Md. Mar. 24, 2026); *Beyond Pesticides v. Exxon Mobil Corp.*, No. 2020 CA 002532 B (D.C. Super. Ct.) (filed May 15, 2020); *Bucks Cnty. v. BP P.L.C.*, No. 2024-01836 (Pa. Ct. Common Pls.) (filed Mar. 25, 2024)*, appeal pending* No. 1525 CD 2025 (Pa. Commw. Ct.); *People of California v. Exxon Mobil Corp.*, No. CGC24618323 (Cal. Super. Ct.) (filed 2024); *City of Chicago v. B.P. P.L.C.*, No. 2024CH01024 (Ill. Cir. Ct.) (filed Feb. 20, 2024); *State of Connecticut v. Exxon Mobil Corp.*, No. HHDCV206132568S (Conn. Super. Ct.) (filed Sept. 14, 2020); *State of Delaware v. BP Am. Inc.*, No. N20-C-09-097 (Del. Super. Ct.) (filed Sept. 10, 2020); *District of Columbia v. Exxon Mobil Corp.*, No. 2020 CA 002892 B (D.C. Super. Ct.) (filed June 25, 2020); *State of Hawai'i v. B.P. P.L.C.*, No. 1CCV-25-0000717 (Haw. Cir. Ct.) (filed May 1, 2025); *City of Hoboken v. Exxon Mobil Corp.*, No. HUD-L-003179-20 (N.J. Super. Ct.) (filed Sept. 2, 2020); *City & Cnty of Honolulu v. Sunoco LP*, No. 1CCV-20-0000380 (Haw. Cir. Ct.) (filed Mar. 9, 2020); *State of Maine v. BP P.L.C.*, No. PORSC-CV24-442 (Me. Super. Ct.) (filed Nov. 26, 2024); *Makah Indian Tribe v. Exxon Mobil Corp.*, No. 23-2-25216-1 (Wash. Super. Ct.) (filed Dec. 20, 2023); *Commonwealth of Massachusetts v. Exxon Mobil Corp.*, No. 1984CV03333 (Mass. Super. Ct.) (filed Oct. 24, 2019); *Cnty of Maui v. Sunoco LP*, 2CCV-20-0000283 (Haw. Cir. Ct.) (filed Oct. 12, 2020); *People of the State*

16

November 2025, a putative class action was filed against national energy producers for allegedly causing insurance premiums to rise. *Kennedy v. Exxon Mobil Corp., et al*, No. 2:25-cv-02378, Dkt. 1 (W.D. Wash. Nov. 25, 2025).

47.    Climate change lawsuits, like Minnesota's, artfully plead around federal law while transparently seeking to change national energy policy related to global greenhouse gas emissions and to regulate conduct beyond local borders. And given the increasing number of suits since 2020, they more directly conflict with and threaten the United States' capacity to administer federal law and conduct foreign affairs. These suits also undermine American energy dominance—which is a cornerstone of national energy policy.

48.    In April 2025, the President issued an executive order for the

---

*of Michigan v. BP PLC*, No. 1:26-cv-00254 (W.D. Mich.) (filed Jan. 23, 2026); *Cnty of Multnomah v. Exxon Mobil Corp.*, No. 23CV25164 (Or. Cir. Ct.) (filed June 22, 2023); *Mun. of Bayamon v. Exxon Mobil Corp.*, No. 3:22-cv-01550 (D.P.R.) (filed Nov. 22, 2022), *appeal pending* No. 25-01961 (1st Cir.); *Mun. of San Juan v. Exxon Mobil Corp.*, No. 3:23-cv-01608 (D.P.R.) (filed Dec. 13, 2023), *appeal pending* No. 25-2035 (1st Cir.); *Platkin v. Exxon Mobil Corp.*, No. MER-L-001797-22 (N.J. Super. Ct.) (filed Oct. 18, 2022), *stay entered* No. A-001641-24T2 (N.J. App. Div.) (Mar. 2, 2026); *City of New York v. Exxon Mobil Corp.*, No. 451071/2021 (N.Y. Sup. Ct.) (filed Apr. 22, 2021), *appeal pending* No. 2025-01687 (N.Y. Super. Ct. App. Div.); *Shoalwater Bay Indian Tribe v. Exxon Mobil Corp.*, No. 23-2-25212-2 (Wash. Super. Ct.) (filed Dec. 20, 2023); *Vermont v. ExxonMobil Corp.*, No. 21-CV-02778 (Vt. Super. Ct.) (filed Sept. 14, 2021); *Commonwealth of Puerto Rico v. Exxon Mobil Corp.*, No. 3:24-cv-01393 (D.P.R.) (filed July 15, 2024) (voluntarily dismissed May 2, 2025); *City of Charleston v. Brabham Oil Co.*, No. 2020-CP-10-03975 (S.C. Ct. Comm. Pls.) (filed Sept. 9, 2020).

United States Attorney General to "take all appropriate action to stop" the continuation of lawsuits filed by States seeking to "dictate national energy policy." *See Protecting American Energy From State Overreach*, Exec. Order No. 14260, §§ 1–2, 90 Fed. Reg. 15513, 15513–14 (Apr. 8, 2025). As the President explained, "American energy dominance is threatened when State and local governments seek to regulate energy beyond their constitutional or statutory authorities." *Id.* When States "target or discriminate against out-of-State energy producers by imposing significant barriers to interstate and international trade," for example, "American energy suffers." *Id.* § 1. Such lawsuits also "weaken our national security and devastate Americans by driving up energy costs for families coast-to-coast." *Id.* In short, State actions like Minnesota's climate change lawsuit "are fundamentally irreconcilable with [the] Administration's objective to unleash American energy." *Id.*

49. The policy enshrined in the *Protecting American Energy from State Overreach* executive order is consistent with other recent directives issued by the President. *See, e.g.*, *Declaring a National Energy Emergency*, Exec. Order No. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025); *Unleashing American Energy*, Exec. Order No. 14154, 90 Fed. Reg. 8353 (Jan. 20, 2025). Such policies support an abundant supply of reliable energy necessary for our economic prosperity, national security, and military readiness. *See id.* § 2.

50.    According to this national energy policy and constitutional require-ments to administer federal law and conduct foreign affairs, the United States has taken decisive action to prevent States from dictating national energy pol-icy. *See, e.g., United States v. New York*, No. 1:25-cv-03656 (S.D.N.Y.); *United States v. Vermont*, No. 2:25-cv-463 (D. Vt.); *United States v. Hawaii*, No. 1:25-cv-00179 (D. Hawaii); *United States v. Michigan*, No. 1:25-cv-496 (W.D. Mich.).

### B. The United States' Interests and Global Energy Policy

51.    An affordable and reliable domestic energy supply, free from "bur-densome and ideologically motivated 'climate change'" lawsuits, is also essen-tial to our foreign policy. *State Overreach*, 90 Fed. Reg. at 15513.

52.    Greenhouse gas emissions "present[] a uniquely international problem of national concern." *City of New York*, 993 F.3d at 85. Regulating these emissions "implicates" not only "the conflicting rights of states" but also "our relations with foreign nations." *Id.* at 92.

53.    Consistent with the Constitution's allocation of supremacy in the field of foreign policy to the federal government, *see Hines v. Davidowitz*, 312 U.S. 52, 62 (1941), the federal government has shown an active and continuous interest in reconciling protection of the environment, promotion of economic growth, and maintenance of national security when regulating global green-house gas emissions and fossil fuels, *see City of New York*, 993 F.3d at 93 (rec-ognizing responsibility of federal government in striking the right "balance" in

19

promoting these goals).

54. The federal government has been exercising its authority here and has been continually evaluating national interests as is its responsibility under the Constitution. It has "in fact . . . addressed" these interwoven issues many times. *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421 (2003).

55. In 1987, for example, Congress enacted the Global Climate Protection Act. *See* Pub. L. No. 100-204, Title XI, §§ 1101–1106, 101 Stat. 1331, 1407–09 (1987), reprinted as note to 15 U.S.C. § 2901. It assigned to the President and EPA the responsibility for devising a "coordinated national policy on global climate change." *Id.* § 1103(b). And the Protection Act assigned to the President and the Secretary of State the responsibility for coordination of climate change policy "in the international arena." *Id.* § 1103(c), 101 Stat. at 1409.

56. In 1992, President Bush signed, and the Senate unanimously approved, the United Nations Framework Convention on Climate Change, May 9, 1992, S. Treaty Doc. No. 102-38, 1771 U.N.T.S. 107 (entered into force Mar. 21, 1994), which has as its "ultimate objective . . . stabilization of greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system." *Id.*, Art. 2.

57. The Framework Convention provides its parties with a forum to "[f]ormulate, implement, publish and regularly update national and, where appropriate, regional programmes containing measures to mitigate climate

20

change by addressing anthropogenic emissions by sources and removals by sinks of all greenhouse gases . . . [and] (c) [p]romote and cooperate in the development, application and diffusion, including transfer, of technologies, practices and processes that control, reduce or prevent anthropogenic emissions of greenhouse gases . . . ." *Id.*, Art. 4.1(b), (c).

58.    Parties to the Framework Convention negotiated two related agreements, the Kyoto Protocol and the Paris Agreement. The United States chose *not* to be a party to the Kyoto Protocol of 1997, which provided for greenhouse gas emission reduction targets. Though the United States signed the protocol, President Clinton never submitted it to the Senate for ratification. Instead, the Senate passed a unanimous resolution expressing disapproval of any protocol or other agreement that provides for disparate treatment of economically developing countries. S. Res. 98, 105th Cong. (1997).

59.    The United States is also not a party to the December 12, 2015 Paris Climate Accord (the Paris Agreement). *See* Paris Agreement to the United Nations Framework Convention on Climate Change, Dec. 13, 2015, in Rep. of the Conference of the Parties on the Twenty-First Session, U.N. Doc. FCCC/CP/2015/10/Add.1, annex (2016). In September 2016, President Obama signed the Paris Agreement but did not submit it to the Senate for ratification. On March 28, 2017, President Trump described how the United States would seek to reconcile the Nation's environmental, economic, and strategic concerns.

*See Promoting Energy Independence and Economic Growth*, Exec. Order No. 13783, 82 Fed. Reg. 16093 (Mar. 28, 2017). On November 4, 2019, the United States deposited a notification of withdrawal from the Paris Agreement. Although on February 19, 2021, President Biden announced that he rejoined this protocol, on February 13, 2025, President Trump withdrew the United States from the Paris Agreement. *See Putting America First in International Agreements*, Exec. Order No. 14162, § 3(a), 90 Fed. Reg. 8455 (Jan. 20, 2025). The President explained that "[i]t is the policy of my Administration to put the interests of the United States and the American people first in the development and negotiation of any international agreements with the potential to damage or stifle the American economy" and that such agreements "must not unduly or unfairly burden the United States." *Id*. § 2.

60. In January 2026, the President issued a memorandum stating that "it is contrary to the interests of the United States to remain a member of, participate in, or otherwise provide support to" the Framework Convention. *Memorandum on Withdrawing the United States From International Organizations, Conventions, and Treaties That Are Contrary to the Interests of the United States*, 2026 Daily Comp. Pres. Docs. No. 000010, §§ 1(b), 2(b)(xxii) (Jan. 2026). In February 2026, the United States deposited a notification of withdrawal from the Framework Convention; the withdrawal takes effect in

February 2027. The withdrawal reflects a conscious national policy of promoting American economic and national security interests and ceasing participation in forums and international agreements that constrain American energy production or use.

**CLAIMS FOR RELIEF**

**COUNT I: Federal Preclusion Under U.S. Constitution**

**(Uniquely Federal Interests)**

61. The United States incorporates all allegations stated above.

62. The Supremacy Clause in Article VI of the U.S. Constitution declares: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land."

63. The field of interstate and global pollution is exclusively governed by federal law. Disputes concerning interstate and global pollution require a uniform, federal rule of decision because such disputes implicate "uniquely federal interests," including the "conflicting rights of states and our relations with foreign nations." *City of New York*, 993 F.3d at 90-92 (cleaned up).

64. Certain areas of law involving "uniquely federal interests" require a federal rule of decision, and in those areas state law is preempted. *See City of Milwaukee v. Illinois and Michigan*, 451 U.S. 304, 313 n.7 (1981); *Am. Elec. Power Co., Inc. (AEP) v. Connecticut*, 564 U.S. 410, 421 (2011) (acknowledging that federal law "addresses subjects within national legislative power where

Congress has so directed or where the basic scheme of the Constitution so demands") (cleaned up); *Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y*, 742 F.3d 37, 41 (2d Cir. 2014) (stating that federal law governs where "the relevant federal interest warrants displacement of state law") (cleaned up). On this basis, courts have applied federal law as the rule of decision in cases ranging from interstate water disputes, *Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 110 (1938), to interstate air carrier liability, *Treiber & Straub, Inc. v. UPS, Inc.*, 474 F.3d 379,384 (7th Cir. 2007). "In these instances," the structure of the U.S. Constitution and "our federal system does not permit the controversy to be resolved under state law." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981). "State law is no substitute" when federal law provides the "rule of decision." *Minnesota*, 63 F.4th at 718–19.

65.    Interstate air pollution is one such area requiring that federal law governs to the exclusion of state law. As the Second Circuit has explained, "[f]or over a century, a mostly unbroken string of cases has applied federal law to disputes involving interstate air or water pollution." *City of New York*, 993 F.3d at 91 (collecting cases); *Illinois v. City of Milwaukee*, 406 U.S. at 103 ("When we deal with air and water in their ambient or interstate aspects," federal law controls); *Illinois v. City of Milwaukee*, 406 U.S. 91, 105, 107 & n.6 (1972) ("federal law governs" interstate water pollution); *Ouellette*, 479 U.S. at 492 ("[T]he control of interstate pollution is primarily a matter of federal law.").

66. Disputes over global greenhouse gas emissions call for a federal rule of decision with particular force. *City of New York*, 993 F.3d at 91–92. Federal law applies to such disputes because they "often implicate two federal interests that are incompatible with the application of state law: (i) the 'overriding . . . need for a uniform rule of decision' on matters influencing national energy and environmental policy, and (ii) 'basic interests of federalism.'" *Id.* at 91–92 (alteration in original). As Judge Stras recognized, federal law must apply to such disputes to avoid the conflicts that would otherwise occur if each State were permitted to impose laws on the same interstate greenhouse gas emissions. *Minnesota*, 63 F.4th at 718. Global greenhouse gas emissions, which "implicat[e] the conflicting rights of [s]tates [and] our relations with foreign nations," are "simply beyond the limits of state law." *City of New York*, 993 F.3d at 91–92 (alteration in original) (quoting *Tex. Indus.*, 451 U.S. at 641).

67. Minnesota's lawsuit is precluded under the U.S. Constitution because it seeks to use state law where federal law controls the rule of decision.

68. The United States is injured because, by usurping exclusive federal authority here, Minnesota is using its state lawsuit to "'effectively override . . . the policy choices made by' the federal government" described above, hindering its ability to speak with one voice in foreign affairs, for example. *Minnesota,* 63 F.4th at 719 (quoting *Ouellette*, 479 U.S. at 495).

69. By using state law to regulate global greenhouse gas emissions,

moreover, Minnesota is complicating energy policy and increasing energy costs nationwide. The financial burdens of the lawsuit on energy businesses increase the United States' costs for purchasing fuels and threaten revenue from federal leasing. In its parens patriae capacity, the United States seeks to protect its citizens from higher energy costs and economic disruption caused by Minnesota's overreach, which individual litigants cannot fully address due to the nationwide impact of Minnesota's lawsuit.

## COUNT II: Federal Preclusion Under the U.S. Constitution
### (Extraterritorial Regulation)

70.     The United States incorporates all allegations stated above.

71.     In addition to committing certain subjects—such as interstate and global air pollution—to exclusive federal control, there are "territorial limits" on "state authority under the Constitution's horizontal separation of powers." *Pork Producers*, 598 U.S. at 376 n.1. The Constitution's federalist structure prohibits a state from regulating conduct outside its borders. *See Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 14 (2025) ("State sovereign authority is bounded by the States' respective borders."); *Franchise Tax Bd. v. Hyatt*, 587 U.S. 230, 245 (2019) ("Each State's equal dignity and sovereignty under the Constitution implies certain constitutional limitations on the sovereignty of all of its sister States.") (cleaned up). This includes imposing liability for emissions of greenhouse gasses outside a State's borders. *Id.*

72.    The rule against extraterritorial regulation flows from the "horizontal separation of powers" and thus "inheres in [the Constitution's] structure." *Nat'l Pork Producers*, 598 U.S. at 370, 376 n.1; *Hyatt,* 587 U.S. at 247–48 (collecting "constitutional doctrines that are not spelled out in the Constitution" but are "historically rooted [and] embedded in the text and structure of the Constitution"). Under these principles, "a state is without power to exercise 'extraterritorial jurisdiction,' that is, to regulate and control activities wholly beyond its boundaries," *Watson v. Emps. Liab. Assurance Corp.*, 348 U.S. 66, 70–71 (1954), especially when a state wields its own law to "punish a defendant for conduct that may have been lawful where it occurred," *State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 421 (2003); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 (1996) ("[A] State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States.").

73.    Minnesota accuses national energy producers of "caus[ing] a substantial portion of *global* atmospheric greenhouse-gas concentrations, and the attendant historical, projected, and committed disruptions to the environment" that go with them. Complaint, Ex. A ¶ 175 (emphasis added); *see also id*. ¶ 7 ("[Minnesota] seeks to ensure that the parties who have profited from avoiding the consequences and costs of dealing with *global* warming . . . bear the costs of those impacts.") (emphasis added). Although disruptions from global effects

27

have allegedly led to a host of problems within Minnesota, they are by no means limited to the "effects of [local] emissions." *City of New York*, 993 F.3d at 92. Rather, Minnesota claims that the defendants encouraged the consumption of fossil fuels "both in *and outside of* Minnesota," Complaint, Ex. A ¶ 26 (emphasis added), meaning that it "intends to hold the [companies] liable, under [state] law, for the effects of emissions made around the globe," *City of New York*, 993 F.3d at 92; *see also Minnesota*, No. 20-cv-1636, Dkt. 67, Remand Hearing Tr. 10:8–14 (acknowledging that global greenhouse gas emissions cannot be isolated to Minnesota); *id* 62:5–10 (refusing to disclaim that it is imposing liability for out-of-state conduct).

74.    "Minnesota's end game is equally clear: change the [energy] companies' behavior on a global scale." *Minnesota*, 63 F.4th at 719. The "wide-ranging request for injunctive relief speaks for itself." *Id.*

75.    Minnesota's lawsuit thus violates the Constitution because it seeks to impose "liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them)," including legal activities in other States and in foreign countries. *City of New York*, 993 F.3d at 93; *see also supra* ¶ 24 (describing where a substantial portion of activities occur). "Such a sprawling" scope of relief "is simply beyond the limits of state law." *City of New York*, 993 F.3d at 92.

76.    The global scope of Minnesota's lawsuit unlawfully overreaches by

seeking to regulate conduct far beyond its territorial jurisdiction, contravening constitutional limits on state authority. *See Pork Producers,* 598 U.S. at 376 n.1 (A State may not "directly regulate[] out-of-state transactions by those with no connection to the State."); *Mallory v. Norfolk S. Ry. Co.,* 600 U.S. 122, 154–55, 154 (2023) (Alito, J., concurring in part and concurring in the judgment) (The Supreme Court has "long recognized that the Constitution restricts a State's power to reach out and regulate conduct that has little if any connection with the State's legitimate interests."). Put simply, Minnesota is imposing liability on extraterritorial activity and impermissibly "project[ing]" its "regulatory regime into the jurisdiction" of other States. *Healy v. Beer Inst. Inc.,* 491 U.S. 324, 337 (1989); *see Gore,* 517 U.S. at 571–72 ("[A] State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States.").

77. Even if one defendant listed in the Complaint has some contacts with Minnesota, such as in-state sales or operations, Minnesota's effort to impose liability or collect damages for out-of-state greenhouse gas emissions does not arise from or relate to those contacts exclusively, violating the requirement that a State's regulatory authority and police powers be limited to conduct with a substantial nexus to the State.

78. The United States is injured because, by usurping exclusive fed-

eral authority there, Minnesota is using its state lawsuit to "'effectively override . . . the policy choices made by' the federal government" described above. *Minnesota,* 63 F.4th at 719 (quoting *Ouellette,* 479 U.S. at 495). In so doing, Minnesota impedes the United States' ability to administer federal law and conduct foreign affairs.

79.     And if Minnesota is permitted to pursue its state-law claims, other States could pursue similar claims, leading to a chaotic "patchwork" of regulations that undermine the United States' national interest to effectively administer coherent national energy policy and regulate global greenhouse gas emissions. *City of New York*, 993 F.3d at 86.

80.     Moreover, by imposing liability on and regulating out-of-state conduct, Minnesota is causing "conflict" with States that do not want to burden energy producers with costs and regulations in the same way, requiring the United States to superintend this conflict. *Minnesota*, 63 F.4th at 718; *see* Iowa Code § 673B.2 (2026) (limiting liability for greenhouse gas emissions).

## COUNT III: Clean Air Act Preemption

81.     The United States incorporates all allegations stated above.

82.     The Supremacy Clause in Article VI of the U.S. Constitution declares: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land."

83.     State action is preempted under the Supremacy Clause when it

intrudes into a field exclusively occupied by federal law (field preemption) or when it conflicts with the text, structure, or objectives of federal law (conflict preemption). *City of Milwaukee v. Illinois and Michigan*, 451 U.S. at 316–17 (field preemption); *Hillsborough County v. Automated Medical Labs., Inc.*, 471 U.S. 707, 713 (1985) (conflict preemption).

84.   The Clean Air Act, 42 U.S.C. § 7401 *et seq.*, creates a comprehensive program for regulating air pollution in the United States and "displaces" the ability of States to regulate greenhouse gas emissions beyond their borders. *City of New York*, 993 F.3d at 96. The Clean Air Act improves the Nation's air quality by delegating authority to EPA alone to prescribe national standards for air pollutants. *See, e.g.*, 42 U.S.C. § 7411; *see also AEP*, 564 U.S. at 424–29 ("The critical point is that Congress delegated to EPA the decision whether and how to regulate carbon-dioxide emissions . . . the delegation is what displaces federal common law."); *City of New York*, 993 F.3d at 99 (noting that the Clean Air Act "anoints the EPA as the 'primary regulator of [domestic] greenhouse gas emissions'"). In fulfilling its statutory role to improve air quality, EPA works with States in a carefully calibrated cooperative federalism scheme, which includes critical components such as a permit system.

85.   The Clean Air Act's comprehensive framework, which includes specific provisions for regulating emissions from stationary and mobile sources (*see, e.g.*, 42 U.S.C. §§ 7410, 7411, 7521), preempts State attempts to regulate

out-of-state greenhouse gas emissions, including through lawsuits involving state-law claims. *See City of New York*, 993 F.3d at 90–100. This is because the Clean Air Act is the standard governing any claims involving interstate greenhouse gas emissions. Thus, because the Clean Air Act "provides a means to seek limits on emissions," there is no other "room for a parallel track" of regulation. *AEP*, 564 U.S. at 425.

86.   To permit Minnesota's lawsuit to proceed under state law would upset the careful balance the federal government struck in the Clean Air Act "between the prevention of global warming, a project that necessarily requires national standards and global participation, on the one hand, and energy production, economic growth, foreign policy, and national security, on the other." *City of New York*, 993 F.3d at 93. The United States is injured when it cannot fulfil this careful balance, as reflected in its energy policy described above.

87.   Moreover, Minnesota's lawsuit conflicts with the Clean Air Act's purposes and objectives by undermining the Clean Air Act's carefully calibrated cooperative federalism scheme. The Clean Air Act grants EPA broad authority to promulgate regulations based on its expert judgment, including whether to impose emissions standards for stationary sources under 42 U.S.C. § 7411 and for mobile sources under 42 U.S.C. § 7521, and it works with States to enforce those regulations. By seeking to impose retroactive liability for law-

ful conduct, Minnesota undermines EPA's regulatory choices and imposes penalties that Congress did not authorize. The United States suffers another injury when a State thwarts its ability to administer a statute.

88.    Minnesota seeks to regulate emissions that Congress and EPA have chosen not to regulate. Such parallel regulation interferes with and conflicts with federal law and policy.

89.    Minnesota's actions also undermine federal objectives by increasing energy costs and disrupting the national energy market, contrary to the Clean Air Act's integration with national energy policy. Insufficient energy production due to restrictive state policies threatens national security and economic prosperity. *See Declaring a National Energy Emergency*, § 1, 90 Fed. Reg. at 8434. By targeting major fossil fuel businesses, many of which operate on federal lands or supply federal agencies, Minnesota's actions raise costs for federal operations and consumers nationwide, obstructing the Clean Air Act's goal of balancing environmental protection with economic growth. *See* 42 U.S.C. § 7401(b)(1) (noting purpose includes protecting air quality "to promote the public health and welfare and the productive capacity of its population").

90.    Finally, if Minnesota is permitted to continue pursuing its lawsuit, as explained, other States will pursue similar actions, leading to a chaotic state of regulations that undermine the United States' interests and ability to carry out constitutional obligations. *City of New York,* 993 F.3d at 86*; see Hines*, 312

U.S. at 67 (state law preempted when it obstructs federal objectives). Such fragmentation would further frustrate Congress's intent for a unified federal approach to global air pollution enshrined in the Clean Air Act.

### COUNT IV: Foreign Affairs Preemption

91. The United States incorporates all allegations stated above.

92. The Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

93. Even aside from his military powers as the "Commander in Chief of the Army and Navy," U.S. Const. art. II, § 2, cl. 1, the Constitution vests broad responsibility for the conduct of foreign affairs in the President of the United States. The President has "Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." *Id.*, art. II, § 2, cl. 2. The President also "nominate[s], and by and with the Advice and Consent of the Senate, . . . appoint[s] Ambassadors, other public Ministers and Consuls." *Id.* The President "receive[s] Ambassadors and other public Ministers." *Id.*, art. II, § 3. And the Constitution authorizes the President to "take Care that the Laws be faithfully executed." *Id.* In short, "the supremacy of the national power in the general field of foreign affairs . . . is made

34

clear by the Constitution." *Hines*, 312 U.S. at 62.

94.    The Supreme Court interprets the provisions of the Constitution that vest authority over foreign affairs in the President to prohibit actions by States that lie outside their traditional areas of responsibility and instead interfere with the federal government's foreign policy, or otherwise have more than an incidental effect in conflict with foreign policy. *See Garamendi*, 539 U.S. at 418–20.

95.    Because Minnesota's lawsuit "seeks a global remedy for a global issue," it falls outside a traditional state interest. *Minnesota*, 63 F.4th at 717. The suit seeks to regulate "a uniquely international problem" that is "not well-suited to the application of state law." *City of New York*, 993 F.3d at 85–86.

96.    The lawsuit also interferes with the United States' foreign policies or otherwise has more than an incidental effect in conflict with our foreign policy. In January 2026, for example, the President issued a memorandum stating that it is contrary to the interests of the United States to remain a member of, participate in, or otherwise provide support to" the Framework Convention.

97.    The withdrawal from the Framework Convention, in addition to other decisions to abstain from agreements aimed at curbing energy production and use, reflects a conscious policy that such agreements are contrary to the United States' interests. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 28-29 (2015) (decision to "withhold recognition" from foreign sovereigns

35

reflects the Executive's foreign policy). By attempting to impose liability based on greenhouse gas emissions purportedly attributable to worldwide fossil fuel extraction and refining, however, Minnesota directly contradicts the United States' foreign policy position.

98.    In contradicting the United States' foreign policy, Minnesota undermines the United States' ability to speak with one voice on global matters. Minnesota's ongoing efforts to impose state-law liability for global greenhouse gas emissions further complicates the United States' relations with foreign countries concerning regulation of those emissions, trade policy, and exports and imports of fossil fuels.

99.    No claim in this complaint challenges Minnesota's authority to enact local regulations that incidentally affect international corporations, *e.g.*, environmental standards for *in-state* operations. Instead, the United States seeks to prevent Minnesota from pursuing its state-law claims because its imposition of liability for global greenhouse gas emissions directly intrudes on the United States' exclusive authority.

## COUNT V: Violation of the Commerce Clause

100.    The United States incorporates all allegations stated above.

101.    The Constitution gives the U.S. Congress "Power . . . [t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3.

36

102.   State laws that discriminate against interstate commerce are unconstitutional, even in the absence of federal legislation regulating the activity. *See Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995).

103.   A state law also violates the Commerce Clause if it has "the practical effect of extraterritorial control" over "interstate commerce." *Ass'n for Accessible Meds. v. Ellison*, 140 F.4th 957, 960 (8th Cir. 2025). A state may not "directly regulate transactions which take place wholly outside the State." *Id.* at 961 (cleaned up). In such cases, "discrimination is not required." *Id.*

104.   Minnesota's lawsuit discriminates against interstate commerce facially, in practical effect, and in purpose by targeting commercial activity—*e.g.*, fossil fuel extraction and refining—that occurs primarily if not exclusively in States other than Minnesota, including in Delaware, Kansas, and Texas. *See supra* ¶ 24 (describing where energy producers and their activities are located).

105.   Because Minnesota's lawsuit discriminates against interstate commerce, strict scrutiny applies, and its lawsuit can be pursued only if "it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 278 (1988). But Minnesota has no legitimate local public interest in discriminating against interstate commerce, as its lawsuit "seeks a global remedy for a global issue." *Minnesota*, 63 F.4th at 717.

106.   Moreover, even if Minnesota's lawsuit did not facially discriminate

against interstate commerce and did not have nondiscriminatory alternatives, it would still violate the Commerce Clause under the balancing test established in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Under *Pike*, a state law that regulates evenhandedly and has only incidental effects on interstate commerce is unconstitutional if the burden imposed on interstate commerce is "clearly excessive in relation to the putative local benefits." *Id.*

107.  Minnesota's lawsuit also exerts direct extraterritorial control over commerce outside Minnesota's borders. That violates the dormant Commerce Clause. *See Ass'n for Accessible Meds.*, 140 F.4th at 960-61.

108.  By targeting fossil fuel businesses for extraction and refining activities and greenhouse gas emissions occurring primarily in other States and foreign countries, Minnesota seeks to disrupt the national energy market.

109.  Minnesota's request for damages also increases energy costs for consumers and businesses nationwide, as these costs are passed through the interstate market. The potential for other States to take similar actions creates a risk of regulatory fragmentation, undermining the uniform national market. Minnesota imposes a substantial and undue burden on interstate commerce that is clearly excessive in relation to any putative local benefit.

### PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests that this Court:

A.   Declare *Minnesota*, No. 62-cv-20-3837 (Minn. Dist. Ct.) (Ex. A), unconstitutional and unlawful under 28 U.S.C. § 2201;

B.   Preliminarily and permanently enjoin Defendants from taking any actions to implement, pursue, enforce, attempt to enforce, threaten to enforce, or prosecute *Minnesota*, No. 62-cv-20-3837 (Minn. Dist. Ct.) (Ex. A);

C.   Award the United States its costs and disbursements here; and

D.   Award any other relief that the Court may deem just and proper.

Date: May 4, 2026

Respectfully submitted,

DANIEL N. ROSEN
United States Attorney
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

STANLEY E. WOODWARD JR.
United States Associate Attorney General

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

ROBERT N. STANDER
Deputy Assistant Attorney General

 /s/ John Adams
John K. Adams
Chief of Staff & Senior Counsel
Michael Weisbuch
Senior Counsel
Ian Swenson
Counsel
Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, D.C. 20530
Telephone: (202) 514-2701
Email John.Adams3@usdoj.gov