**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 26-cv-02456-SRN-DLM |
| STATE OF MINNESOTA and | ) | |
| KEITH ELLISON, in his official capacity | ) | **Expedited Handling** |
| as Minnesota Attorney General | ) | **Requested** |
| | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

_____)

**MEMORANDUM IN SUPPORT OF
MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................ 3

    I.    Climate Change Lawsuits Seek to Regulate Global Greenhouse Gas
        Emissions Under State Law in State Court ............................................. 3

    II.   Although Minnesota Has Minimal Fossil Fuel Activities, It Filed a
        Climate Change Suit to Regulate Global Greenhouse Gases ................ 4

    III. The United States' Interests ................................................................. 7

STANDARD OF REVIEW ................................................................................ 9

ARGUMENT ................................................................................................... 10

    I.    The United States Has Standing to Vindicate the Supremacy of
        Federal Law and Redress Its Injuries .................................................. 10

    II.   The United States is Entitled to a Preliminary Injunction .................. 15

        A. The United States is Likely to Succeed on the Merits ..................... 15

            1.    The Constitution precludes state-imposed liability for
                subjects   implicating "uniquely federal interests,"
                such as global pollution ............................................................. 16

            2.    The Constitution's horizontal separation of powers precludes
                States from projecting their own regulatory actions into
                other jurisdictions ...................................................................... 19

            3.    The Clean Air Act preempts Minnesota's lawsuit ..................... 23

            4.    The Foreign Affairs doctrine precludes Minnesota's lawsuit ... 25

            5.    The dormant Commerce Clause precludes Minnesota's
                lawsuit ......................................................................................... 31

        B. The United States Has Suffered, and Will Continue to Suffer,
           Irreparable Harm Absent a Preliminary Injunction ........................ 32

        C. The Equities and the Public Interest Favor the United States ....... 34

CONCLUSION ................................................................................................ 36

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Abbott v. Perez,*
   585 U.S. 579 (2018) .............................................................................. 3, 33

*Am. Elec. Power Co. (AEP) v. Connecticut,*
   564 U.S. 410 (2011) .....................................................................passim

*Am. Ins. Ass'n v. Garamendi,*
   539 U.S. 396 (2003) ............................................................................ 26, 29

*Arbor Pharms., LLC v. ANI Pharms., Inc.,*
   2018 WL 3677923 (D. Minn. Aug. 2, 2018) ................................................... 5

*Arizona v. United States,*
   567 U.S. 387 (2012) .....................................................................passim

*Ass'n for Accessible Meds. v. Ellison,*
   140 F.4th 957 (8th Cir. 2025).................................................................... 32

*BMW of N. Am. v. Gore,*
   517 U.S. 559 (1996) ................................................................................ 20

*City of Charleston v. Brabham Oil Co.,*
   2025 WL 2269770 (S.C. Ct. Com. Pl. Aug. 6, 2025)................................ 18,19

*City of New York v. Chevron Corp.,*
   993 F.3d 81 (2d Cir. 2021).............................................................passim

*Crosby v. Nat'l Foreign Trade Council,*
   530 U.S. 363 (2000) ................................................................................ 28

*Daimler Truck N. Am. LLC v. Cal. Air Res. Bd.,*
   2025 WL 3049944 (E.D. Cal. Oct. 31, 2025)............................................. 3, 37

*Dataphase Sys., Inc. v. C L Sys., Inc,*
   640 F.2d 109 (8th Cir. 1981) .................................................................... 10

*Dep't of Homeland Sec. v. D.V.D.*,
  145 S. Ct. 2153 (Mem) ................................................................................. 33

*Edwards v. Monsanto Co.*,
  2023 WL 3160857 (E.D. Mo. Apr. 28, 2023) .................................................... 5

*Fed. Election Comm'n v. Cruz*,
  596 U.S. 289 (2022) ..................................................................................... 10

*Franchise Tax Bd. v. Hyatt*,
  587 U.S. 230 (2019) ................................................................................. 19, 20

*Healy v. Beer Inst., Inc.*,
  491 U.S. 324 (1989) ..................................................................................... 20

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) ....................................................................................... 26

*Hollingsworth v. Perry*,
  558 U.S. 183 (2010) ..................................................................................... 33

*Illinois v. City of Milwaukee*,
  406 U.S. 91 (1972) ....................................................................................... 17

*In re Debs*,
  158 U.S. 564 (1895) ..................................................................................... 14

*In re Grand Jury Subpoena*,
  866 F.3d 231 (5th Cir. 2017) ........................................................................ 37

*Int'l Paper Co. v. Ouellette*,
  479 U.S. 481 (1987) ................................................................................. 16, 17

*Japan Line, Ltd. v. County of Los Angeles*,
  441 U.S. 434 (1979) ..................................................................................... 29

*KalshiEX LLC v. Johnson*, --- F. Supp. 3d ---,
  2026 WL 976055 (D. Ariz. Apr. 10, 2026) ................................................. 10, 33

*La Union Pueblo Entero (LUPE) v. Abbott*,
  604 F. Supp. 3d 512 (W.D. Tex. 2022) ........................................................... 11

iv

*Leiter Mins., Inc. v. United States*,
　352 U.S. 220 (1957) ............................................................................... 36, 37

*Mallory v. Norfolk S. Ry. Co.*,
　600 U.S. 122 (2023) ...................................................................................... 20

*Maryland v. King*,
　567 U.S. 1301 (2012) .................................................................................... 33

*Massachusetts v. EPA*,
　549 U.S. 497 (2007) ...................................................................................... 35

*Massachusetts v. Mellon*,
　262 U.S. 447 (1923) ...................................................................................... 15

*Minnesota by Ellison v. Am. Petroleum Instit.*,
　63 F.4th 703 (8th Cir. 2023)..................................................................passim

*Minnesota v. Am Petroleum Instit., et al.*,
　No. 62-cv-20-3837 (Minn. Dist. Ct.)......................................................passim

*Missourians for Fiscal Responsibility v. Klahr*,
　830 F.3d 789 (8th Cir. 2016) .......................................................................... 5

*Movsesian v. Victoria Versicherung AG*,
　670 F.3d 1067 (9th Cir. 2012) ................................................................ 26, 28

*Myers v. United States*,
　272 U.S. 52 (1926) ........................................................................................ 14

*Nat'l Pork Producers Council v. Ross*,
　598 U.S. 356 (2023) ...............................................................................passim

*New Energy Co. of Indiana v. Limbach*,
　486 U.S. 269 (1988) ................................................................................ 31, 32

*Nken v. Holder*,
　556 U.S. 418 (2009) ................................................................................ 10, 34

*Noem v. Doe,*
  145 S. Ct. 1524 (Mem) ................................................................................ 33

*Noem v. Nat'l TPS All.,*
  145 S. Ct. 2728 (Mem) ................................................................................ 33

*Ok. Tax Comm'n v. Jefferson Lines, Inc.,*
  514 U.S. 175  (1995) ................................................................................... 31

*Pavek v. Simon,*
  467 F. Supp. 3d 718 (D. Minn. 2020) .......................................................... 36

*Safe Streets Alliance v. Hickenlooper,*
  859 F.3d 865 (10th Cir. 2017) ................................................................ 10, 11

*Sanitary Dist. of Chicago v. United States,*
  266 U.S. 405 (1925) .................................................................................... 15

*Sleep Number Corp. v. Young,*
  532 F. Supp. 3d 793 (D. Minn. 2021) .......................................................... 15

*Sprietsma v. Mercury Marine,*
  537 U.S. 51 (2002) ...................................................................................... 27

*State Farm Mut. Auto. Ins. v. Campbell,*
  538 U.S. 408 (2003) .................................................................................... 20

*Tex. Indus., Inc. v. Radcliff Materials, Inc.,*
  451 U.S. 630 (1981) .................................................................................... 16

*Tex. Midstream Gas Servs., LLC v. City of Grand Prairie,*
  608 F.3d 200 (5th Cir. 2010) ....................................................................... 32

*Texas v. Yellen,*
  105 F.4th 755 (5th Cir. 2024) ...................................................................... 33

*Transportation Div. of the Int'l Ass'n of Sheet Metal, Air, Rail & Transp.
  Workers v. Fed. R.R. Admin.,*
  10 F.4th 869 (D.C. Cir. 2021) ...................................................................... 35

*Trump v. CASA, Inc.,*
606 U.S. 831 (2025) ................................................................................ 34

*U.H.A. v. Bondi,*
--- F.Supp.3d ---, 2026 WL 558824 (D. Minn. Feb. 27, 2026) ...................... 10

*United States v. Alabama,*
691 F.3d 1269 (11th Cir. 2012) ..................................................................... 11

*United States v. Arizona,*
641 F.3d 339 (9th Cir. 2011) .................................................................. 3, 33

*United States v. California,*
921 F.3d 865 (9th Cir. 2019) ...................................................................... 34

*United States v. City of Jackson, Miss.,*
318 F.2d 1 (5th Cir. 1963) ..................................................................... 14, 15

*United States v. Idaho,*
623 F. Supp. 3d 1096 (D. Idaho 2022) ......................................................... 11

*United States v. Missouri,*
114 F.4th 980 (8th Cir. 2024) ............................................................. 2, 10, 12

*United States v. Oakland Cannabis Buyers' Coop.,*
532 U.S. 483 (2001) .................................................................................. 34

*United States v. Texas,*
557 F.Supp.3d 810 (W.D. Tex. 2021) ............................................................ 33

*United States v. Texas,*
566 F. Supp. 3d 605 (W.D. Tex. 2021) ......................................................... 15

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens,*
529 U.S. 765 (2000) .................................................................................. 11

*Von Saher v. Norton Simon Museum of Art at Pasadena,*
592 F.3d 954 (9th Cir. 2010) ...................................................................... 30

*Watkins Inc. v. Lewis,*
346 F.3d 841 (8th Cir. 2003) ...................................................................... 10

*Watson v. Emps. Liab. Assurance Corp.*,
  348 U.S. 66 (1954) ...................................................................... 20

*Winter v. Nat'l Resources Def. Council, Inc.*,
  555 U.S. 7 (2008) ...................................................................... 32

*Young v. Masci*,
  289 U.S. 253 (1933) .................................................................. 21

*Zschernig v. Miller*,
  389 U.S. 429 (1968) .................................................................. 30

**Statutes**

42 U.S.C. § 7411(a)(1) ................................................................ 13

**Other Authorities**

U.S. Constitution .................................................................passim

*Declaring a National Energy Emergency,*
  Exec. Order No. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025) ...................... 8, 15

*Protecting American Energy From State Overreach,*
  Exec. Order No. 14260, 90 Fed. Reg. 15513 (Apr. 8, 2025) ................ 8, 14, 35

*Unleashing American Energy,*
  Exec. Order No. 14154, 90 Fed. Reg. 8353 (Jan. 20, 2025) ...................... 8, 9

## INTRODUCTION

This case "presents 'a clash over [who] regulat[es] worldwide greenhouse gas emissions.'" *Minnesota by Ellison v. Am. Petroleum Instit.*, 63 F.4th 703, 717 (8th Cir. 2023) (Stras, J., concurring). Minnesota unilaterally claimed that authority when it sued national energy producers in state court for alleged violations of state law. Through its lawsuit, "Minnesota does not even try" to "hid[e] the obvious": "it seeks a global remedy for a global issue" involving global "climate change." *Id.* at 717. And there is no mistaking that Minnesota is using its state-law claims to "effectively regulate" that global issue. *City of New York v. Chevron Corp.*, 993 F.3d 81, 92–93 (2d Cir. 2021) (holding that the city's state-law claims—an effective form of "regulation"—were preempted).

But federal law, not state law, exclusively governs regulation of global greenhouse gas emissions. State law is preempted in this area due to the "'overriding need for a uniform rule of decision' on matters influencing national energy and environmental policy" and the "basic interests of federalism" enshrined in our Constitution. *Id.* at 91–92 (cleaned up). Minnesota's state-law claims are thus preempted, and its reactivated litigation in state court is currently thwarting the United States' exclusive authority to regulate interstate pollution, administer federal law, and conduct foreign affairs. Accordingly, the United States moves on an expedited basis for a preliminary injunction to vindicate the supremacy of federal law and to redress its irreparable injuries.

1

The United States is likely to succeed on the merits. As Judge Stras explained in an opinion discussing the very lawsuit the United States challenges here, Minnesota's suit unlawfully "attempt[s] to set national energy policy through its own consumer-protection laws." *Minnesota*, 63 F.4th at 717–19. The problem, of course, is that "federal law [] reigns supreme" in disputes over international pollution, as many courts have held. *See, e.g., City of New York*, 993 F.3d 81. The United States has thus shown that it has an overwhelming likelihood of prevailing on all its claims: (1) the Constitution precludes state-imposed liability for subjects implicating uniquely federal interests, (2) Minnesota's lawsuit exceeds constitutional limits on extraterritorial regulation, and (3)–(5) Minnesota's lawsuit is preempted by the Clean Air Act, the Foreign Affairs doctrine, and the dormant Commerce Clause. At bottom, Minnesota's "[a]rtful pleading cannot transform [its] complaint into anything other than" an attempt to regulate global greenhouse gas emissions. *City of New York*, 993 F.3d at 91–93. Longstanding federal law forbids such regulation.

Absent injunctive relief, the United States suffers irreparable harm. The United States is injured when States usurp exclusive federal authority, *Arizona v. United States*, 567 U.S. 387 (2012), or when they interfere with its administration of federal law or conduct in foreign affairs, *United States v. Missouri*, 114 F.4th 980, 984 (8th Cir. 2024). As described in the declarations of U.S. Environmental Protection Agency (EPA) Assistant Administrator Aaron

2

Szabo and U.S. Deputy Secretary of State Christopher Landau, Minnesota is interfering with the United States' sovereign duties to administer the Clean Air Act and conduct foreign affairs. Szabo Decl. ¶¶ 17–27; Landau Decl. ¶¶ 16–23. The "inability to enforce its duly enacted [law] clearly inflicts irreparable harm on" the United States. *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018).

Finally, the equities and the public interest favor granting the motion. This action seeks to protect the interests of the United States as a whole, so the public interest will be protected if this Court grants the motion. And the United States' "interest of preserving the Supremacy Clause is paramount." *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011) (cleaned up), *aff'd in part, rev'd in part and remanded,* 567 U.S. 387 (2012).

For these reasons and more, this Court should preliminarily enjoin Minnesota from prosecuting its state court lawsuit that attempts to regulate global greenhouse gas emissions. *See, e.g.*, *Daimler Truck N. Am. LLC v. Cal. Air Res. Bd.*, 2025 WL 3049944, at *17–18 & n.22 (E.D. Cal. Oct. 31, 2025) (enjoining agency from enforcing local emissions standards through a state court lawsuit).

## BACKGROUND

### I.    Climate Change Lawsuits Seek to Regulate Global Greenhouse Gas Emissions Under State Law in State Court

Before 2020, local efforts to regulate global greenhouse gas emissions or out-of-state conduct through state-law claims were rare. By many estimates,

less than a dozen States sought to regulate such emissions or conduct through climate change lawsuits. *See* Compl. ¶ 45. Since 2020, dozens of additional cases have been filed, with novel legal theories regularly emerging. *Id.* ¶ 46.

The plaintiffs in these cases assert materially identical allegations that the worldwide production, sale, or promotion of fossil fuels caused greenhouse gas emissions and thereby contributed to global climate change. The lawsuits also share a common feature: the plaintiffs use state law (*e.g.*, consumer-protection statutes) to bring claims against energy producers rather than using federal law. By framing their climate change lawsuits under state law, the plaintiffs try to sidestep federal law and federal preemption.

Yet "[t]here is no hiding the obvious" with these lawsuits and the state-law claims on which they are based. *Minnesota*, 63 F.4th at 717. They seek to change energy producers' "behavior on a global scale." *Id.* at 719. Consequently, though these lawsuits "would regulate cross-border emissions in an indirect and roundabout manner, [they] would regulate them nonetheless"—as a "regulation can be effectively exerted through an award of damages" or the mere risk of liability. *City of New York*, 993 F.3d at 92–93.

## II. Although Minnesota Has Minimal Fossil Fuel Activities, It Filed a Climate Change Suit to Regulate Global Greenhouse Gases

"Minnesota has no fossil fuel reserves or production." U.S. Energy Information Administration, U.S. Dep't of Energy, *Minnesota* (Oct. 16, 2025),

4

https://perma.cc/A9D5-F9S9.[1] It also does not have: "any crude oil reserves or production," "any natural gas reserves or production," or "any operating coal mines or economically recoverable reserves." *Id*. Rather than promote fossil fuel use, Minnesota uses "significant renewable resources." *Id*.

Notwithstanding its minimal fossil fuel activities, Minnesota sued national energy companies in state court for alleged state-law violations. *See Minnesota v. Am. Petroleum Instit., et al.*, No. 62-cv-20-3837 (Minn. Dist. Ct.), Index 1 (Ex. A). The defendants it seeks to regulate include a trade association and national energy producers headquartered and conducting principal activities outside of Minnesota. *See* Compl. ¶ 24 (identifying places of incorporation and principal places of business in Delaware, Kansas, New Jersey, Texas, Washington, D.C.); *see also, e.g.*, Exxon Mobil Corporation 10-K at 21–22 (2025) (describing "global network"), *available at* https://perma.cc/YX2U-KVYQ.[2] Taking "aim at the production and sale of fossil fuels worldwide," *Min-*

---

[1] Courts may take "judicial notice of the information contained on [a government] website." *Arbor Pharms., LLC v. ANI Pharms., Inc.*, 2018 WL 3677923, at *4 n.3 (D. Minn. Aug. 2, 2018) (citing *Missourians for Fiscal Responsibility v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016)); *see also* Compl. n.2 (describing U.S. Energy Information Administration).

[2] Courts may take judicial notice of the places of incorporation and principal places of business. *See Edwards v. Monsanto Co.*, 2023 WL 3160857, at *1 n.1 (E.D. Mo. Apr. 28, 2023) (judicial notice of place of incorporation and principal place of business); *see also supra* n.1 (judicial notice for government website).

5

*nesota*, 63 F.4th at 717, the complaint asserts five state-law statutory and common-law claims related to fraud and misrepresentation, Ex. A ¶¶ 184–242.

In support of its claims, Minnesota alleges that "energy production has 'caused a substantial portion of global atmospheric greenhouse-gas concentrations.'" *Minnesota*, 63 F.4th at 717 (citing Ex. A ¶ 175). "Those gases," Minnesota contends, have resulted in "climate change"—"a label that appears in the complaint over 200 times." *Id.* Minnesota seeks "ambitious" relief: "a far-reaching injunction, restitution, and disgorgement of 'all profits made as a result of the companies' unlawful conduct.'" *Id.* (describing Ex. A ¶¶ 243–51). Minnesota's lawsuit "effectively regulate[s]" the energy "[p]roducers' behavior far beyond [its] borders." *City of New York*, 993 F.3d at 92.

Shortly after Minnesota sued in 2020, the defendants removed the case to federal court, and Minnesota moved to remand. *See* Compl. ¶¶ 29–31 (procedural history). At the hearing on its motion, Minnesota conceded that global greenhouse gas emissions cannot be isolated to Minnesota. *See Minnesota*, No. 20-cv-1636, Dkt. 67, Remand Hearing Tr. 10:8–14 (D. Minn. Jan. 19, 2021) (conceding that "greenhouse gases mix in the atmosphere" and that "[c]limate change is a global phenomenon, and so you can't separate out necessarily how much climate change has worsened in Minnesota versus Wisconsin, for example"). Minnesota also declined to disclaim that it is seeking relief for lawful global greenhouse gas emissions. *See, e.g.*, *id.* at 62:5–10. The district court

6

granted the motion and remanded the case. Compl. ¶ 32.

In March 2023, the Eighth Circuit affirmed the remand order, concluding that Minnesota's state-law claims are not removable. *Minnesota*, 63 F.4th at 717; *see also City of New York*, 993 F.3d at 93–94 (explaining the "heightened standard unique to the removability inquiry" regarding whether an anticipated defense creates federal-question jurisdiction under 28 U.S.C. § 1331). In June 2024, after remand, the defendants moved to dismiss the complaint on multiple grounds. The state court denied the motion, after which the defendants appealed certain (automatically appealable) issues. *See* Compl. ¶¶ 35–42. The state court granted a stay in June 2025 pending appeal. *Id.* ¶ 39.

Due to the stay, Minnesota could not regulate the energy producers' behavior or conduct beyond its borders. Nor could it try to "'override the policy choices made by' the federal government." *Minnesota*, 63 F.4th at 719.

On April 15, 2026, the defendants exhausted their appeals when the Minnesota Supreme Court denied their petitions for review. Compl. ¶ 41. On May 4, the stay dissolved. *Id.* ¶ 43. As a result, Minnesota is back regulating global greenhouse gas emissions and imposing its energy policies on the nation.

### III.    The United States' Interests

On April 8, 2025—the same day the energy companies moved for a stay in their state court case, *see* Compl. ¶ 38—the President issued an executive order for the United States Attorney General to "take all appropriate action to

stop" the continuation of lawsuits filed by States seeking to "dictate national energy policy." *See Protecting American Energy From State Overreach*, Exec. Order No. 14260, § 1, 90 Fed. Reg. 15513, 15513 (Apr. 8, 2025). As the President explained, "American energy dominance is threatened when State and local governments seek to regulate energy beyond their constitutional or statutory authorities." *Id.* When States "target or discriminate against out-of-State energy producers by imposing significant barriers to interstate and international trade," for example, "American energy suffers." *Id.* Such lawsuits also "weaken our national security." *Id.*

The United States' interests enshrined in this executive order is consistent with other recent directives issued by the President to unleash American energy. *See, e.g.*, *Declaring a National Energy Emergency*, Exec. Order No. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025); *Unleashing American Energy*, Exec. Order No. 14154, 90 Fed. Reg. 8353 (Jan. 20, 2025). Such policies support an abundant supply of reliable energy necessary for our economic prosperity, national security, and military readiness. *See, e.g.*, *id.* § 2.

Such policies are also essential to the United States' foreign policy. Congress directed the Executive Branch to develop a "coordinated national policy on global climate change" through the Global Climate Protection Act. Compl. ¶ 55. The federal government has been carefully coordinating and refining that

8

policy for decades, including by rejecting restrictive measures that hamper economic growth, raise consumer prices, or inhibit energy production, such as through attempts to impose liability for the consequences of greenhouse gas emissions. *See id.* ¶¶ 51–60. Absent a unified federal policy, States could implement their own liability schemes, which could risk "upsetting the careful balance that has been struck between the prevention of global warming, a project that necessarily requires national standards and global participation, on the one hand, and energy production, economic growth, foreign policy, and national security, on the other." *City of New York*, 993 F.3d at 93.

In January 2026, the President declared that "it is contrary to the interests of the United States to remain a member of, participate in, or otherwise provide support to" the United Nations Framework Convention on Climate Change. *See* Compl. ¶ 60. So the United States deposited a notification of withdrawal from the Framework Convention. The withdrawal reflects a conscious national policy of promoting American interests in an abundant, reliable energy supply. Such interests include ceasing participation in international forums or agreements that substantially curb domestic energy production or use.

## STANDARD OF REVIEW

Courts consider four factors in deciding a motion for a preliminary injunction: (1) the likelihood of success on the merits; (2) the threat of irreparable harm in the absence of relief; (3) the balance between that harm and the harm

9

that the relief would cause to the other litigants; and (4) the public interest. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003); *accord Dataphase Sys., Inc. v. C L Sys., Inc*, 640 F.2d 109 (8th Cir. 1981) (en banc) (listing the *Dataphase* factors). For the first factor, "the question is not whether the movant has 'proved a greater than fifty per cent likelihood that [it] will prevail,' but whether any of [its] claims provide a 'fair ground for litigation.'" *U.H.A. v. Bondi*, --- F.Supp.3d ---, 2026 WL 558824, at *9 (D. Minn. Feb. 27, 2026) (citations omitted and cleaned up). The movant must show that it has a "'fair chance of prevailing'" on its claims, with a "'fair chance' meaning something less than fifty percent." *Id.* The last two factors merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I. The United States Has Standing to Vindicate the Supremacy of Federal Law and Redress Its Injuries

Article III standing requires injury in fact, traceability, and redressability. *Missouri*, 114 F.4th at 984. When considering standing, courts must "accept as valid" the merits of the claim. *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 298 (2022). For two reasons, "the [United States] has standing to sue to enjoin enforcement of preempted state laws." *KalshiEX LLC v. Johnson*, --- F. Supp. 3d ---, 2026 WL 976055, at *1 (D. Ariz. Apr. 10, 2026) (collecting cases); *see also Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 898 (10th Cir.

10

2017) ("The Supreme Court has reaffirmed time and again that the United States is empowered to enforce the supremacy of federal law against preempted State action, and that it may obtain an injunction to that effect.").

***Sovereign Injury.*** "It is beyond doubt" that a complaint "asserts an injury to the United States" if it alleges an "injury to [U.S.] sovereignty arising from violation of its laws." *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000). "When state governments enact laws that impugn the United States' sovereignty, a personal injury to the United States arises." *La Union del Pueblo Entero (LUPE) v. Abbott*, 604 F. Supp. 3d 512, 527 (W.D. Tex. 2022). Courts thus hold that "the United States' sovereign interests are harmed when its laws are violated." *United States v. Idaho*, 623 F. Supp. 3d 1096, 1107 (D. Idaho 2022). That is especially true when a "domain of federal authority," such as global pollution, is "undermined by impermissible state regulation[]." *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012).

Here, Minnesota is using state-law claims in state court to "regulat[e] worldwide greenhouse gas emissions." *Minnesota*, 63 F.4th at 717. But "federal law . . . reigns supreme" in disputes involving global greenhouse gas emissions. *Id.* The usurpation of exclusive federal authority to regulate global greenhouse gases—*i.e.,* the "clash over [who] regulat[es] worldwide greenhouse gas emissions," *id.*—is itself "a concrete harm to [the United States'] sovereignty," *LUPE*, 604 F. Supp. 3d at 526. And declaratory and injunctive relief from this

11

Court will fully redress that harm. That is sufficient for standing.

But there is more. Minnesota's overreach impedes the United States' ability to administer federal law. *See Missouri*, 114 F.4th at 984 ("Interference with the federal government's interest in enforcing federal law is sufficient to establish" injury.). As EPA Assistant Administrator Szabo attests, "EPA is experiencing adverse effects due to the uncertainty caused by Minnesota's lawsuit which negatively impacts EPA's ability to carry out its statutory functions," including "to (1) provide certainty as the exclusive regulator [of greenhouse gas emissions] at the national level; (2) develop standards that accurately reflect relevant statutory factors and purposes; and (3) administer statutory programs," *e.g.*, the renewable fuel standards program. Szabo Decl. ¶ 18.

EPA, for example, must "consider the cost and feasibility of potential systems of emission control when promulgating and revising" emission guidelines or calculating "lead time, compliance cost, and the availability of requisite technology" for new motor vehicles. *Id*. ¶ 23. "By threatening potentially hundreds of millions (or even billions) of dollars in additional liability for the oil and gas sector, a regulated source category under [the Act], Minnesota's lawsuit interferes with EPA's ability to assess the sector's capacity to bear the costs of additional controls" or to "evaluate the future market for vehicles." *Id*. ¶ 24. Such significant liability further undermines EPA's ability to carefully balance national interests to obtain an affordable and reliable energy supply

12

when regulating greenhouse gas emissions. *See, e.g.*, 42 U.S.C. § 7411(a)(1) (requiring stationary source emission standards to reflect "the cost of achieving such [emissions] reduction and any nonair quality health and environmental impact and energy requirements"); *Am. Elec. Power Co. (AEP) v. Connecticut*, 564 U.S. 410, 427 (2011) (explaining that "the environmental benefit potentially achievable" by regulation must be weighed against "our Nation's energy needs and the possibility of economic disruption").

Minnesota also injures the United States by obstructing another sovereign duty: foreign affairs. As Deputy Secretary of State Landau describes, Minnesota stymies the United States' foreign policy goals by seeking to regulate a global issue. *See* Landau Decl. ¶¶ 16–23. For example, Minnesota's lawsuit directly conflicts with U.S. foreign policy on how to regulate greenhouse gas emissions, as evidenced by the United States' withdrawal from the Paris Agreement and its notice of withdrawal from the Framework Convention. *Id.* ¶ 19. Likewise, Minnesota's lawsuit seeks to impose the very type of liability and compensation scheme that the United States has opposed for decades internationally. *Id.* ¶ 18. The lawsuit also risks friction in bilateral relations with foreign countries where defendant energy producers have substantial operations. *Id.* ¶ 21; *see also supra* p.5 (identifying "global network" for Exxon Mobil Corporation). The lawsuit thus exposes American fossil fuel producers operating abroad to retaliation. Landau Decl. ¶ 21. All these effects limit the United

13

States' ability to speak with one voice internationally. *Id.* ¶ 22.

Finally, Minnesota is attempting "to set national energy policy through its own consumer-protection laws" in a manner that "would 'effectively override the policy choices made by' the federal government." *Minnesota*, 63 F.4th at 719. But the United States has the constitutional and statutory prerogative to set nationwide energy policy, because the President holds "the mandate of the people to exercise his executive power." *Myers v. United States*, 272 U.S. 52, 123 (1926). The Executive Branch is responsible for carrying out his policies. And his policies could not be clearer: "[a]n affordable and reliable domestic energy supply" is "essential to the national and economic security of the United States, as well as our foreign policy." Exec. Order No. 14260, § 1; *accord* Landau Decl., ¶ 17. State climate change suits, like the one Minnesota is pursuing, are "irreconcilable with [the] Administration's objective" to support economic prosperity, military readiness, and national security. *Id*. The United States is injured when a State attempts to override its policy goals.

***General Welfare and Parens Patriae.*** Separately, the United States has "standing in court" to sue for "injury to the general welfare." *In re Debs*, 158 U.S. 564, 584 (1895). "When a State . . . takes action motivated by a policy which collides with national policy as embodied in the Constitution, the interest of the United States 'to promote the interest of all' gives it standing to challenge the State in the courts." *United States v. City of Jackson, Miss.,* 318 F.2d

14

1, 9 (5th Cir. 1963); *accord Massachusetts v. Mellon*, 262 U.S. 447, 486 (1923) ("[T]he United States . . . represents [the American People] as parens patriae").

The United States alleges injury to the national energy economy and its consumers through an "obstruction to interstate and foreign commerce." *Sanitary Dist. of Chicago v. United States*, 266 U.S. 405, 425-426 (1925). The President has declared an energy emergency, concluding that "insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy." Exec. Order No. 14156, § 1. For reasons just explained, Minnesota's lawsuit threatens these interests, thereby creating unnecessary "conflict" among the States and within interstate commerce. *United States v. Texas*, 566 F. Supp. 3d 605, 640 (W.D. Tex. 2021) ("*Debs* . . . offers the United States standing when there are obstructions to interstate commerce.").

## II.   The United States is Entitled to a Preliminary Injunction

### A. The United States is Likely to Succeed on the Merits

The Supremacy Clause declares that the Constitution and the "Laws of the United States" "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. "[S]tate laws are pre-empted when they conflict with federal law." *Arizona*, 567 U.S. at 399. Though the United States "only needs to establish that it is likely to succeed on the merits of one of its claims," it is likely to succeed on all five. *Sleep No. Corp. v. Young*, 532 F. Supp. 3d 793, 798 (D. Minn. 2021).

15

**1. The Constitution precludes state-imposed liability for subjects implicating "uniquely federal interests," such as global pollution.**

**a.** Courts have long recognized that "our federal system does not permit [certain] controvers[ies] to be resolved under state law." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981). This includes areas in which "the interstate or international nature of the controversy makes it inappropriate for state law to control." *Id.* For these controversies, the "basic scheme of the Constitution . . . demands" a federal rule of decision due to the uniquely federal interests of such subjects. *AEP*, 564 U.S. at 421; *Minnesota*, 63 F.4th at 718–19 ("[F]ederal law still reigns supreme" in disputes involving "unique federal interests" due to the overriding "need for a uniform rule of decision.").

Since the Founding, federal law exclusively has applied to disputes involving cross-boundary pollution, which implicate "uniquely federal interests," including "the conflicting rights of states and our relations with foreign nations." *City of New York*, 993 F.3d at 90–92 (collecting cases). There is no history or tradition of States regulating interstate, much less global, pollution or "climate change." And for good reason: if each State could apply its own law in this area, the result would be "an irrational system of regulation" that "lead[s] to chaotic confrontation between sovereign states" and "uncertainty" over the governing legal standard, as persons would have to comply with the laws "of all states potentially affected by" an otherwise "lawful discharge." *Int'l Paper*

16

*Co. v. Ouellette*, 479 U.S. 481, 496–97 (1987) (quotation marks omitted); *Minnesota*, 63 F.4th at 718–19 ("[C]onflicts between states with different tolerances for greenhouse-gas emissions can only be resolved at the federal level . . . ."). Because the structure of our Constitution requires "a uniform rule of decision" for "controvers[ies]" involving interstate pollution, it "demands . . . applying federal law . . . and not the varying . . . law of the individual States." *Illinois v. City of Milwaukee*, 406 U.S. 91, 105 n.6, 107 n.9 (1972).

**b.** Minnesota's lawsuit is precluded under the Constitution because it seeks to use state law where federal law controls the rule of decision.

Minnesota purports to bring state-law claims against a group of energy companies, but "its lawsuit takes aim at the production and sale of fossil fuels worldwide" through "[a]rtful pleading." *Minnesota*, 63 F.4th at 719. Such a case is simply beyond our constitutional structure because it "effectively regulates" national energy producers' worldwide conduct under state law when federal law exclusively governs. *City of New York*, 993 F.3d at 92.

In *City of New York*, the Second Circuit rejected the city's argument that its climate change lawsuit seeking "compensatory damages," *id.* at 88, did not "regulate" global greenhouse gas emissions, *id.* at 91–92. The court reasoned that "'regulation can be effectively exerted through an award of damages,' and 'the obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.'" *Id.* at 92. Thus, while the

17

city was "not expressly seeking to impose a standard of care or emission re-strictions on the [energy producers], the goal of its lawsuit [was] perhaps even more ambitious: to effectively impose strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were re-leased (or who released them)." *Id*. at 93. And though the city's "lawsuit would regulate cross-border emissions in an indirect and roundabout manner" through a nuisance action, "it would regulate them nonetheless." *Id*. Federal law thus preempted the city's lawsuit asserting state-law claims. *Id*. at 91–93.

The same logic applies here. Minnesota, like the City of New York, is effectively regulating energy producers' worldwide conduct under state law in a subject—interstate pollution—that requires a federal rule of decision. As Judge Stras describes Minnesota's lawsuit, it "presents 'a clash over [who] *regulat[es]* worldwide greenhouse gas emissions." *Minnesota*, 63 F.4th at 717 (emphasis added). Minnesota unilaterally claimed such regulatory authority by threatening damages and injunctive relief to "change the companies' behavior on a global scale" so it could "set national energy policy through its own con-sumer-protection laws." *Id*. at 719; *id*. (explaining that the "obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy") (collecting cases); Ex A ¶¶ 244–49 (requested relief). But binding precedent is clear. Federal law applies to such disputes—as a "growing chorus" of courts have concluded. *City of Charleston v. Brabham*

18

*Oil Co.,* 2025 WL 2269770, at *2 (S.C. Ct. Com. Pl. Aug. 6, 2025).

Accordingly, our constitutional structure preempts Minnesota's lawsuit, which attempts to regulate global greenhouse gas emissions through state-law claims, because "a federal rule of decision is necessary to protect uniquely federal interests" related to interstate and international pollution. *City of New York*, 993 F.3d at 90; *Minnesota*, 63 F.4th at 719 (same).

### 2. The Constitution's horizontal separation of powers precludes States from projecting their own regulatory actions into other jurisdictions.

**a.** On top of committing certain subjects—*e.g.,* interstate pollution—to exclusive federal control, there are "territorial limits" on local authority that further constrain extraterritorial regulation. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023). Our federalist structure prohibits a State from regulating out-of-state conduct. *See Franchise Tax Bd. v. Hyatt,* 587 U.S. 230, 245 (2019) ("Each State's equal dignity and sovereignty under the Constitution implies certain constitutional limitations on the sovereignty of all of its sister States.") (cleaned up). This includes imposing liability for out-of-state pollution, where it may have been legal.

The rule against extraterritorial regulation flows from the "horizontal separation of powers" and thus "inheres in [the Constitution's] structure." *Pork Producers*, 598 U.S. at 376 n.1; *Hyatt*, 587 U.S. at 247–48 (collecting "constitu-

19

tional doctrines that are not spelled out in the Constitution" but are "historically rooted [and] embedded in the text and structure of the Constitution"). The Supreme Court has "long recognized that the Constitution restricts a State's power to reach out and regulate conduct that has little if any connection with the State's legitimate interests." *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 154–55, 157–59 (2023) (Alito, J., concurring in part and concurring in the judgment). "This principle . . . is expressed in the very nature of the federal system that the Constitution created . . . ." *Id.* at 154.

The rule also finds expression in express provisions. The Commerce Clause, for example, bars "inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336–37 (1989). Similarly, under the Due Process Clause, "a state is without power to exercise 'extraterritorial jurisdiction,' that is, to regulate and control activities wholly beyond its boundaries," *Watson v. Emps. Liab. Assurance Corp.*, 348 U.S. 66, 70–71 (1954), especially when a State wields its own law to "punish a defendant for conduct that may have been lawful where it occurred," *State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 421 (2003); *accord BMW of N. Am. v. Gore*, 517 U.S. 559, 572–73 (1996).

**b.** Minnesota's lawsuit is an "obvious" example of unconstitutional extraterritorial regulation. *Minnesota*, 63 F.4th at 717. Far from incidentally affecting out-of-state activity by targeting in-state conduct, *see Pork Producers*,

20

598 U.S. at 374–76 & n.1, the lawsuit "seeks a global remedy for a global issue," *Minnesota*, 63 F.4th at 717. Minnesota sued national energy producers to "[r]egulat[e] the production and sale of fossil fuels worldwide" by "chang[ing] the companies' behavior on a global scale." *Id.* at 719. The universal reach of its lawsuit necessarily means that it is regulating out-of-state conduct, as the energy producers maintain their places of incorporation and substantial business activities outside of Minnesota. *See supra* Background § II (describing the substantial activities taking place in Delaware, Kansas, New Jersey, New York, Texas, and Washington D.C.—and not Minnesota). Nor does Minnesota have a legitimate local interest to try and "set national energy policy" at odds with the policy choices of other sovereigns. *Minnesota*, 63 F.4th at 719,

Moreover, the conduct Minnesota seeks to regulate bears no traceable connection to Minnesota. Although the Supreme Court has recognized cases in which "a person acting outside the State may be held responsible according to the law of the State for injurious consequences within it," *Young v. Masci*, 289 U.S. 253, 259 (1933), that exception applies only when there is a direct, traceable, and particularized connection between the out-of-state conduct and the in-state harm, *see id.* at 256 (owner of a car in one State allowed someone else to drive the car into another State, where the driver struck a man). No such connection exists here, as Minnesota concedes. *See Minnesota*, No. 20-cv-1636,

Dkt. 67 at 10:8–14 (acknowledging that "greenhouse gases mix in the atmosphere" and that "[c]limate change is a global phenomenon, and so you can't separate out necessarily how much climate change" occurs across geographies).

Minnesota alleges that "energy production has 'caused a substantial portion of *global* atmospheric greenhouse-gas concentrations." *Minnesota*, 63 F.4th at 717 (citing Ex. A ¶ 175) (emphasis added). But Minnesota has minimal fossil-fuel activities that would contribute to such concentrations. *See supra* Background § II. And, in any event, the medium allegedly transmitting Minnesota's alleged injuries is the Earth's entire atmosphere, where "[g]reenhouse gases once emitted 'become well mixed,'" making it impossible to trace any activity outside Minnesota to any injury within it. *AEP*, 564 U.S. at 422 (citation omitted); *City of New York*, 993 F.3d at 92 ("Greenhouse gas molecules cannot be traced to their source, and greenhouse gases quickly diffuse and commingle in the atmosphere.") (record citation omitted). The inability to trace atmospheric pollution explains why Minnesota must rely on broad "climate change" allegations more than 200 times. After all, the mixing of greenhouse gases in the atmosphere means that "emissions in New Jersey may contribute no more to flooding in [Minnesota] than emissions in China." *AEP*, 564 U.S. at 422.

Because Minnesota seeks to impose liability for global greenhouse gas emissions without the prospect of linking any specific emissions to in-state harm, its lawsuit necessarily "directly regulate[s] out-of-state [activity] by

22

those with no [relevant] connection to the State." *Pork Producers*, 598 U.S. at 376 n.1. Under our constitutional structure, that effort "is simply beyond the limits of state law" and is thus preempted. *City of New York*, 993 F.3d at 92.

### 3. The Clean Air Act preempts Minnesota's lawsuit.

**a.** The Clean Air Act likewise preempts Minnesota's attempt to impose liability for greenhouse gas emissions originating in other States. As explained, federal law has always occupied the field of interstate air pollution regulation. Federal common law governed this area until Congress enacted the Clean Air Act in 1963. *City of New York*, 993 F.3d at 90–95.

Through the Clean Air Act, Congress supplanted federal common law with a comprehensive program for regulating air pollutants in the United States—including greenhouse gases—that generally allows emissions until EPA determines that one or more statutory standards for regulatory controls are satisfied. *See AEP*, 564 U.S. at 426; *City of New York*, 993 F.3d at 95–96. But that displacement of federal common law did not make state law competent to govern in this field. *Id.* at 98. Instead, because the Act operates in a field of interstate air pollution that state law has "traditionally not occupied," Minnesota cannot "resort[] to state law" to regulate global greenhouse gas emissions unless specifically "authorized by" the Act. *Id.* at 98–99 (cleaned up).

And the Clean Air Act authorizes only a "slim reservoir" of local author-

ity to regulate or impose liability for interstate pollution. *Id*. at 100. Any regulations or state-imposed liability must be based on the law of the pollution's "source state[]." *Id*. Consider, as an example, a Wisconsin factory emitting air pollutants that cause injury in Minnesota. Under the Clean Air Act, Minnesota could bring a suit against the Wisconsin emitter under Wisconsin law (*i.e.*, the source-state law), but not Minnesota law.

Climate change lawsuits do not (and cannot) take advantage of this "slim reservoir" of authority because global greenhouse gas emissions "emanat[e] simultaneously from all 50 states and the nations of the world." *City of New York*, 993 F.3d at 100. "The Clean Air Act therefore does not author-ize . . . state-law claims, meaning that such [state-law] claims concerning domestic emissions are barred." *Id*.

**b.** In this case, "the Clean Air Act does not authorize" Minnesota to "recover damages for the harms caused by global greenhouse gas emissions . . . under [Minnesota] law" or "effectively regulate" out-of-state emissions. *Id.* at 91–92, 99. Given the inherently federal nature of the issue and the national concerns it implicates, *see, e.g.*, Compl. ¶¶ 45–60, the Clean Air Act must af-firmatively "authorize" state regulation or state-imposed liability of interstate air pollution, *City of New York*, 993 F.3d at 99 (cleaned up). As with the lawsuit in *City of New York*, the lawsuit filed by Minnesota "does not seek to take ad-vantage of th[e] slim reservoir of state" authority under the Clean Air Act to

regulate or impose liability in this area of interstate pollution. *Id.* at 100.

Minnesota's lawsuit instead openly regulates and imposes state-law liability against interstate (indeed, global) emissions. The lawsuit gives away the game by unabashedly targeting activity across "the Earth" that has allegedly caused "the atmosphere and oceans [to] warm[], sea level[s] [to] ris[e], snow and ice cover [to] diminish[], [and] oceans [to] acidify[]." Ex. A ¶ 46. Nothing in its complaint limits the scope of its lawsuits to emissions originating in Minnesota. Nor could it given the nature of global greenhouse gases. This is why Minnesota has conceded that its lawsuit applies to out-of-state emissions. *See Minnesota*, No. 20-cv-1636, Dkt. 67, Remand Hearing Tr. 10:8–14 & 62:5–10.

Traditional preemption principles—field and conflict—confirm that the lawsuit is preempted. The Clean Air Act, which occupies the field of greenhouse gas emissions, leaves no room for Minnesota to regulate those emissions, through a lawsuit or otherwise. Further, to "permit [Minnesota's] suit," "would undermine" the Clean Air Act and "seriously interfere with the achievement of the full purposes and objectives of Congress." *City of New York*, 993 F.3d at 100; *see also* Szabo Decl. ¶¶ 17–27 (describing interference).

### 4. The Foreign Affairs doctrine precludes Minnesota's lawsuit.

Minnesota's attempt to globalize its regulatory reach collides with the Foreign Affairs doctrine. Under this doctrine, state law is conflict-preempted

"when it conflicts with an express federal foreign policy." *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1071 (9th Cir. 2012) (en banc) (citing *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421 (2003)). And "even in the absence of any express federal policy," state law is field-preempted "if it intrudes on the field of foreign affairs without addressing a traditional state responsibility." *Movsesian*, 670 F.3d at 1072. Minnesota's lawsuit fails on both scores.

***Conflict Preemption***. State law is preempted when there is a "likelihood that state legislation will produce something more than incidental effect in conflict with express foreign policy." *Garamendi*, 539 U.S at 420. Because foreign affairs is the "exclusive responsibility" of the United States, *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941), the threshold for creating a conflict is low. *See also* Compl. ¶¶ 92–94. That threshold is easily met here.

To begin with, Minnesota's lawsuit is "out of place given that Congress created a comprehensive scheme designed to address greenhouse gas emissions—the Clean Air Act—which [Congress] declined to extend beyond our borders." *City of New York*, 993 F.3d at 103. Because "the Clean Air Act contemplates the need for foreign nations to promulgate reciprocal legislation," Minnesota's lawsuit "circumvent[s] Congress's own expectations and carefully balanced scheme of international cooperation on a topic of global concern." *Id.* To illustrate, in the Global Climate Protection Act, Congress tasked the President

and the Secretary of State with coordinating climate change policy in the international arena. *See* Landau Decl. ¶ 4. Yet a state-law lawsuit in state court that imposes liability on global greenhouse gas emissions is the antithesis of a coordinated national policy to address a worldwide issue.

In truth, Minnesota's lawsuit "directly conflicts with . . . U.S. foreign policy in multiple respects." Landau Decl. ¶¶ 16–23. The lawsuit exacerbates the national energy emergency by imposing crushing penalties on global energy production, "thereby undermining crucial U.S. policy and national security interests in increasing affordable domestic energy" and the President's express determination that more production is imperative to our national security and foreign policy. *Id.* ¶¶ 13–15, 17. It undercuts the United States' policy decision to abstain from international regimes that seek to impose restrictive measures to reduce global greenhouse gas emissions. *Id.* ¶ 19; *cf. Sprietsma v. Mercury Marine*, 537 U.S. 51, 66 (2002) (reasoning that "a federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left unregulated"). And it "hampers what President Trump has lauded as the ability of the United States to 'grow its economy and maintain jobs for its citizens while playing a leadership role in global efforts to protect the environment.'" Landau Decl. ¶ 22.

The conflict doesn't stop there. When it comes to international cooperation, a state-law lawsuit seeking a global remedy for a global issue "bypass[es]

the various diplomatic channels that the United States uses to address" global greenhouse gas emissions. *City of New York*, 993 F.3d at 103. As a result, it compromises the United States' capacity to "speak . . . with one voice" on the world stage. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 (2000). For example, Minnesota's efforts to obtain a global remedy here run headlong into the United States' decision to refrain from participating in certain international efforts that restrict energy production. Landau Decl. ¶ 19 (discussing U.S. decision to withdraw from the Paris Agreement and its notice of withdrawal from the Framework Convention).

Minnesota also "undermines important ongoing diplomacy to advance U.S. interests." *Id.* ¶ 18. "[I]n international climate-change negotiations, the United States has long opposed the establishment of liability and compensation schemes at the international level." *Id.* ¶ 18; *see also City of New York*, 993 F.3d at 103 n.11 (same). Minnesota interferes with this longstanding position by effectively establishing just such a program on energy producers and therefore foments new frictions in international climate negotiations by targeting fossil fuel companies for actions they took overseas. Landau Decl. ¶¶ 20–21. In other words, Minnesota "expresses a distinct political point of view on a specific matter of foreign policy" that contradicts the view of the United States. *Movsesian*, 670 F.3d at 1076. This "obviously sow[s] confusion and needlessly complicate[s] the nation's foreign policy." *City of New York*, 993 F.3d at 103.

28

Finally, Minnesota "harms foreign relations between the United States and foreign countries where" energy producers have substantial operations implicated by Minnesota's lawsuit. Landau Decl. ¶ 20; *City of New York*, 993 F.3d at 103 (holding companies "accountable for purely foreign activity . . . would require them to internalize the costs of climate change and would presumably affect the price and production of fossil fuels abroad"); *supra* p.5 (identifying "global network"). Because foreign fossil fuel producers that have a connection with Minnesota will necessarily be affected by this lawsuit, their home countries may seek to respond through their relations with the United States, including through retaliatory actions that increase costs on Americans. Landau Decl. ¶ 21; *see, e.g.*, *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 450 (1979) (explaining that affected foreign nations "may retaliate against American-owned instrumentalities present in their jurisdictions"). "These types of actions could impair the Executive Branch's ability to achieve the President's foreign policy goals, especially related to energy." Landau Decl. ¶ 21.

All this establishes a clear conflict with the United States' foreign policy—or, at minimum, a "likelihood" that Minnesota's lawsuit will have a "more than incidental effect" on foreign policy, which is all that is required for preemption. *Garamendi*, 539 U.S at 420. These foreign policy harms, moreover, multiply as other States lodge their own climate change lawsuits to regulate a global issue. *See* Compl. ¶ 46; Landau Decl. ¶ 16. Such a state-by-state regime

29

makes it "even more difficult—if not impossible—to maintain a coherent national position on the regulation of global greenhouse gas emissions." *Id*. ¶ 23.

***Field Preemption.*** Minnesota's lawsuit is preempted for another reason. Minnesota is intruding into a field occupied by federal law without addressing traditional state responsibilities. The National government enjoys exclusive domain over foreign affairs. *See Zschernig v. Miller*, 389 U.S. 429, 436 (1968). And global greenhouse gas emissions is a subject that falls squarely within that domain, presenting "a uniquely international problem of national concern" that "is simply beyond the limits of state law." *City of New York*, 993 F.3d at 85, 92.

Here, the lawsuit affects foreign affairs because it is seeking to redress global climate change. But global emissions are "a uniquely international problem" that is "beyond the limits of state law." *City of New York*, 993 F.3d at 85, 92. On its face, then, the lawsuit works "an intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress." *Zschernig*, 389 U.S. at 432. Attempting "to set national energy policy through . . . consumer-protection laws" is simply not a traditional state responsibility. *Minnesota*, 63 F.4th at 719; *see also Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 964 (9th Cir. 2010) ("Courts have consistently struck down state laws which purport to regulate an area of traditional state competence, but in fact, affect foreign affairs.").

30

### 5. The dormant Commerce Clause precludes Minnesota's lawsuit.

State laws that discriminate against interstate commerce are unconstitutional. *Ok. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179–80 (1995). Minnesota discriminates against interstate commerce here by targeting worldwide commercial activity that exclusively occurs outside Minnesota. The lawsuit seeks damages not only to regulate the energy companies, but also to fund in-state activities. *See, e.g.*, Ex. A ¶ 246 (demanding money for "public education"). The lawsuit thus runs roughshod over constitutional prohibitions on States "build[ing] up domestic commerce through burdens upon the industry and business of other States." *Pork Producers*, 598 U.S. at 369 (cleaned up).

Because Minnesota discriminates against interstate commerce, strict scrutiny applies, and its lawsuit can be upheld only if "it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 278 (1988). There is no legitimate local purpose here, as explained. *See City of New York*, 993 F.3d at 85–86. But even if the Court were to conclude otherwise, the lawsuit would still fail because its objectives can be adequately served by reasonable, nondiscriminatory alternatives. For example, Minnesota could fund a "public education campaign in Minnesota relating to the issue of climate change" with its own tax revenue. Ex. A ¶ 246. Because this alternative would

31

achieve Minnesota's policy goals without imposing penalties on out-of-state conduct, Minnesota's lawsuit is unconstitutional. *New Energy*, 486 U.S. at 278.

State actions also violate the Commerce Clause if they have "the practical effect of extraterritorial control" over "interstate commerce." *Ass'n for Accessible Meds. v. Ellison*, 140 F.4th 957, 960 (8th Cir. 2025). States, in other words, may not "directly regulate[] transactions which take place wholly outside the State." *Id.* at 961 (cleaned up). So, even if Minnesota isn't discriminating against interstate commerce, it is still unconstitutionally regulating out-of-state commerce. *Id.* (explaining that "discrimination is not required" when states exert extraterritorial control over interstate commerce).

## B. The United States Has Suffered, and Will Continue to Suffer, Irreparable Harm Absent a Preliminary Injunction

Upon demonstrating a likelihood of success on the merits, a plaintiff must also establish that, absent the preliminary injunction, there is a likelihood that the defendant will cause irreparable harm. *See Winter v. Nat'l Resources Def. Council, Inc.*, 555 U.S. 7, 22 (2008). For three independently sufficient reasons, preliminary injunctive relief is necessary here.

***First***, when a law is preempted, as here, "a finding with regard to likelihood of success fulfills the remaining [preliminary injunction] requirements." *Tex. Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 206 (5th Cir. 2010). This is because the United States suffers a "per se irreparable

32

harm" when States attempt to usurp exclusive federal authority and enforce preempted laws. *United States v. Texas*, 557 F.Supp.3d 810, 821 (W.D. Tex. 2021) (collecting cases); *see also, e.g.*, *Arizona*, 641 F.3d at 366 (finding irreparable harm to the United States if Arizona enforced its preempted laws); *Texas v. Yellen*, 105 F.4th 755, 774 (5th Cir. 2024) (holding that laws affecting "sovereign authority" inflict irreparable harm). "The United States Supreme Court confirmed this proposition in *Arizona*, 567 U.S. at 416, 132 S. Ct. 2492, where the Court affirmed in part a preliminary injunction issued based on a finding of irreparable harm that would be caused by the enforcement of preempted state law." *KalshiEX*, 2026 WL 976055, at *2.

***Second***, the "inability to enforce its duly enacted [law] clearly inflicts irreparable harm on" the United States. *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018); *see also Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (same). Indeed, the Supreme Court has recently and repeatedly found that the federal government would be irreparably harmed if it could not enforce federal law. *See, e.g.*, *Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2153 (Mem) (2025); *Noem v. Doe*, 145 S. Ct. 1524 (Mem) (2025); *Noem v. Nat'l TPS All.*, 145 S. Ct. 2728 (Mem) (2025); *see also Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (per curiam) (must show irreparable harm to obtain a stay). Because Minnesota obstructs EPA's ability to effectuate the Clean Air Act and the United States' conduct in foreign affairs, *see supra* Argument § I, the

United States suffers irreparable injury.

*Finally*, our constitutional system is irreparably injured when the Executive Branch is thwarted from carrying out the policies preferred by the American voters. *Cf. Trump v. CASA, Inc.*, 606 U.S. 831, 859–60 (2025) (recognizing that the federal government "will suffer irreparable harm" if it is prevented from "enforcing its policies"). This is enough to justify an injunction.

### C. The Equities and the Public Interest Favor the United States

This action seeks to protect the interests of the United States, so the burdens that will result without injunctive relief are directly tied to the public benefits that will be protected if this Court issues the requested injunction. *See Nken*, 556 U.S. at 435. This is all the more true given the longstanding "recognition that preventing a violation of the Supremacy Clause serves the public interest." *United States v. California*, 921 F.3d 865, 893–94 (9th Cir. 2019).

Moreover, preliminary injunctive relief will preserve the United States' sovereign authority. *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 496–98 (2001) (when weighing the public interest, courts of equity must respect Congress's policy choices as set forth in a statute). A preliminary injunction would permit EPA to effectively administer the Clean Air Act free from Minnesota interference, *see* Szabo Decl. ¶¶ 17–27, and allow the United States to conduct foreign affairs, *see* Landau Decl. ¶¶ 16–23. By contrast, a

34

preliminary injunction will not burden Minnesota. For the reasons explained, States have never had the authority to regulate greenhouse gas emissions, so a preliminary injunction would simply maintain that status quo.

And the United States acted timely here. At the time it sued, the energy producers had not answered the complaint. *See* Compl. ¶¶ 23–44 (explaining procedural history). They also moved for a stay on the same day the President issued *Protecting American Energy From State Overreach*, Exec. Order No. 14260. There was thus not much for the United States to do as the state court lawsuit would soon be stayed with a significant prospect of being dismissed on appeal. *See* Compl. ¶¶ 35–44. The United States is also facing dozens of State actions that raise the same constitutional infirmities as here, requiring it to take a "'pragmatic one-step-at-a-time" approach to "treat [this] problem." *Transportation Div. of the Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. Fed. R.R. Admin.,* 10 F.4th 869, 875 (D.C. Cir. 2021) (cleaned up); *accord Massachusetts v. EPA*, 549 U.S. 497, 524 (2007) (recognizing that "[a]gencies, like legislatures, do not generally resolve massive problems in one fell regulatory swoop"); *see also Justice Department Files Complaints Against Hawaii, Michigan, New York and Vermont Over Unconstitutional State Climate Actions*, U.S. Dep't of Justice (May 1, 2025), *available at* https://perma.cc/4SMF-G3TW. The circumstances changed when, after the energy producers exhausted their appeals and the stay dissolved, Minnesota renewed its efforts to

35

regulate global greenhouse gas emissions and "to set national energy policy through its own consumer-protection laws." *Minnesota*, 63 F.4th at 719.

Lastly, if this Court ultimately concludes that Minnesota's lawsuit does not offend federal law, Minnesota would then be able to proceed with its case. But given that this case implicates core constitutional principles and application of a federal statute—by which the federal interest is paramount—any burden on Minnesota from a preliminary injunction would be modest. In the meantime, "Minnesota . . . does not suffer at all because a 'State has no interest in enforcing laws that are unconstitutional and an injunction preventing the State from enforcing [its lawsuit] does not irreparably harm the State.'" *Pavek v. Simon*, 467 F. Supp. 3d 718, 762 (D. Minn. 2020) (Nelson, J.).

## CONCLUSION

*Minnesota*, No. 62-cv-20-3837, imposes immediate and per se irreparable harm on the United States by infringing on its sovereign authority, obstructing its ability to administer federal law, and interfering with its conduct of foreign affairs. The United States is likely to succeed on the merits, and the balance of equities and public interest weigh heavily in its favor. Accordingly, the Court should grant the United States' motion and preliminarily enjoin Minnesota from regulating greenhouse gas emissions through its lawsuit. *See Leiter Mins., Inc. v. United States*, 352 U.S. 220, 225–26 (1957) ("There can be no doubt . . . of the right of the United States to enjoin state court proceedings

whenever the prerequisites for relief by way of injunction be present."); *In re Grand Jury Subpoena,* 866 F.3d 231, 233 (5th Cir. 2017) (same); *Daimler*, 2025 WL 3049944, at \*17–18 & n.22 (enjoining state court lawsuit).

Dated: May 11, 2026                         Respectfully submitted,

DANIEL N. ROSEN                      STANLEY E. WOODWARD JR.
United States Attorney               United States Associate Attorney General
600 U.S. Courthouse
300 South Fourth Street              ADAM R.F. GUSTAFSON
Minneapolis, MN 55415                Principal Deputy Assistant Attorney General

                                     ROBERT N. STANDER
                                     Deputy Assistant Attorney General

                                     s/ John Adams
                                     John K. Adams
                                     Chief of Staff & Senior Counsel
                                     Michael Weisbuch
                                     Senior Counsel
                                     Ian M. Swenson
                                     Counsel
                                     Environment and Natural Resources Division
                                     U.S. Department of Justice
                                     950 Pennsylvania Ave, NW
                                     Washington, D.C. 20530
                                     Telephone: (202) 514-5442
                                     Email John.Adams3@usdoj.gov

37