**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

UNITED STATES,

      Plaintiff,

v.

STATE OF MINNESOTA, *et al.*,

      Defendants.

Case No. 0:26-cv-02456

**[PROPOSED] BRIEF OF THE STATE OF IOWA, AND 22 OTHER STATES AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' REQUEST FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................ii

INTRODUCTION AND INTERESTS OF *AMICI CURIAE* ........................................................ 3

BACKGROUND ......................................................................................................................... 3

ARGUMENT............................................................................................................................... 4

    I.    Minnesota's Litigation Will Start an Interstate Race to the Bottom................................. 4

    II.    Minnesota's Litigation Violates the Structural Constitution. ............................................ 9

CONCLUSION......................................................................................................................... 12

CERTIFICATE OF SERVICE ................................................................................................. 12

**TABLE OF AUTHORITIES**

### Cases

*Baldwin v. G.A.F. Seelig, Inc.*,
  294 U.S. 511 (1935)......................................................................................................... 3, 6

*BMW of N. Am., Inc. v. Gore*,
  517 U.S. 559 (1996)......................................................................................................... 9, 11

*Bonaparte v. Appeal Tax Ct. of Baltimore*,
  104 U.S. 592 (1881).......................................................................................................... 10

*Carroll v. Lanza*,
  349 U.S. 408 (1955).............................................................................................................. 7

*Chevron USA Inc. v. Plaquemines Parish, La.*,
  146 S.Ct. 1052 (2026)......................................................................................................... 1

*Cipollone v. Liggett Grp.*,
  505 U.S. 504 (1992)............................................................................................................. 6

*City of New York v. Chevron Corp.*,
  993 F.3d 81 (2d Cir. 2021)........................................................................................... 1, 2, 8

*Clearfield Tr. Co. v. United States*,
  318 U.S. 363 (1943).......................................................................................................... 6, 10

*Connecticut v. Massachusetts*,
  282 U.S. 660 (1931)............................................................................................................. 8

*Georgia v. Tenn. Copper Co.*,
  206 U.S. 230 (1907)............................................................................................................. 9

*Healy v. Beer Inst., Inc.*,
  491 U.S. 324 (1989)............................................................................................................. 3

*Hoyt v. Sprague*,
  103 U.S. 613 (1881)............................................................................................................. 9

*Huges v. Oklahoma*,
  441 U.S. 322 (1979)............................................................................................................. 3

*Illinois v. City of Milwaukee*,
  406 U.S. 91 (1972)............................................................................................................. 10

*Int'l Paper Co. v. Ouellette*,
  479 U.S. 481 (1987)...................................................................................................... 6, 8, 10

*Kansas v. Colorado*,
  206 U.S. 46 (1907)............................................................................................................ 5, 10

*Kurns v. R.R. Friction Prods. Corp.*,
  565 U.S. 625 (2012)............................................................................................................. 6

*Minnesota ex rel. Ellison v. Am. Petroleum Inst.*,
  63 F.4th 703 (8th Cir. 2023) ............................................................................ 1, 2, 6, 7, 8, 11

*National Pork Producers Council v. Ross*,
  598 U.S. 356 ................................................................................................................. 5, 6, 9

*New Jersey v. New York*,
  283 U.S. 336 (1931)............................................................................................................. 9

*North Carolina*,
  615 F.3d 291 (4th Cir. 2010) ............................................................................................. 11

*Northwest Austin Mun. Util. Dist. No. One v. Holder*,
    557 U.S. 193 (2009)................................................................................................. 4
*Rhode Island v. Massachusetts*,
    37 U.S. 657 (1838).............................................................................................. 4, 8
*Sable Commc'ns of Cal., Inc. v. FCC*,
    492 U.S. 115 (1989)................................................................................................. 9
*San Diego Bldg. Trades Council v. Garmon*,
    359 U.S. 236 (1959).............................................................................................. 11
*Shelby Cnty. v. Holder*,
    570 U.S. 529 (2013)......................................................................................... 4, 8, 10
*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003)................................................................................................. 8
*State v. Am. Petroleum Inst.*,
    2026 WL 192130 (Minn. App. Jan. 26, 2026)..................................................... 1, 2
*Tax Bd. of California v. Hyatt*,
    587 U.S. 230 (2019)................................................................................................. 8
*Texas Indus., Inc. v. Radcliff Materials, Inc.*,
    451 U.S. 630 (1981)................................................................................................. 8
*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980)................................................................................................. 9

**Statutes**

15 U.S.C. § 1334(b) ....................................................................................................... 7
42 U.S.C. § 7401............................................................................................................ 9, 10
Iowa Code § 673B.2 (2026)........................................................................................... 8
U.S. Const. art. IV, § 1.................................................................................................. 7

## INTRODUCTION AND INTERESTS OF *AMICI CURIAE*

Six years ago, Minnesota joined a bevy of States and municipalities taking "aim at the production and sale of fossil fuels worldwide." *Minnesota ex rel. Ellison v. Am. Petroleum Inst.*, 63 F.4th 703, 717 (8th Cir. 2023) (Stras, J., concurring); *see State v. Am. Petroleum Inst.*, 2026 WL 192130, at *1 (Minn. App. Jan. 26, 2026), *review denied sub nom. State by Ellison v. Am. Petroleum Inst.*, 2026 WL 1040497 (Minn. Apr. 15, 2026). For much of that time, the case was pending in federal court while the parties contested whether the decades-long allegations related to climate change could be removed. *See Am. Petroleum Inst.*, 63 F.4th at 708. Joining several

sister Circuits to reject removal on those grounds, in 2023 the Eighth Circuit remanded Minnesota's case to state court. *Id.* (collecting cases); *but cf. Chevron USA Inc. v. Plaquemines Parish, La.*, 146 S.Ct. 1052 (2026); *City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021).

Now several oil companies spread across the country face debilitating liability, under state law in state court, for "decades" of worldwide "production and use of fossil fuels." *Am. Petroleum Inst.*, 63 F.4th at 708. That is the absurd result sought by Minnesota's suit, and the other suits also seeking to collectively impose billions upon billions of dollars of liability on America's energy industry. That risks hurting Americans who rely on cheap and available energy across the country. Minnesota has not been tasked with providing "a global remedy for a global issue" and thus is overly "ambitious" in seeking "a far-reaching injunction, restitution, and disgorgement of 'all profits made as a result of the companies' unlawful conduct.'" *Id.* (Stras, J., concurring) (quoting *City of New York*, 993 F.3d at 91).

The Attorneys General of Iowa, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, West Virginia, and Wyoming (collectively, "*Amici* States") therefore submit this *amici curiae* brief in support of the United States as it seeks an injunction to stymie Minnesota's attempt to become the world's climate police. As Judge Stras recognized, the Constitution does not contemplate that "'one or two' individual states like Minnesota should be able to 'dictate environmental policy for other sovereign states.'" *Id.* (quoting Brief of Indiana *et al.* as Amici Curiae in Support of Petitioners at 1, *Suncor Energy (U.S.A.) Inc. v. Bd. of Cnty. Comm'rs*, No. 21-1550 (U.S. July 11, 2022)). Minnesota is trying to have its state courts unilaterally determine the outcome of what is, "in effect, an interstate dispute." *Id.*

**BACKGROUND**

Six years ago, Minnesota started this state-court litigation against a litany of out-of-state fossil fuel producers, nominally asserting state-law consumer protection and common-law fraud claims. *Am. Petroleum Inst.*, 2026 WL 192130, at *1. But as Judge Stras recognized, this is merely a form of artful pleading. *Am. Petroleum Inst.*, 63 F.4th at 720 (Stras, J., concurring). While Minnesota points to an alleged "misinformation campaign" within its borders, the gravamen of its complaint is an attempt to harshly regulate the production and sale of fossil fuels worldwide. *Id.* at 708.

The State's complaint invokes "climate change" over 200 times and seeks to hold the defendants liable for causing a "substantial portion of global atmospheric greenhouse-gas concentrations" and the attendant environmental disruptions. *Id.* at 717. To address what it appears to believe is the global phenomenon of climate change, Minnesota seeks a remarkably ambitious remedy: a far-reaching injunction, restitution, and the disgorgement of "all profits made as a result of [the companies'] unlawful conduct." *Id.*

In effect, Minnesota "intends to hold the [companies] liable, under [state] law, for the effects of emissions made around the globe." *Id.* (quoting *City of New York*, 993 F.3d at 92). That sweeping endeavor is not a traditional local tort suit; it is a clash over regulating worldwide greenhouse gas emissions and slowing global climate change. By seeking billions in damages against energy companies for allegedly causing a global climate-change crisis, Minnesota is attempting to dictate environmental and energy policy for other sovereign States.

Just as agricultural States like Iowa rely on a unified national market free from the idiosyncratic and ever-changing agricultural mandates of a single sister State, the Nation depends on the reliable production of energy from traditional sources. Minnesota's litigation threatens that stability. The practical effect of its sought-after liability would be to impose potentially ruinous

penalties on traditional energy companies, effectively overriding the policy choices made by the federal government and other States. Such an attempt to unilaterally project state power over out-of-state economic activity is, in effect, an interstate dispute that threatens to ignite the economic balkanization the Framers sought to prevent.

## ARGUMENT

### I.     Minnesota's Litigation Will Start an Interstate Race to the Bottom.

The Framers of our Constitution convened in Philadelphia with a "central concern:" To forge a unified national market and to cure the commercial "Balkanization that had plagued relations among the colonies and later among the States under the Articles of Confederation." *Huges v. Oklahoma*, 441 U.S. 322, 325 (1979). They understood from bitter experience that the prosperity and salvation of the new Republic lay in union, not division. To secure that union, the structural Constitution guaranteed that the peoples of the several states must "sink or swim together." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 n.12 (1989) (quoting *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 523 (1935)).

Yet Minnesota's unprecedented climate litigation ignores that constitutional design and revives the isolationist tendencies the Constitution was drafted to extinguish. Under the thinnest veil of state consumer-protection law, Minnesota has fired the opening shots in what could become an interstate trade war over global climate policy. While Minnesota's complaint alleges a "misinformation campaign" within its borders, its true target is the production and sale of fossil fuels worldwide. Minnesota is seeking a global remedy for what is undeniably a global issue. If this Court permits a single State to leverage its state-court system to regulate interstate emissions, it will ignite the economic strife and confrontation between sovereign States that the Framers sought to avert.

This litigation is not a traditional local tort suit; it is a clash over regulating greenhouse gas

4

emissions worldwide. As such, it touches on basic interests of federalism and presents an overriding need for a uniform rule of decision. Permitting one State to project its preferred environmental policies into other States fundamentally offends the principle of equal sovereignty. *See Shelby Cnty. v. Holder*, 570 U.S. 529, 544 (2013).

The Constitution's structure gives each State sovereignty equal to every other State, a cardinal rule that ensures no single State can force its domestic policies upon its neighbors. *Id.*; *see Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009) (describing "our historic tradition that States enjoy equal sovereignty"). "A sovereign decides by his own will, which is the supreme law within his own boundary." *Rhode Island v. Massachusetts*, 37 U.S. 657, 737 (1838). By joining the Union, States "surrendered to congress, and its appointed court, the right and power of settling their mutual controversies." *Id.*

Yet Minnesota seeks to dictate the national, even global, agenda by litigating in its courts an issue that is, in effect, an interstate dispute. By demanding billions in damages for the effects of emissions made around the globe, Minnesota attempts to unilaterally impose a global regulatory regime.

Litigation in the courts of one State, applying the law of only that State, is no way to resolve disputes that implicate the conflicting rights of co-equal sovereigns. Indeed, courts have protected the States from such overreach, holding that whatever practices may tend to disturb the harmony between the States may be objects of federal superintendence. THE FEDERALIST No. 80, at 476 (C. Rossiter ed. 1961); *see Kansas v. Colorado*, 206 U.S. 46, 95, 98 (1907). Interstate disputes are as old as the country itself, which is precisely why the Framers vested the federal judiciary with the authority to resolve them using known and settled principles of national jurisprudence. If Minnesota can weaponize its state courts to penalize traditional energy companies for conduct that

is lawful in—and vital to the economies of—States like the undersigned, the constitutional equality of the States will be reduced to a dead letter.

The practical consequences of upholding Minnesota's extraterritorial gambit are as predictable as they are ruinous. It will open the door to the very rivalries and reprisals that were meant to be averted by subjecting commerce between the States to the power of the national government. If Minnesota can effectively regulate conduct in other States in accordance with its idiosyncratic "flavor of the day" demands, a regulatory race to the bottom is inevitable. *National Pork Producers Council v. Ross*, 598 U.S. 356, 407 (Kavanaugh, J., concurring in part and dissenting in part) ("*NPPC*").

Courts may observe this phenomenon in the agricultural sector, where States like Massachusetts and California have attempted to dictate how hogs must be raised in Iowa and North Carolina. Such mandates force out-of-state producers to endure enormous compliance costs, creating artificial scarcity, skyrocketing consumer prices, and a fractured national market. For example, if farmers must invest millions of dollars to remodel their hog farms to comply with Massachusetts's requirements, only to find California enacting a law imposing larger or conflicting housing requirements, the industry's supply chain will break down entirely.

Energy markets are exponentially more complex and interconnected, meaning the fallout from a fragmented regulatory regime would be more severe. Applying conflicting state laws to global emissions "would lead to great diversity in results by making identical transactions subject to the vagaries of the laws of several states." *Clearfield Tr. Co. v. United States*, 318 U.S. 363, 367 (1943). The result would be a confused patchwork of standards, to the detriment of industry and the environment alike. *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 496 (1987).

Indeed, if climate litigation could be localized this way, there would be no logical or

6

constitutional limits on what other fields could be. Imagine a State prohibiting the retail sale of goods from producers that do not pay for employees' birth control or abortions. Brief of Indiana and 19 Other States as Amici Curiae at 33, *NPPC*, 598 U.S. 356. Or imagine a State refusing to allow the sale of products from States with a lower minimum wage. If State appeals to local health and economic welfare could excuse those extraterritorial mandates, they would bring a "speedy end to our national solidarity." *Baldwin*, 294 U.S. at 523.

Minnesota plows fertile ground for protectionist measures that will forfeit the efficiency and reliability benefits of integrated markets and ignite state-to-state trade wars. The Constitution's structural protections, including the Dormant Commerce Clause and the Full Faith and Credit Clause, expressly forbid that kind of extraterritorial overreach. A State may not impose economic sanctions on violators of its laws with the intent of changing lawful conduct in other States. Such an agenda is beyond the limits of state law.

Minnesota thus is seeking to impose incalculable costs on its sister States without bearing the political or economic fallout of its own policies. States like Iowa contribute massively to the national economy through industries that require stable, unified regulatory frameworks. Tort liability for damages can be, and indeed is designed to be, "a potent method of governing conduct and controlling policy." *See Am. Petroleum Inst.*, 63 F.4th at 719 (Stras, J., concurring) (quoting *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012); *see Cipollone v. Liggett Grp.*, 505 U.S. 504, 548 (1992) (Scalia, J., concurring in the judgment in part and dissenting in part) (observing that "general tort-law duties" can "impose 'requirement[s] or prohibition[s]'" on private parties (quoting 15 U.S.C. § 1334(b))).

Minnesota intends to leverage massive liability to force a global transition away from fossil fuels. *Am Petroleum Inst.*, 63 F.4th at 719 (Stras, J., concurring). But Minnesota itself produces

7

very little of the nation's traditional energy, meaning it is trying to regulate a market in which it lacks expertise and economic stake. While some Minnesota voters may celebrate a "victory" against out-of-state energy producers, they will not pay the political price for the devastation this will cause to the broader national economy. Instead, Minnesota exports the burdens of its moral crusade to the rest of the country.

But the structural Constitution precludes a single State from serving as the nation's environmental regulator. The Dormant Commerce Clause prohibits State laws that regulate commerce in other States, while the Full Faith and Credit Clause prevents States from adopting policies of hostility to the public acts of another State. *See* U.S. Const. art. IV, § 1; *Carroll v. Lanza*, 349 U.S. 408, 413 (1955). A single state cannot unilaterally override the policy choices made by the federal government and other States. Minnesota cannot be permitted to impose economic sanctions on interstate actors with the intent of changing lawful conduct in other States.

Already, Minnesota's lawsuit has concrete effects on *Amici* States. For example, state defendant Koch Industries has a significant presence in Iowa. They have major fertilizer operations and ethanol plants throughout the state. *See*, *e.g.*, Donnelle Eller, *Koch Completes Controversial $3.6 billion purchase of Iowa Fertilizer Co. Plant*, Des Moines Register (Aug. 30, 2024). Indeed, those facilities produce "3.5 million metric tons of nitrogen fertilizers and diesel exhaust fluid annually." *Id.* The company produces carbon dioxide emissions that may be implicated by Minnesota's lawsuit—and an adverse ruling could directly affect Iowa businesses and jobs contrary to Iowa law. *See* Iowa Code § 673B.2 (2026).

Allowing Minnesota's suit to proceed in state court under state law turns the cooperative federalist system enacted to ensure a clean environment on its head. The rule of decision in interstate disputes has always been known and settled principles of national jurisprudence. *See Am.*

8

*Petroleum Inst.*, 63 F.4th at 718 (quoting *Rhode Island v. Massachusetts*, 37 U.S. 657, 737 (1838)). State law is no substitute basis for resolving disputes implicating the conflicting rights of co-equal sovereigns. *Fran. Tax Bd. of California v. Hyatt*, 587 U.S. 230, 246 (2019) (quoting *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981)); *see Connecticut v. Massachusetts*, 282 U.S. 660, 670 (1931). As the Second Circuit correctly recognized, conflicts between States with different tolerances for greenhouse-gas emissions can only be resolved at the federal level because of the uniquely federal interests involved. *See Am. Petroleum Inst.*, 63 F.4th at 719 (quoting *City of New York*, 993 F.3d at 92). Allowing the fifty states' court systems to simultaneously regulate the global climate through civil litigation would be inviting chaotic confrontation. *Id.* (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 496–97 (1987). Because the emissions are global, there is an overriding need for a uniform rule of decision. *Id.* The federal courts must intervene to preserve the constitutional balance, vindicate the equal sovereignty of the States, and halt Minnesota's disastrous race to the bottom.

## II.     Minnesota's Litigation Violates the Structural Constitution.

The Supreme Court has long recognized that "each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003). That structural Constitution preserves the architecture of our Union and prevents the disarray that plagued the Articles of Confederation. *See Franchise Tax Bd.*, 587 U.S. at 246 (quoting *Shelby Cnty. v. Holder*, 570 U.S. 529, 544 (2013)). And it depends on the understanding that each State may exercise its police powers only "upon persons and property within the limits of its own territory." *Hoyt v. Sprague*, 103 U.S. 613, 630 (1881). This allows different communities to live "with different local standards" according to those communities' local preferences. *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989).

By seeking a global injunction and billions in damages to regulate interstate greenhouse-gas emissions, Minnesota has launched a direct assault on the Constitution's extraterritoriality principle and the equal sovereignty of its sister States. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980) (A State's equal sovereignty under the Constitution "implie[s] a limitation on the sovereignty of all its sister States.").

So an injunction here will protect the Constitution's structure, which gives each State sovereignty equal to every other State. By seeking to project its own environmental and energy policy preferences beyond its borders, Minnesota violates those structural limitations. *See NPPC*, 598 U.S. at 375 (quoting *Hoyt*, 103 U.S. at 630). States are not supposed to try to impose their policies on their sisters. Yet Minnesota seeks billions in damages against energy companies for allegedly causing a global climate-change crisis, effectively attempting to dictate environmental policy for other sovereign States. Allowing one State to foist its own policy choices on neighboring States destroys the equality of right that serves as the cardinal rule of federalism. *See BMW of N. Am.*, *Inc. v. Gore*, 517 U.S. 559, 571 (1996).

To be sure, States' traditional police powers include regulating energy and the environment. States have "real and substantial interests" in their natural environments. *New Jersey v. New York*, 283 U.S. 336, 342 (1931). And that includes "all the earth and air within [a State's] domain." *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907). That fits within the federal framework established in the Clean Air Act, 42 U.S.C. § 7401 et seq. That Act affirms that States have "the primary responsibility" of "air pollution prevention . . . and air pollution control *at its source*." 42 U.S.C. § 7401(a)(3) (emphasis added). But the key to those regulations is that they must stop at the State's border. A State may not impose its legislation on "one of the other[ States]," because within its own borders, each State "is bound to yield its own views to none." *Kansas v.*

10

*Colorado*, 206 U.S. 46, 97 (1907); *see also Bonaparte v. Appeal Tax Ct. of Baltimore*, 104 U.S. 592, 594 (1881) ("No State can legislate except with reference to its own jurisdiction.").

That territorial limitation on State authority to regulate fits neatly with the States' "equality of right"—the "cardinal rule" of federalism that "[e]ach state stands on the same level with all the rest." *Kansas*, 206 U.S. at 97; *see Shelby Cnty*, 570 U.S. at 544. That is why the Supreme Court explained in *Illinois v. City of Milwaukee* the two circumstances where the federal courts should intervene in interstate disputes. 406 U.S. 91, 105 n.6 (1972). The first is "where there is an overriding federal interest in the need for a uniform rule or decision." *Id.* And the second is "where the controversy touches the basic interests of federalism." *Id. Illinois* itself was a dispute about interstate pollution, providing a clear roadmap for this Court's action.

Because the gas emissions at issue here are national and global, subjecting emitters to the vagaries of the laws of several States will create chaos. Permitting Minnesota to apply its own state tort law to a global phenomenon would necessarily lead to a confused patchwork of standards, and thus to untenable uncertainty for traditional energy companies that would become "subject to the vagaries of the laws of several states." *Clearfield Tr. Co.*, 318 U.S. at 367. Indeed, allowing different states to regulate the same conduct would risk severe confrontation between sovereigns. *Int'l Paper Co.*, 479 U.S. at 496. Given the proliferation of suits across the country by different actors trying to impose liability for the same actions, allowing civil litigation like Minnesota's could "scuttle the nation's carefully created system for accommodating the need for energy production and the need for clean air." *North Carolina*, 615 F.3d 291, 296 (4th Cir. 2010).

A State may disagree with the balance struck by federal law or with the policy of another State, but it "may not impose economic sanctions on violators of its laws with the intent of changing . . . lawful conduct in other States." *BMW*, 517 U.S. at 572. Suits like Minnesota's are

11

improperly "designed to . . . govern[] conduct and control[] policy" well beyond the plaintiff's borders. *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959).

Minnesota will likely try to salvage its unconstitutional gambit by insisting that it is merely enforcing standard consumer-protection laws against localized deception. But artful pleading comes in many forms, and "[t]his is one of them." *Am. Petroleum Inst.*, 63 F.4th at 717 (Stras, J., concurring). A "peek behind" the complaint reveals that its lawsuit unmistakably takes aim at the production and sale of fossil fuels worldwide. *Id.* at 720. The character of a case is determined by the questions involved, not by the skillful statements and omissions of the plaintiff.

The Constitution forbids Minnesota from setting national energy policy from a state-court bench, and this Court should enjoin the litigation accordingly.

## CONCLUSION

For all these reasons, this Court should grant the United States's injunction to stop the ongoing climate litigation.

Respectfully submitted,                    Dated: May 18, 2026

s/Nicholas J. Nelson
Nicholas J. Nelson (#391984)
Upper Midwest Law Center
12600 Whitewater Dr., Ste. 140
Minnetonka, MN 55343
(612) 428-7000
nicholas.nelson@umlc.org
    *Counsel for proposed amici curiae*

Brenna Bird
    *Attorney General*
Eric H. Wessan
    *Solicitor General*
Office of the Attorney General
1305 E. Walnut St.
Des Moines, Iowa 50319
eric.wessan@ag.iowa.gov
(515) 823-9117
    *Counsel for the State of Iowa*

12

*Counsel for Additional* Amici *States*

Steve Marshall
Attorney General of Alabama

Cori Mills
Acting Attorney General of Alaska

Tim Griffin
Attorney General of Arkansas

James Uthmeier
Attorney General of Florida

Chris Carr
Attorney General of Georgia

Raúl R. Labrador
Attorney General of Idaho

Theodore E. Rokita
Attorney General of Indiana

Kris Kobach
Attorney General of Kansas

Liz Murrill
Attorney General of Louisiana

Lynn Fitch
Attorney General of Mississippi

Catherine Hanaway
Attorney General of Missouri

Austin Knudsen
Attorney General of Montana

Michael T. Hilgers
Attorney General of Nebraska

Drew Wrigley
Attorney General of North Dakota

Gentner Drummond
Attorney General of Oklahoma

Dave Sunday
Attorney General of Pennsylvania

Alan Wilson
Attorney General of South Carolina

Marty Jackley
Attorney General of South Dakota

Jonathan Skrmetti
Attorney General of Tennessee

Ken Paxton
Attorney General of Texas

Derek E. Brown
Attorney General of Utah

John B. McCuskey
Attorney General of West Virginia

Keith G. Kautz
Attorney General of Wyoming

13

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that on May 18, 2026, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to all parties of record.

*/s/Nicholas J. Nelson*
*Counsel for proposed amici curiae*

14