## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>*Plaintiff,* )<br><br>v. )<br><br>STATE OF MINNESOTA and )<br>KEITH ELLISON, in his official capacity )<br>as Minnesota Attorney General )<br><br>*Defendants.* ) | Civil Action No.<br>26-cv-02456-SRN-DLM |

## REBUTTAL DECLARATION OF
## <u>DEPUTY SECRETARY OF STATE OF THE UNITED STATES</u>

I, Christopher Landau, declare as follows:

1.      I am familiar with the lawsuits in *Minnesota v. American Petroleum Institute, et al.*, No. 62-CV-20-3837 (Minn. Dist. Ct.), and *United States v. Minnesota, et al.*, No. 26-cv-02456 (D. Minn), as well as the declarations of Todd Stern (*id.* Dkt. 43) and Jacob Sullivan (*id.* Dkt 44) in support of Minnesota.

2.      Subject to the broader points regarding the deference that courts should give to the views of current officials set out in Section II of the United States Reply in Support of Motion for a Preliminary Injunction and in the

*U.S. v. Minnesota (D. Minn.)* – State Department Rebuttal Declaration

Motion to File Rebuttal Declaration of Deputy Secretary of State of the United States, and although more can be said, I write to make four points in response to the Stern and Sullivan declarations.

3.      *First*, Mr. Stern writes that "climate diplomacy has always centered on the conduct, duties, and obligations of national governments, including in regard to liability and compensation." Stern Decl. ¶ 25; *id.* ¶ 17 ("[T]he focus of the United States' climate diplomacy has been the conduct of national governments—the rights, duties, and obligations of states toward each other."). This statement fails to provide a complete picture of foreign diplomacy.

4.      Foreign diplomacy, whether involving climate change or other global issues, regularly concerns commercial actors. In fact, despite his statement seemingly to the contrary, Mr. Stern acknowledges that foreign affairs implicate "private-sector actors." *Id.* ¶ 20.

5.      The Department's 2026-2030 Agency Strategic Plan identifies "Economic and Technical Dominance" as a top goal. *See* Agency Strategic Plan, Fiscal Years 2026-2030, U.S. Department of State, p.3 (available at https://www.state.gov/wp-content/uploads/2026/01/Agency-Strategic-Plan-for-Fiscal-Years-2026-2030.pdf ) ("American enterprise is the root of our global power and our domestic prosperity" and that "[t]hrough a reinvigorated focus on commercial diplomacy, we will protect American businesses, workers, and

2

*U.S. v. Minnesota (D. Minn.)* – State Department Rebuttal Declaration

economic interests across the world."). To operationalize this goal, under Secretary Rubio's leadership, the Department leverages commercial diplomacy to drive the agenda for U.S. foreign policy. For example, earlier this year, the Department launched a Commercial Diplomacy Enterprise ("CDE"), which includes new processes to consistently elevate commercial opportunities and issues for Department leadership's engagement, and a system to share opportunities with interagency partners. In sum, commercial diplomacy is a key tool of diplomatic statecraft, necessary to ensure the United States forges and maintains strategic partnerships, secures critical supply chains, opens foreign markets for American firms, and creates opportunities for American workers.

6.      On climate related policy specifically, the United States has vigorously opposed a proposal at the International Maritime Organization (IMO) that would compel commercial owners of large cargo and cruise ships worldwide to pay directly into a fund administered by the IMO unless their vessels meet stringent requirements for their emissions of greenhouse gases. The U.S. opposition and diplomatic engagement have been grounded not on the proposed international obligation among states that would require national port authorities to check that ships have a valid IMO certificate of compliance, but rather on the adverse economic effects for U.S. businesses and ultimately consumers of a "carbon tax" on international shipping. A joint statement issued

*U.S. v. Minnesota (D. Minn.)* – State Department Rebuttal Declaration

by three Cabinet secretaries last October made clear that the Administration "will not tolerate any action that increases costs for our citizens, energy providers, shipping companies and their customers, or tourists." Taking Action to Defend America from the UN's First Global Carbon Tax, Media Note, U.S. Department of State, October 10, 2025 (available at https://www.state.gov/releases/office-of-the-spokesperson/2025/10/taking-action-to-defend-america-from-the-uns-first-global-carbon-tax-the-international-maritime-organizations-imo-net-zero-framework-nzf/.) At an April meeting of IMO member states, joined by industry and civil-society groups as observers, the United States and partners "successfully brokered a diplomatic path forward that protects American workers and trade." *See* U.S. Coalition Fractures Support for the IMO Global Carbon Tax, Protecting American Interests," U.S. Department of State Press Statement, May 1, 2026 (available at https://www.state.gov/releases/office-of-the-spokesperson/2026/05/u-s-coalition-fractures-support-for-the-imo-global-carbon-tax-protecting-american-economic-interests/).

7.    Additionally, the Department has been engaged on behalf of U.S. energy exporters regarding how the European Union (EU) enforces its methane regulations, given that it is difficult for the industry to comply with the EU requirements to verify hydrocarbon producers and related measuring, monitoring, reporting and verification practices. Ongoing U.S. engagement is

4

*U.S. v. Minnesota (D. Minn.)* – State Department Rebuttal Declaration

important because many U.S. hydrocarbons exporters cannot identify where purchased oil and natural gas is produced as they buy from marketers or virtual trading hubs, making it difficult to track the precise origin of the methane they export. On June 25, 2026, Department of Energy Secretary Christopher Wright publicly raised the U.S. concerns about the EU's regulation on behalf of U.S. energy producers. *See* https://financialpost.com/pmn/business-pmn/us-warns-that-gas-will-go-outside-eu-if-bloc-keeps-methane-rules.

8.     In addition, the President and Secretary of State recently traveled to China to negotiate "stability and confidence for businesses and consumers around the world." The White House (May 17, 2026), *available at* https://perma.cc/UXK7-RUQT. Dozens of business leaders (*e.g.*, Tim Cook of Apple and Kelly Ortberg of Boeing) joined President Trump and Secretary Rubio on that trip. All of these examples demonstrate the importance of U.S. corporations in the context of U.S. foreign policy and diplomacy, including climate policy and diplomacy.

9.     *Second,* it is true that the United Nations Framework Convention on Climate Change (UNFCCC) involved climate diplomacy among "national governments," Stern Decl. ¶ 17, but that is because they are Parties to the Convention. It is not true, however, that actions taken by the Conference of Parties (COP) to the Convention do not take into account private actors,

5

*U.S. v. Minnesota (D. Minn.)* – State Department Rebuttal Declaration

including fossil fuel producers. In fact, the UNFCCC regime encourages non-state actors to engage in its work. *See, e.g.,* "Climate Change Action," https://unfccc.int/climate-action. I note that, while Mr. Stern emphasizes at paragraph 17 that the U.S position opposing international liability schemes was focused on government liability, he carefully does not say that it was U.S. policy to support such international liability schemes for private actors.

10.    *Third,* Mr. Stern states that the Minnesota litigation does not interfere with the U.S. withdrawal from the Paris Agreement and the UNFCCC. *See* Stern Decl. at ¶¶ 30-31. He is correct that this litigation does not interfere with the U. S. right to withdraw from these agreements but is incorrect about the concern. Litigation by Minnesota and other U.S. states is at odds with the U.S. policy against regulating greenhouse gas emissions internationally. In fact, one of the reasons that the United States decided to withdraw from the Paris Agreement was that it did not reflect U.S. values for the pursuit of economic and environmental objectives. *See* E.O. 14162 "Putting America First in International Environmental Agreements," section 1 (Jan. 20, 2025)

11.    *Fourth,* both Mr. Stern and Mr. Sullivan suggest that climate change cases, including *Minnesota,* No. 26-cv-02456, have not caused tangible or concrete effects to foreign affairs. *See* Stern Decl. ¶ 34 ("I am unaware of any instance where [climate change] lawsuits have interfered with the United

6

*U.S. v. Minnesota (D. Minn.)* – State Department Rebuttal Declaration

States' foreign relations by influencing any negotiation, complicating any relationship with a foreign state, or impairing the United States' ability to advance its positions internationally."); Sullivan Decl. ¶ 17 (similar). This isn't true.

12.   Current U.S. foreign policy opposing international liability schemes is impaired by domestic litigation like the Minnesota case that seeks to do just that. When U.S. States pursue litigation to impose liability on U.S. and foreign corporations for their global greenhouse gas emissions, it encourages other countries to allow similar (and even broader) actions against a broad array of companies ranging from energy producers to financial companies, conflicting with U.S. opposition to such liability schemes.[1] This type of "copycat" litigation can be as problematic as direct retaliation against U.S. companies overseas.   In other foreign jurisdictions, foreign governments are already allowing non-governmental actors to bring litigation to enforce liability for greenhouse gas emissions based on their purported global harm.[2]   Quite

---

[1] *See, e.g.,* The Climate Litigation Database, Sabin Center for Climate Change Law (Columbia Law School and Columbia Climate School) (available at https://www.climatecasechart.com/, (listing hundreds of climate-change related litigation, including claims against corporations for deceptive advertising and failure to disclose).

[2] *See, e.g., Milieudefense v Shell*, Rb. Den Haag, 26 mei 2021, ECLI:NL:RBDHA:2021:5339 (Milieudefensie/Royal Dutch Shell plc) (Neth.), rev'd, Hof Den Haag 12 november 2024, ECLI:NL:GHDHA:2024:2100.

simply, if Minnesota's case is enforceable, then the United States has less to offer and less economic and diplomatic leverage as a consequence to address the issues concerning global greenhouse gas emissions.

13. Accordingly, Minnesota's case, along with the other state level cases, undermines the U.S. ability to speak with one voice internationally and can weaken efforts to persuade our foreign counterparts to oppose such schemes or to counteract an environment where such litigation flourishes.

14. Individually or collectively, it is clear that climate change cases—including *Minnesota*, No. 26-cv-02456—have had more than an incidental effect on foreign relations.

I declare under penalty of perjury that the foregoing is true and correct.

Christopher Landau

Executed this _____ day of June 2026, Washington, D.C.