

**U.S. Department of Justice**

---

950 Pennsylvania Ave, NW
Washington, DC  20530

(202) 514-2701
John.Adams5@usdoj.gov

VIA CM/ECF            August 3, 2026

Hon. Susan Richard Nelson
United States District Court
316 N. Robert Street
St. Paul, MN 55101

> Re:  Notice of Supplemental Authority in *United States of America, et al. v. State of Minnesota, et al.*, No. 26-cv-02661-KMM-DTS (D. Minn.)

Dear Judge Nelson:

The United States respectfully submits notice of *United States, et al. v. State of Minnesota, et al.*, No. 26-cv-02661, Dkt. 76 (July 27, 2026 D. Minn) (Ex. A), in which the court granted the United States' motion for a preliminary injunction. The order enjoins Minnesota from enforcing a law before it takes effect, because the federal government retains "exclusive jurisdiction" to regulate the conduct covered by the challenged law, which subjected private actors to liability and was not directed at the federal government. *Id.* at 3.

Relevant here, the court concluded that the federal government had standing because Minnesota had interfered with the United States' "interest in enforcing federal law," even before the state law took effect. *Id.* at 19 (quoting *United States v. Missouri*, 114 F.4th 980 (8th Cir. 2024)). The court stated:

> [Minnesota] argue[s] that the United States' . . . interest in enforcing federal law is too amorphous to constitute an injury in fact. Instead, [Minnesota] argue[s] that the United States must allege "concrete harm to federal agency operations or direct violation of federal law" and has failed to do so. The Court disagrees.

*Id.* at 19 (citation omitted). In support, the court cited *KalshiEX LLC v. Johnson*, --- F. Supp. 3d ---, 2026 WL 1223373, at *3 (D. Ariz. May 5, 2026), *appeal filed* in No. 26-2978 (9th Cir.), which in turn relied upon *Arizona v. United States*, 567 U.S. 387 (2012).

In addition, the court found that a declaration stating that the federal government had diverted resources to address the interference constituted another injury. *Id.* at 20; *see also, e.g.*, Dec. of Aaron Szabo, No. 26-cv-02456, Dkt.

1

13 ¶ 27 (describing threat of a "significant shift in available resources" to EPA). The court also noted that Minnesota "risk[ed] conflating the Article III concept of injury in fact with the merits" in its standing analysis. Ex. A at 21 (citing *Missouri*, 114 F.4th at 985).

Finally, the court concluded that infringing on the "exclusive authority" of the federal government constitutes irreparable harm and that equity favored granting the motion for a preliminary injunction. *Id.* at 41–42.

Respectfully submitted,

/s/ John Adams

John K Adams
Deputy Associate Attorney General
United States Department of Justice

# Exhibit A

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, and Commodity Futures Trading Commission, | No. 26-cv-2661 (KMM/DTS) |
| Plaintiff, | |
| v. | |
| State of Minnesota, et al., | |
| Defendants. | |

| | |
|---|---|
| KalshiEX LLC, | No. 26-cv-2778 (KMM/DTS) |
| Plaintiff, | |
| v. | |
| Keith Ellison, *in his official capacity as Attorney General of Minnesota*, et al., | |
| Defendants. | |

| | |
|---|---|
| QCX LLC, *doing business as* Polymarket US, | No. 26-cv-2841 (KMM/DTS) |
| Plaintiff, | |
| v. | |
| Keith Ellison, *in his official capacity as Attorney General of Minnesota*, et al., | |
| Defendants. | |

## ORDER ON PLAINTIFFS' MOTIONS
## FOR PRELIMINARY INJUNCTION

KalshiEX LLC (Kalshi) and QCX LLC (Polymarket US) are financial services companies that operate designated contract markets (DCMs) registered with the United States Commodities Futures Trading Commission (CFTC). Anyone with access to the Kalshi or Polymarket US platforms can purchase an "event contract," an instrument that allows a person to risk her money by predicting the outcomes of a wide variety of events occurring in sports, politics, culture, and other areas. If the person predicts the outcome correctly, the event contract pays back her initial investment plus something more, and the profit she makes depends on how likely or unlikely the market believed the outcome was at the time she entered the contract. If she guesses wrong, however, she takes nothing and loses the money she risks. These contracts are traded online, often through a mobile app.

To Minnesota lawmakers, this arrangement sounds a lot like gambling. Concerned about the negative effects that such transactions have on their constituents, Minnesota lawmakers passed a law prohibiting the creation, operation, and advertising of prediction markets in the state. That law is scheduled to take effect on August 1, 2026. It imposes criminal penalties for those operating prediction markets and engaging in other activities supporting those markets. Minn. Stat. § 609.7615[1] [hereafter "prediction market statute"].

---

[1] The prediction market statute will be codified at Minn. Stat. § 609.7615, but is the product of two separate laws. (*CFTC*, Dkt. 36 at 11 n.19.) The text of the soon-to-be-effective law is available at https://www.revisor.mn.gov/laws/2026/0/118/laws.6.3.0#laws.6.3.0 (last visited July 27, 2027).

In these three related cases,[2] Kalshi, Polymarket US, the United States, and the CFTC (collectively "Plaintiffs") seek the ultimate relief of a permanent injunction prohibiting Defendants from enforcing the prediction market statute.[3] They contend that the Commodity Exchange Act (CEA) preempts Minnesota's statute because the CEA gives the CFTC "exclusive jurisdiction" to regulate the type of event-contract transactions offered by Kalshi and Polymarket US. In addition, Kalshi and Polymarket US claim that the prediction market statute violates their First Amendment rights by prohibiting advertising of their exchanges in Minnesota and preventing them from receiving information related to prediction markets from third parties.

These matters are before the Court on the Plaintiffs' motions for preliminary injunctive relief. *CFTC* (Dkt. 24); *Kalshi* (Dkt. 21); *Polymarket* (Dkt. 19).[4] As explained below, Plaintiffs' motions are granted. The Court finds that Plaintiffs have met their burden to show they are likely to succeed, at least in part, on their express-preemption claims, that they face a threat of irreparable harm, and that the balance of harms and the public interest

---

[2] Within a few days of each other, each Plaintiff filed a separate case. *United States v. Minnesota*, No. 26-cv-2661 (KMM/DTS); *KalshiEx LLC v. Ellison*, No. 26-cv-2778 (KMM/DTS); *QCX LLC v. Ellison*, No. 26-cv-2841 (KMM/DTS). Respectively, the Court cites to the record in each as follows: (1) *CFTC* (Dkt. XX); (2) *Kalshi* (Dkt. XX); and (3) *Polymarket* (Dkt. XX).

[3] *See, e.g.*, *Polymarket* (Dkt. 1 at 40 (requesting a preliminary and permanent injunction against enforcement of the prediction market statute)).

[4] Across the three cases, the Defendants include: the State of Minnesota; Minnesota Governor Tim Walz; Minnesota Attorney General Keith Ellison; the Minnesota Department of Public Safety (DPS); and Jon Anglin, the Director of the Alcohol and Gambling Division of DPS.

weigh in favor of entering a preliminary injunction barring enforcement of Minnesota's prediction market statute until a final decision on the merits is reached.

## BACKGROUND

### *Futures Markets and Event Contracts*

This case involves a dispute over the proper scope of the CFTC's regulation of derivatives markets.[5] A derivative is a "financial instrument or contract whose price is directly dependent upon (i.e., derived from) the value of one or more underlying assets— for example, commodities (like corn and wheat), securities, or debt instruments." *KalshiEx LLC v. Commodity Futures Trading Commission*, No. 23-cv-3257-JMC, 2024 WL 4164694, at *1 (D.D.C. Sep. 12, 2024) [hereafter "*CFTC D.D.C.*"] (cleaned up); *see also* Derivative, *Futures Glossary*. "Derivatives include futures, options, and swaps," and "[t]hey are used to hedge risk or to exchange a floating rate of return for [a] fixed rate of return." Derivative, *Futures Glossary*.

An event contract is a type of derivative where the possible payoff is "based on a specified event, occurrence or value." *KalshiEx LLC v. Martin*, 793 F. Supp. 3d 667, 671

---

[5] "Futures" or "futures contracts" are agreements "to purchase or sell a commodity for delivery in the future: (1) at a price that is determined at initiation of the contract; (2) that obligates each party to the contract to fulfill the contract at the specified price; (3) that is used to assume or shift price risk; and (4) that may be satisfied by delivery or offset." CFTC, Futures Glossary: A Guide to the Language of the Futures Industry, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm [hereafter "*Futures Glossary*"]. An interested reader can find detailed descriptions of the nature of commodity futures markets, the mechanics of how they work, and the roles played by hedgers and speculators in *Leist v. Simplot*, 638 F.2d 283, 286–88 (2d Cir. 1980) (Maine potato futures contracts), and *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1156–58 (8th Cir. 1971) (soft red winter wheat futures contracts).

(D. Md. 2025). An event contract "can be purchased or sold any time before its expiration date for a specific value, and upon expiration, the seller will pay the buyer if the event occurs." *Id.* Event contracts are generally framed as a yes-or-no question. "The buyer of the event contract, for example, may take a yes position on whether the underlying event will happen, and the seller implicitly takes the opposite, or no, position," and the changing likelihood that the event will happen determines fluctuation in the contract price. *N. Am. Derivatives Exch. v. Nev. Gaming Control Bd.*, 815 F. Supp. 3d 1169, 1176 (D. Nev. 2025) [hereafter "*Crypto*"] (cleaned up).

### *The CEA and Creation of the CFTC*

The CEA was first passed in 1936 to regulate derivatives markets, and it has been amended several times since then. Commodity Exchange Act, 74 Cong., Ch. 545, 49 Stat. 1491 (June 15, 1936). In 1974, Congress amended the CEA and created the CFTC, an independent executive agency responsible for commodity futures regulation. 7 U.S.C. § 2(a)(2)(A). The CEA requires any "board of trade" to apply to the CFTC "for designation as a contract market" under terms that the CFTC establishes. 7 U.S.C. § 7(a). Such an approved trading market is known as a designated contract market or "DCM." *Martin*, 793 F. supp. 3d at 672; *see also* Designated Contract Market, *Futures Glossary*. Following the application process, the CFTC designates an exchange as a DCM when it complies with certain "core principles" established by law and requirements imposed by the CFTC pursuant to its administrative rules and regulations. 7 U.S.C. § 7(d)(1)(A).

The CEA defines the scope of the CFTC's authority. In general, it states that the CFTC "shall have exclusive jurisdiction . . . with respect to accounts, agreements . . ., and

transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed" on a DCM. 7 U.S.C. § 2(a)(1)(A). This jurisdictional provision also includes the following savings clause:

> Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on . . . regulatory authorities under the laws . . . of any State, or (II) restrict . . . such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

*Id.*

### *Dodd-Frank Act*

Congress exempted most "over-the-counter"[6] derivatives or swaps from regulation by the CFTC in the Commodities Futures Monetization Act of 2000. S. Rep. No. 111-176, at 29 (2010). In 2010, Congress enacted the Dodd-Frank Act in response to the financial crisis of 2008, which was attributed, in large part, to the unregulated market for swaps. *Id.*; *see also United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025) (explaining that "many saw the previous lack of regulation in swaps as a contributing cause" of the 2008 financial

---

[6] So-called over-the-counter derivatives or swaps are those that are "executed bilaterally rather than over an exchange." *Securities Industry and Fin. Markets Assoc. v. CFTC*, 67 F. Supp. 3d 373, 385 (D.D.C. 2014); Over-the-Counter (OTC), *Futures Glossary* (defining over-the-counter as the "trading of commodities, contracts, or other instruments not listed on any exchange. OTC transactions can occur electronically or over the telephone. Also referred to as Off-Exchange."). The Commodities Futures Monetization Act of 2000 "left the markets for most derivative swaps 'essentially unregulated and unmonitored—effectively dark—in most respects,' and those markets flourished until the 2008 financial crisis." *Sec. Indus. and Fin. Markets Assoc.*, 67 F. Supp. 3d at 385 (quoting *Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 171 (D.D.C. 2012)).

crisis). In relevant part, the Dodd-Frank Act expanded the CEA's coverage to include regulation of swaps by the CFTC. 7 U.S.C. § 2(a)(1)(A). The CEA now defines a swap to include "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). As noted above, and because of the Dodd-Frank Act's amendments to the CEA, the CFTC's "exclusive jurisdiction" now extends to "transactions involving swaps" that are "traded or executed on" a CFTC-regulated DCM. 7 U.S.C. § 2(a)(1)(A).

The Dodd-Frank Act also added a "special rule" that gives the CFTC the power to prohibit certain event contracts or swaps that the CFTC concludes are contrary to the public interest. 7 U.S.C. § 7a-2(c)(5)(C). "Specifically, if a [DCM] lists contracts 'in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency,' the CFTC may identify the contracts as 'contrary to the public interest' (and prohibit their listing) if they 'involve' either 'activity that is unlawful under any Federal or State law' or 'gaming.'" *KalshiEx LLC v. Schuler*, No. 26-3196, 2026 WL 1295806, at \*2 (6th Cir. Apr. 24, 2026) (quoting 7 U.S.C. § 7a-2(c)(5)(C)(i)(I), (V)).

The CFTC issued a regulation, effective in 2011, that exercised its rulemaking authority under the special rule. That regulation provides that a regulated DCM is prohibited from listing "[a]n agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, *gaming*, or an activity that is unlawful under

7

any State or Federal law." 17 C.F.R. § 40.11(a)(1) (emphasis added). In June 2024, the CFTC proposed amendments to this regulation that would further define gaming "as the staking or risking by any person of something of value upon: (i) the outcome of a contest of others; (ii) the outcome of a game involving skill or chance; (iii) the performance of one or more competitors in one or more contests or games; or (iv) any other occurrence or non-occurrence in connection with one or more contests or games." Commodity Futures Trading Commission, *Notice of Proposed Rulemaking – Event Contracts*, 89 Fed. Reg. 48968, 48974–75 (proposed June 10, 2024). The 2024 proposed rule provided a non-exclusive list of event contracts that would constitute gaming to be prohibited from registered DCM prediction markets. It stated that "gaming" includes: "the staking or risking by any person of something of value upon: (i) the outcome of a political contest, including an election or elections; (ii) the outcome of an awards contest; (iii) the outcome of a game in which one or more athletes compete; or (iv) an occurrence or non-occurrence in connection with such a contest or game, regardless of whether it directly affects the outcome." *Id.* at 48975.

However, on February 6, 2026, the CFTC withdrew the 2024 Notice of Proposed Rulemaking. CFTC, *Withdrawal of Proposed Regulatory Action – Event Contracts*, 91 Fed. Reg. 5386, 5387 (Feb. 6, 2026) ("The Commission is withdrawing these proposed rules to reconsider them in light of various forms of state regulatory actions and litigation concerning the Commission's exclusive jurisdiction over event contract derivatives listed on designated contract markets[.]"). The following month, the CFTC issued an Advanced Notice of Proposed Rulemaking seeking public comment about the factors it should

consider in determining whether event contracts involving five listed categories of activities (activities that are illegal under federal or state law, war, assassination, terrorism, gaming) are contrary to the public interest. CFTC, *Advanced Notice of Proposed Rulemaking, Request for Comments – Prediction Markets*, 91 Fed. Reg. 12516 (proposed Mar. 16, 2026). On June 12, 2026, the CFTC issued a new Advanced Notice of Proposed Rulemaking regarding prediction markets and sought public comment through July 27, 2026 on its proposed approach to evaluating whether certain event contracts are contrary to the public interest. CFTC, *Notice of Proposed Rulemaking, Prediction Markets – Public Interest Determinations*, 91 Fed. Reg. 35806 (proposed June 12, 2026). In part, the CFTC proposes to amend 17 C.F.R. § 40.11 by: providing that the CFTC "may determine" that certain event contracts involving the five enumerated activities in the CEA's special rule are contrary to the public interest; establishing a set of procedures for making that determination with respect to specific contracts; and further defining the relevant enumerated activities, including gaming, and the factors by which the CFTC evaluates whether event contracts are in the public interest.[7] 91 Fed. Reg. at 35859–61.

---

[7] The proposed rule lists "positive" and "negative" factors that weigh for or against finding that "gaming" contracts are contrary to the public interest. Factors weighing against a contrary-to-public-interest finding include whether the settlement of event contracts depends on: the "aggregate outcome" of professional or collegiate sports games; individual statistical performance of an individual; "objectively determinable settlement data, as opposed to . . . inherently subjective determinations"; and other matters. 91 Fed. Reg. at 35860. Factors that would support a finding that a gaming event contract is contrary to public interest include whether the agreements involve a game of random chance; whether the contract is settled based on player injury or officiating outcome; whether the contract settles based on the outcome of a game where "participants are below the collegiate level"; and other factors. *Id.* at 35860–61.

***Minnesota's Prediction Market Statute***

As prediction markets and online trading in event contracts have exploded in popularity in recent months, Minnesota lawmakers grew concerned that many event contracts were indistinguishable from gambling, raising the potential for both manipulation and the negative effects of problem gambling, particularly for young people. *CFTC* (Dkt. 36 at 13 (quoting comments of a proponent of Minnesota's prediction market statute).) Against that backdrop, Minnesota lawmakers enacted the prediction market statute that Plaintiffs now seek to enjoin.

The prediction market statute defines "prediction markets" as follows:

> (e) "Prediction market" means a system that allows consumers to place a wager[8] on the future outcome of a specified event that is not determined or affected by the performance of the parties to the contract for:
>
> (1) an athletic event or game of skill, or portions thereof or individual performance statistics therein;
>
> (2) any game played with cards, dice, equipment, or any mechanical or electronic device or machine;
>
> (3) war, state or national emergencies, human-made disasters, mass shootings, acts of terrorism, or public health crises, or the ancillary effects thereof;
>
> (4) any event or events happening to a natural person or group of people;
>
> (5) a federal, state, or local election, or the specific decisions of the federal, state, or local government and the government's agencies, employees, and officers, the

---

[8] Minnesota's prediction market statute defines "wager" as "a contract, including a prediction market contract, whereby the parties to the contract agree to a gain or loss by one to the other of money, property, or benefit." Minn. Stat. § 609.7615, subd. 1(f).

primary underlying characteristic of which is not financial, commercial, or economic or the outcome is under the complete control of any person or the outcome is known by any person in advance. This prohibition applies to event contracts on the specific action or decision itself and does not apply to the resulting consequences of such actions or decisions;

(6) legal actions, including but not limited to a civil or criminal suit, grand jury action, jury trial, settlement, plea, or conviction;

(7) the death, assassination, or attempted killing of a person or group of persons, or mass casualty events;

(8) events in popular culture, including but not limited to awards and the date a piece of entertainment will be released; or

(9) whether a person will make a particular statement.

Minn. Stat. § 609.7615, subd. 1(e).

The Minnesota law imposes criminal liability for a variety of conduct involving prediction markets. If a person does any of the following, she is guilty of a felony:

(1) creates a prediction market;

(2) operates, manages, or controls a platform or system intending that consumers will use the platform or system to make wagers in a prediction market;

(3) intentionally facilitates the operation of a prediction market by:

(i) identifying or listing events knowing the events will be used by consumers to make wagers;

(ii) accepting, holding, or directing the disposition of funds or other things of value for the purpose of allowing consumers to make wagers or to settle wagers made by consumers;

11

(iii) determining, administering, or enforcing the terms, pricing, or settlement of wagers made by consumers;

(iv) regularly or continuously acting as a counterparty to wagers made by consumers by entering into a wager, offering to enter into a wager, or taking a temporary position in a wager that may be replaced by a different consumer; or

(v) setting or adjusting the prices, odds, or terms that apply to wagers entered into by consumers;

(4) provides data, information, or verification services, including the provision of event outcomes, directly to a prediction market knowing that the data, information, or verification services will be used to allow consumers to make wagers or to settle wagers made by consumers in violation of this section; or

(5) provides supportive services to a prediction market knowing that the services will be used to identify a consumer's location, transfer funds, or make or process payments for the purpose of allowing consumers to make wagers or to settle wagers made by consumers in violation of this section.

Minn. Stat. § 609.7615, subd. 2.[9] The prediction market statute also makes it a felony for a person to "advertise[] or market[] financial or technological products that promote transactions prohibited under" the law. *Id.* § 609.7615, subd. 3. The prediction market statute goes into effect in Minnesota on August 1, 2026.

---

[9] Criminal liability under subdivision 2 of the prediction market statute also requires that the person take the prohibited acts "for consideration, and as part of a business." Minn. Stat. § 609.7615, subd. 2.

### *Kalshi and Polymarket US*

Kalshi and Polymarket US are financial services companies that operate derivatives exchanges and prediction markets where users can buy and sell event contracts. *Kalshi* (Dkt. 1 ¶ 18); *Polymarket* (Dkt. 1 ¶ 17). Kalshi and Polymarket US operate nationwide DCMs, and each has received CFTC approval to do so following registration. *Kalshi* (Dkt. 25 ¶ 5); *Polymarket* (Dkt. 1 ¶ 52; Dkt. 22-3).[10]

Polymarket US lists event contracts for a variety of "real-world events of public interest," including contracts predicting which political party will control the chambers of Congress following the November 3, 2026 elections and which National Football League team will win the Super Bowl. *Polymarket* (Dkt. 1 ¶¶ 53, 55–56). Other examples of event contracts listed by Polymarket US include:

- "program host contracts" where users risk money predicting whether a specific person will host a particular show during a designated time period;

- "solar event contracts" such as predicting whether and when solar flares or geothermal storms will occur;

- "title award contracts" that depend on predictions of who will win an award, such as the Oscar for best actor;

- "event mention contracts" that pay out if a speaker at an identified event mentions a word or phrase or says it a specific number of times; and

---

[10] Polymarket US emphasizes that it is a distinct entity from its parent company "Blockratize Inc. d/b/a Polymarket." *Polymarket* (Dkt. 21 at 8).

- "participant attend contracts" which hinge on whether an identified person attends a specified event.[11]

Kalshi's "platform currently allows users to trade on[, for example,] the level of US GDP growth in Q2 2026, the closing price of the S&P 500 at the end of 2026, whether India will meet its 2030 climate goals, whether the market share for electric vehicles will be above 50% in 2030, or when the Strait of Hormuz will open." *Kalshi* (Dkt. 1 ¶ 62). "Kalshi also offers contracts on congressional votes, weather events, technological benchmarks, markers of cultural influence, and Federal Reserve interest rate decisions."[12] *Id.* Both Kalshi and Polymarket US also offer users the opportunity to purchase sports-related event contracts on point spreads, player statistics, and many other game details. *See KalshiEx LLC v. Flaherty*, 172 F.4th 220, 232 (3rd Cir. 2026) (Roth, J., dissenting).

DCMs are required to submit new types of contracts they want to list on their exchanges to the CFTC for approval. "For 'a new contract or other instrument,' approval by the [CFTC] is required, although by statute the [CFTC] 'shall approve' a new event contract or other instrument unless the Commission concludes it violates the CEA or regulations." *Martin*, 793 F. Supp. 3d at 673 (quoting 7 U.S.C. § 7a-2(c)(5)(B)). DCMs can also self-certify that a new contract they intend to list for trading complies with the CEA

---

[11] A list of the types of contracts Polymarket US has certified to be compliant with the CEA and CFTC regulations is found on the CFTC's website. https://tinyurl.com/rsjnj8fj (last visited July 27, 2026).

[12] For example, Kalshi has self-certified an event contract for trading on "Whether the U.S. midterm elections will be held on time in <time period>?"; and "Will <participant> qualify for the Grand Final of the Eurovision Song Contest <year>?" These contract certifications and others can be found on the CFTC's website. https://tinyurl.com/383j7tfw (last visited July 27, 2026).

and CFTC's regulatory requirements. *See* 7 U.S.C. § 7a-2(c)(1). Both Kalshi and Polymarket US self-certify event contracts that are available on their exchanges. *Kalshi* (Dkt. 25 ¶ 6); *Polymarket* (Dkt. 1 ¶ 53; Dkt. 22 ¶¶ 5–8). In the recent past, the CFTC has decided not to take action with respect to any of Kalshi's and Polymarket US's listing of binary-option event contracts (*i.e.*, event contracts where the parties take either a "yes" or "no" position on identified events). *See Kalshi* (Dkt. 1 ¶¶ 64–65; Dkt. 25 ¶¶ 8–10); *Polymarket* (Dkt. 22 ¶ 9; Dkt. 22-8); *see also CFTC* (Dkt. 68 at 39–40 ("THE COURT: How many times has the CFTC asked for a contract to be taken down since the last 18 months? MR. DICKMAN: With respect to event contracts, I don't believe we have. . . . And so far we haven't taken any action to stay [Kalshi's and Polymarket US's self-certified contracts] because we believe they do comply with the CEA.")).

### *Plaintiffs' Claims*

The CFTC, Kalshi, and Polymarket US filed these cases in response to Minnesota's enactment of the prediction market statute. There is no real dispute that Kalshi and Polymarket US operate prediction markets within the meaning of the Minnesota law. Nor is there any dispute that Kalshi and Polymarket US engage in advertising and marketing to promote prediction market transactions that would violate the Minnesota statute. *See, e.g.*, *Kalshi* (Dkt. 1 ¶ 2). All three Plaintiffs raise identical preemption claims in their complaints, asserting that the Minnesota law is preempted by the CEA. They assert that the Minnesota prediction market statute is expressly preempted by the CEA's conferral of "exclusive jurisdiction" on the CFTC for transactions involving swaps. 7 U.S.C. § 2(a)(1).

15

They also claim that the Minnesota law is field preempted and conflict preempted. *Polymarket US* (Dkt. 1 ¶¶ 95–113); *Kalshi* (Dkt. 1 ¶¶ 76–86); *CFTC* (Dkt. 1 ¶¶ 94–101).

In addition, Kalshi and Polymarket US claim that Minnesota's prediction market statute violates their First Amendment rights in two ways. First, both argue that the law burdens their free speech rights by prohibiting them from advertising and marketing their prediction markets. *Polymarket* (Dkt. 1 ¶¶ 115–17); *Kalshi* (Dkt. 1 ¶¶ 87–96). Second, Polymarket US claims that because Minnesota's prediction market statute targets those who knowingly provide data or verification services to a prediction market to enable wagers prohibited by the state law, the statute burdens Polymarket US's First Amendment right to receive and communicate truthful information about its products. *Polymarket* (Dkt. 1 ¶¶ 118–20).

## DISCUSSION

### I.    Preliminary Injunction Standard

"A preliminary injunction is an extraordinary remedy[.]" *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A district court has "broad discretion" in determining whether to issue a preliminary injunction. *Entergy, Ark., Inc. v. Nebraska*, 210 F.3d 887, 898 (8th Cir. 2000) (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998)). A party seeking to obtain a preliminary injunction must demonstrate that the *Dataphase*[13] factors favor injunctive relief: (1) the movant's likelihood of success on the merits; (2) irreparable harm to the movant without injunctive relief; (3) a balance of the

---

[13] *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).

equities; and (4) the public interest. *Euphoric, LLC v. UNIKC, LLC*, No. 25-3146, 2026 WL 1813514, at \*3 (8th Cir. June 24, 2026); *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 664 (8th Cir. 2022). The party seeking relief bears the burden of showing that a preliminary injunction is needed. *Lindell v. United States*, 82 F.4th 614, 618 (8th Cir. 2023).

## II.    Likelihood of Success on the Merits

The likelihood of success on the merits is considered the "most important" factor in assessing a motion for preliminary injunctive relief. *Jet Midwest Int'l Co., Ltd. v. Jet Midwest Gr., LLC*, 953 F.3d 1041, 1044 (8th Cir. 2020) (quoting *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011)). Generally, to meet its burden on this factor the moving party must show a "fair chance of prevailing, . . . but it need not show that it has a greater than fifty per cent likelihood of success[.]" *Sleep Number Corp. v. Young*, 33 F.4th 1012, 1016–17 (8th Cir. 2022) (cleaned up); *see also Wilbur-Ellis Co., LLC v. Jens*, 139 F.4th 608, 611 (8th Cir. 2025) (same). However, if the moving party seeks to "enjoin enforcement of a validly enacted statute, they must establish as a threshold matter that they are 'likely to prevail on the merits.'" *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1053–54 (8th Cir. 2014) (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc)); *Minn. Chamber of Comm. v. Choi*, 707 F. Supp. 3d 846, 857 (D. Minn. 2023) (same). This standard requires a "more rigorous threshold showing" than the ordinary fair-chance-of-prevailing metric, and it "is designed 'to ensure that preliminary injunctions that thwart a state's presumptively reasonable

17

democratic processes are pronounced only after an *appropriately deferential analysis.*"

*Otto*, 744 F.3d at 1054 (quoting *Planned Parenthood*, 530 F.3d at 733) (emphasis in *Otto*).[14]

### A. CFTC's Standing

Defendants contend that the CFTC's motion for preliminary injunction should be denied because the CFTC is unlikely to show that it has standing to bring its preemption claims.[15] To establish Article III standing for declaratory and injunctive relief, the CFTC must show that it (1) faces an imminent threat of an injury in fact,[16] (2) that is traceable to the Defendants, and (3) that could be redressed by a court order. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "At the preliminary injunction stage, . . . the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter*, 555 U.S. at 22). When assessing standing in this context, the Court assumes the CFTC's allegations are true

---

[14] In their reply memoranda on the motions for preliminary injunctions, Plaintiffs do not dispute that this more rigorous likely-to-prevail standard applies in this case. *CFTC* (Dkt. 53); *Kalshi* (Dkt. 38); *Polymarket* (Dkt. 35). At the hearing on the motions, counsel for the CFTC confirmed that the agency does not disagree that the likely-to-prevail standard applies. *CFTC* (Dkt. 68 at 43–44).

[15] Defendants raise no challenge to Kalshi's or Polymarket US's standing to challenge the constitutionality of Minnesota's prediction market statute. Of course, standing is a jurisdictional matter, and courts have an independent obligation to assess their jurisdiction. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Here, the Court's review raises no concern that Kalshi or Polymarket US lacks standing to pursue their claims.

[16] The injury-in-fact element requires a showing of an imminent threat of such injury in the CFTC's case "because the [CFTC] requests forward-looking relief[.]" *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citing *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)).

and views them in a light favorable to the CFTC. *See GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660, 667 (8th Cir. 2024).

The issue here concerns the injury-in-fact requirement. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). "The United States has a legally protected interest in enforcing federal law." *United States v. Missouri*, 114 F.4th 980, 984 (8th Cir. 2024). "Interference with the federal government's interest in enforcing federal law is sufficient to establish that [a state law's] implementation injured the United States." *Id.* at 985.

For purposes of its motion for preliminary injunctive relief, the CFTC has sufficiently demonstrated an imminent threat of an injury in fact. At least one other court has reached that conclusion under similar circumstances. *KalshiEX LLC v. Johnson*, No. CV-26-01715-PHX-MTL, 2026 WL 1223373, at *3 (D. Ariz. May 5, 2026) (concluding at the preliminary injunction stage that the CFTC "has standing to seek to enjoin Arizona's enforcement of its gambling laws against event contracts traded on DCMs").

Defendants argue that the United States' and the CFTC's interest in enforcing federal law is too amorphous to constitute an injury in fact. Instead, Defendants argue that the United States must allege "concrete harm to federal agency operations or direct violation of federal law" and has failed to do so. *CFTC* (Dkt. 36 at 25). The Court disagrees. Even if the CFTC must demonstrate concrete interference with agency operations, at this preliminary stage, the CFTC has done enough to meet that burden. *See Murthy*, 603 U.S.

19

at 58 (observing that a plaintiff "must support each element of standing with the manner and degree of evidence required at the successive stages of the litigation") (quotations omitted).

Joshua Beale, the Acting Director of the CFTC's Division of Market Oversight ("DMO"), states the following:

> [He is] responsible for supervising DMO staff who have received requests for guidance from a DCM in the wake of recent court decisions requiring compliance with State-specific gambling laws and regulations. For example, DMO and CFTC staff have received requests for guidance as to appropriate steps to comply with the CEA and CFTC regulations, to the extent possible, while subject to court orders requiring compliance with state gambling laws. DMO and other CFTC staff have devoted resources to assessing steps DCMs and other CFTC-registered entities may need to take to maintain compliance with the CEA and CFTC regulations. Those resources have necessarily been diverted from core functions of the CFTC, including supervising DCMs and other markets. Steps taken by State authorities to enforce State gambling laws against CFTC regulated DCMs has complicated CFTC oversight of DCMs and other CFTC-registered entities.

*CFTC* (Dkt. 25-1 ¶ 7); *see also CFTC* (Dkt. 1 ¶ 13 (alleging the same)). Defendants have not introduced evidence to controvert the agency's showing, and they identify no authority for the idea that the described injury is insufficient for standing. Under these circumstances, the Court finds that the United States and the CFTC have made an adequate showing that they are likely to establish an injury in fact. *Cf. Missouri*, 114 F.4th at 984 (finding the United States had sufficiently alleged an injury in fact where it presented "uncontroverted evidence that implementation of the [state law] impaired" the government's interest in

20

enforcing federal firearms regulations by requiring withdrawal of state resources from joint operations with federal law enforcement).

Defendants also argue that the United States lacks standing to sue to enjoin enforcement of an arguably preempted state law unless the challenged statute involves a direct violation of federal law, but again they point to no clear authority for this proposition. For example, relying on *United States v. Missouri*, Defendants contend that a "direct violation of federal law" is needed to show injury-in-fact because the Missouri law at issue there "purported to invalidate federal law," making the "interference with federal law sufficiently high to establish standing." *CFTC* (Dkt. 36 at 25). But the Eighth Circuit's articulation of the federal government's interest in enforcing its own laws is broader than that. *Missouri*, 114 F.4th at 984 ("The United States has a legally protected interest in enforcing federal law."). And equating the requirement of injury with the need to identify a direct violation of federal law risks conflating the Article III concept of injury in fact with the merits. *See id.* at 985 ("Interference with the federal government's interest in enforcing federal law is sufficient to establish that the Act's implementation injured the United States. Whether the United States is entitled to relief from that injury is a question on the merits of the dispute.").

For these reasons and at this stage, the CFTC has shown that it is sufficiently likely to establish the injury-in-fact element of standing, and the CFTC's motion for a preliminary injunction should not be denied for failure to meet its burden.

### B. Preemption

Plaintiffs assert that they are likely to succeed on the merits of their claims that the CEA preempts Minnesota's prediction market statute. Federal law can preempt a state law either expressly or by implication. *WinRed, Inc. v. Ellison*, 59 F.4th 934, 941 (8th Cir. 2023). The "ultimate touchstone of pre-emption analysis" is congressional intent. *Cipollone v. Liggett Gr., Inc.*, 505 U.S. 504, 516 (1992) (quotation omitted).

As explained below, the Court finds that Plaintiffs have met their burden to show they are likely to succeed on the merits of their express-preemption claims, at least as to the application of Minnesota's law to many of the trades listed on Kalshi's and Polymarket US's platforms. Specifically, it appears that whether the Minnesota statute is expressly preempted turns on whether the state law attempts to regulate trades in event contracts that qualify as "swaps" within the meaning of the CEA. And there are several examples of event contracts hosted by Kalshi and Polymarket US that fit that definition because they concern the occurrence of events with clear potential economic, financial, or commercial consequences that are neither remote or unattenuated. Kalshi and Polymarket US are designated contract markets, so the CFTC has exclusive jurisdiction to regulate transactions involving those "swaps." The Court reaches this preliminary determination based on: (1) the grant of "exclusive jurisdiction" to the CFTC over transactions involving swaps; (2) the broad language Congress used to define the contracts that constitute swaps; (3) the CEA's "special rule" and its interplay with the categories of event contracts prohibited by Minnesota's prediction market statute; and (4) the persuasive statutory analysis in recent caselaw involving similar issues.

22

The Court pauses to note that the Minnesota statute may not, ultimately, be preempted in all respects, even as to Kalshi and Polymarket US. Aside from the preliminary nature of this Court's assessment of the likelihood of success, Plaintiffs have not shown that every event contract listed on Kalshi and Polymarket US fits the statutory definition of a "swap." If they don't fit, Plaintiffs have much weaker claims that the CFTC is the only authority that can regulate them. After all, as relevant here, the exclusive jurisdiction Congress gave to the CFTC extends to transactions involving *swaps* that are conducted on DCMs, not to every conceivable event contract that Kalshi, Polymarket US, or any other DCM might host. If, as appears to be the case, Kalshi and Polymarket US are listing at least some event contracts that don't meet the CEA's definition of swaps, any permanent injunctive relief may be much narrower. But given the unique nature of Minnesota's prediction market statute, the posture of these cases, and the imminent effective date of Minnesota's statute, a preliminary injunction maintaining the status quo until the merits of this case can be fully resolved is appropriate.

### 1. Express Preemption

"Express preemption occurs where a federal law explicitly prohibits or displaces state regulation in a given field." *Johnson v. MFA Petroleum Co.*, 701 F.3d 243, 248 (8th Cir. 2012); *In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Pracs. Litig.*, 621 F.3d 781, 792 (8th Cir. 2010) ("Express preemption exists where Congress uses explicit pre-emptive language to express its purpose.") (quotation omitted). When Congress has expressly preempted state legislation, courts do not apply any "presumption against pre-emption." *Bio Gen LLC v. Sanders*, 142 F.4th 591, 600 (8th Cir. 2025) (quoting *Watson v.*

23

*Air Methods Corp.*, 870 F.3d 812, 817 (8th Cir. 2017)). Whether a federal statute expressly preempts a state law depends on the "plain wording of the clause" at issue because the text of the statute is "the best evidence of Congress' pre-emptive intent." *WinRed*, 59 F.4th at 942.

### *Exclusive Jurisdiction*

Plaintiffs' express-preemption claims find support in the text of the CEA, first in the fact that Congress gave the CFTC "exclusive jurisdiction" over transactions involving swaps that are traded on DCMs. 7 U.S.C. § 2(a)(1)(A). "Jurisdiction" means "the power, right, or authority to interpret and apply the law." *Jurisdiction*, Merriam-Webster, https://www.merriam-webster.com/dictionary/jurisdiction (last visited July 27, 2026). The adjective "exclusive" describes something that is "independent from or not shared by others." *Exclusive*, Merriam-Webster, https://www.merriam-webster.com/dictionary/exclusive (last visited July 27, 2026). As relevant here, these terms reflect congressional intent to give the CFTC the power over transactions in swaps that is independent from or not shared by other authorities.

As an initial matter, courts have recognized that § 2(a)(1)(A)'s "exclusive jurisdiction" language has a preemptive effect on state regulation.[17] *See Leist v. Simplot*,

---

[17] The Court notes that the Sixth Circuit has questioned whether § 2(a)(1)(A) reflects congressional intent to expressly preempt a state's application of its gambling laws that forbid unlicensed sports betting. *See United States v. Schuler*, No. 26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026) (questioning § 2(a)(1)(A)'s fit as an express preemption provision). This case does not concern any effort by Minnesota to apply its existing sports-betting laws to Kalshi or Polymarket US. Instead, Minnesota's prediction market statute applies to far more than sports-related event contracts.

24

638 F.2d 283, 322 (2d Cir. 1980) ("The federal government has been vitally concerned with trading in futures since 1922; indeed, the courts have held that [§] 2(a)(1) of the CEA preempts the application of state law.") (citing cases). And in other contexts, courts have recognized that statutes granting "exclusive jurisdiction" to certain courts or federal agencies can expressly preempt state authority in a specific area. *Cf. Transcon. Gas Pipe Line Co., LLC v. Pennsylvania Env't Hearing Bd.*, 108 F.4th 144, 151–52 (3d Cir.) ("The explicit statutory conferral of exclusive jurisdiction to a federal court over a particular subject matter is a form of express preemption because it withdraws any concurrent jurisdiction that state courts may have over that same subject matter."), *amended on denial of reh'g,* 110 F.4th 612 (3d Cir. 2024); *Soo Line R. Co. v. City of Minneapolis*, 38 F. Supp. 2d 1096, 1099 (D. Minn. 1998) ("The [Interstate Commerce Commission Termination Act] contains an express preemption clause granting the newly-established Surface Transportation Board . . . exclusive jurisdiction over all railroad transportation." (citing 49 U.S.C. § 10501)).

While § 2(a)(1)(A) contains two savings clauses, these clauses do not appear to reserve to the states the power to regulate transactions involving swaps that take place on DCMs. Specifically, after expressly conferring exclusive jurisdiction on the CFTC for certain transactions on DCMs, the statute states:

> Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws.

> Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

7 U.S.C.A. § 2(a)(1)(A). The first of these savings clauses begins by limiting its own scope: it applies *except* as provided in the preceding text that grants the CFTC exclusive jurisdiction over transactions involving swaps. *Flaherty*, 172 F.4th at 230–31. And the "second carveout preserves jurisdiction for state courts in common-law actions but does not contravene the grant of CFTC's exclusive jurisdiction." *Id.* at 231. Neither carveout undermines the significance of the CEA's grant of exclusive jurisdiction.

### Broad Definition of "Swap"

Plaintiffs' express preemption claims also find textual support in the language Congress used to define what constitutes a "swap." 7 U.S.C. § 1a(47)(A)(ii). If the event contracts Polymarket US and Kalshi list on their exchanges are "swaps," then those transactions appear to fall within the CFTC's exclusive jurisdiction, and if the contracts are not "swaps," they likely do not.[18] And if the Minnesota prediction market statute would

---

[18] Whether Kalshi's and Polymarket US's event contracts satisfy certain elements of the relevant "swap" definition is not in dispute. Kalshi and Polymarket US list event contracts on their platforms that are "agreements, contracts, or transactions" and those transactions "provide[] for payment" to a user "dependent on the occurrence" of an event. 7 U.S.C. § 1a(47)(A)(ii). What Kalshi and Polymarket US offer on their exchanges fit these aspects of the definition of "swap" in § 1a(47)(A)(ii). For example, Kalshi might list an agreement where a user pays $100 to predict the winner of an NFL game between the Minnesota Vikings and the Pittsburgh Steelers, and if the user's prediction on the outcome of the game is correct, he receives $1,000. If a user takes the "yes" side of such an event contract predicting that the Vikings will win the game, she receives payment that is dependent on the outcome of that event. And the "no" side of the agreement likewise receives payment depending on the game's outcome.

prohibit Kalshi and Polymarket US from listing event contracts that are "swaps," it is more likely that the state law invades the CFTC's exclusive territory.

The Court's initial focus, therefore, is on determining whether the transactions at issue make payment dependent on the "occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). In making that determination, the Court must look at the language Congress chose in this definition and assume that "the ordinary meaning of that language accurately expresses the legislative purpose." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). The plain and ordinary meaning of the language here tilts in Plaintiffs' favor.

The CEA's definition of "swap" is broad, *see United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025), a description that flows from the relevant terms Congress used in § 1a(47)(A)(ii). The breadth of the terms "associated with" and "potential" is instructive— applying the ordinary meaning of these words captures many of the event contracts Kalshi and Polymarket US list on their platforms and that the Minnesota prediction market statute would prohibit. The occurrence of an event is "associated with" a financial, economic, or commercial consequence when the event and the consequence are simply "connected." *Associated*, New Oxford American Dictionary (3d ed. 2010) ("(of a person or thing) connected with something else"). Of course, there must be a limit to whether the event in question is "associated with" a potential consequence, or the statute would allow for "the most remote of attenuated connections-upon-connections" to qualify as swaps. *QCX LLC v. Nessel*, No. 1:26-cv-710, 2026 WL 1895958, at *3 (W.D. Mich. June 17, 2026). This

27

language reflects congressional intent to require some connection between the outcome of the event and a potential financial, economic, or commercial consequence. And it cannot be enough that *any* event has a potential financial consequence simply because people decide to make trades predicting the outcome.[19] Nevertheless, even giving meaning to § 1a(47)(A)(ii)'s words of limitation, there still can be no doubt that an array of transactions are "associated with" the required financial consequences, and constitute swaps under this definition.

The term "potential" performs a similar role in the definition of "swap." In the context of the statutory definition, the event in question must be connected to a "*potential* financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii) (emphasis added). Applying the ordinary meaning of "potential" to this context contemplates the occurrence of an event has the capacity to result in the identified consequence in the future. *Potential*, New Oxford Am. Dictionary (3d ed. 2010) ("having or showing the capacity to become or develop into something in the future"). The occurrence of the event in question does not have to ultimately result in a financial, economic, or commercial consequence to meet the definition. It is enough that such consequences are foreseeable future possibilities.

---

[19] Any suggestion that the potential financial consequences making an event contract a swap are those that the speculators wagering on the events might experience would ignore the full text of § 1a(47)(A)(ii). The CEA says that an event contract is a swap when payment depends on the occurrence or nonoccurrence of an *event* that has potential financial consequences. It does not say that event contracts are swaps when the agreements make payment dependent on the outcome of the *trades* made by speculators themselves. For what it's worth, Plaintiffs have not advanced an argument that Kalshi and Polymarket US are listing event contracts that are swaps simply because people could make money off their trades.

28

The use of such terms reflects congressional intent to define "swap" somewhat broadly and to extend the CFTC's exclusive regulatory authority to cover many transactions and agreements. *KalshiEx LLC v. Orgel*, No. 3:26-cv-00034, 2026 WL 474869, at *8 (M.D. Tenn. Feb. 19, 2026) ("Congress could have imposed a more stringent requirement. Or it could have omitted a qualifier altogether. Congress chose to use 'potential,' which is broad.").

In sum, these statutory terms support Plaintiffs' express preemption claims. Defendants do not really take issue with the plain meaning of the words Congress used in § 1a(47)(A)(ii). Instead, they argue that the Court should not give those terms their natural effect for three reasons: (1) swaps should only be understood to include event contracts that are tied to some commodity; (2) Plaintiffs' interpretation runs counter to the associated-words canon because the contracts Kalshi and Polymarket US offer are unlike the other types of swaps identified in adjacent subparts of the CEA's definition; and (3) interpreting subparagraph (ii) as broadly as the Plaintiffs suggest would offend the canon against surplusage. *See Kalshi* (Dkt. 35 at 32–34, 35–36.) At this stage, the Court is not rejecting these arguments entirely, but finds that they likely do not overcome the effect of the statutory definition's plain language.

First, Defendants' effort to limit the scope of the CFTC's jurisdiction to trades that focus on traditional commodities futures ignores the plain language of the statutory

definition of swap, which has no such limiting language.[20] Second, the broad terms used in § 1a(47)(A)(ii) undermine the argument that the canon against surplusage requires the Court to read § 1a(47)(A)(ii) as narrowly as Defendants suggest. *Cf. United States Postal Serv. v. Konan*, 607 U.S. 391, 406 (2026) ("The canon against surplusage is subordinate to the 'cardinal canon' that 'a legislature says in a statute what it means and means in a statute what it says there.'" (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992))). *But see Crypto*, 815 F. Supp. 3d at 1184 ("If everything can be defined as an event, the statutory words either have no meaning or have such a broad meaning that they would render superfluous other portions of the CEA's definition of a swap."). And finally, Defendants' reliance on the associated-words canon (also referred to as *noscitur a sociis*) to limit the reach of subparagraph (ii) risks making that provision do nothing more than reiterate what subparagraphs (i) and (iii) already accomplish: that reading would, in fact, create surplusage. In the face of the breadth of the definition of swaps, at this preliminary stage, the interpretive canons Defendants rely on do not clearly override the statutory language of the grant of exclusive jurisdiction.

---

[20] Of course, as Defendants point out, "[s]waps were added to the CFTC's jurisdiction in the aftermath of the 2008 financial crisis because high-risk swaps by parties who ultimately lacked the credit to pay what they had agreed were perceived to be partially responsible for that crisis." *CFTC* (Dkt. 36 at 32). In finding the Plaintiffs have shown the necessary likelihood of success on the merits of their express preemption claims, at least in part, the Court does not diminish the importance of this historical context, nor foreclose further consideration of such matters when the time comes to make an ultimate determination on the merits in this case. However, at least at this preliminary stage, the Court finds more persuasive that the § 1a(47)(A)(ii) is couched in broad terms, and the ordinary meaning of those terms appears to encompass at least a sizeable portion of the event contracts Kalshi and Polymarket US list on their platforms.

***Special Rule***

Also weighing in the Plaintiffs' favor at this preliminary stage is the fact that Congress enacted the "special rule" as part of the Dodd-Frank Act of 2010. That rule gives the CFTC the discretionary authority to prohibit six categories of event contracts listed on DCMs if the CFTC concludes they are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C). Thus, the CFTC has been empowered to consider whether transactions are contrary to the public interest when they are based on underlying occurrences that involve unlawful activities under state or federal law, terrorism, assassination, war, gaming, or other similar activities. 7 U.S.C. § 7a-2(c)(5)(C)(i), (C)(ii). If the CFTC makes such a determination, then a DCM cannot list those transactions.

In combination with the congressional decision to give the CFTC exclusive jurisdiction over swaps, allowing the CFTC to either permit event contracts in these categories or declare them contrary to the public interest suggests, at least preliminarily, that Congress intended DCM-based transactions over these prediction markets to be governed by the CFTC. *See Flaherty*, 172 F.4th at 231 (observing that the CEA "gave the CFTC exclusive jurisdiction over trades on DCMs, provided for continued state regulation of trades conducted off DCMs, and *recognized that while event contracts could involve gaming, the CFTC has discretionary power to review and prohibit those contracts*") (emphasis added); *KalshiEX LLC v. Johnson*, No. CV-26-01715-PHX-MTL, 2026 WL 1223373, at *7 (D. Ariz. May 5, 2026) ("By directing the CFTC to review event contracts and prohibit those contrary to the public interest, Congress placed event contracts under the CFTC's exclusive authority.").

31

### *Recent Caselaw*

The Court's preliminary conclusion also finds support in recent caselaw. In particular, the Court finds persuasive the analysis from several courts that have examined the scope of the CEA's definition of "swap" in disputes between DCMs like Kalshi and Polymarket US and states attempting to enforce their existing gambling laws against them. Although the decisions are by no means uniform,[21] several courts that have considered the meaning of the statutory definition of swap have found that event contracts involving the outcomes of sporting events fall within the definition's scope. At this preliminary stage, the Court is persuaded by the statutory analysis reflected in cases that have given effect to the broad wording of § 1a(47)(A)(ii). *See, e.g.*, *Flaherty*, 172 F.4th at 228 ("Because Kalshi's sports-related event contracts are traded on a CFTC-licensed DCM and depend on event outcomes associated with economic consequences, they fit within the Act's definition

---

[21] *Compare Flaherty*, 172 F.4th at 227–28 (concluding that the definition of "swap" in § 1a(47)(A)(ii) covered sports-related event contracts offered by Kalshi), *and KalshiEx LLC v. Orgel*, No. 3:26-cv-00034, 2026 WL 474869, at *8 (M.D. Tenn. Feb. 19, 2026) (same), *and KalshiEx LLC v. Johnson*, No. CV-26-01715-PHX-MTL, 2026 WL 1223373, at *5 (D. Ariz. May 5, 2026) (same), *appeal filed* No. 26-2978 (9th Cir. May 11, 2026), *with Crypto*, 815 F. Supp. 3d at 1180–85 (distinguishing between the statute's use of the term "event" and the outcomes of those events and finding that certain event contracts are not swaps), *and KalshiEx, LLC v. Schuler*, No. 2:25-cv-1165, 2026 WL 657004, at *4–7 (S.D. Ohio Mar. 9, 2026) (similar), *affirmed* No. 26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026). Again, the Court notes that in this case, it need not decide whether Minnesota may enforce its existing gambling laws against the sports-related event contracts offered by Kalshi and Polymarket US. The Court is, instead, asked to consider the prediction market statute that applies to a broad array of wagers on events.

32

of 'swaps' subject to the CFTC's jurisdiction." (quoting 7 U.S.C. §§ 2(a)(1)(A), 1a(47)(A)(ii))); *Orgel*, 2026 WL 474869, at *7–8.[22]

### *Interplay Between the CEA and the Prediction Market Statute*

Based on the record in this case and on publicly available information, at least some of the event contracts that Kalshi and Polymarket US list on their platforms make payment contingent on the occurrence of events that are likely to be associated with potential financial, economic, or commercial consequences. Therefore, such event contracts appear to qualify as transactions involving "swaps" over which the CFTC has exclusive jurisdiction. And the Minnesota prediction market statute would prohibit Kalshi and Polymarket US from offering trades in swaps that the CEA appears to place in the CFTC's exclusive jurisdiction. However, some of the transactions prohibited by Minnesota's statute do not meet the definition of swaps, and fall outside of that preemption.

The event contracts on Plaintiffs' platforms include transactions that pay out depending on the outcome of a variety of events, including: athletic events and games of skill, and portions of those games or individual participants' performances; events that happen to individuals and groups of people; elections and decisions of government bodies and their agencies; legal actions; events in popular culture; and whether specific people

---

[22] While this Court agrees generally with the *Ogrel* court's consideration of the language of § 1a(47)(A)(ii), it is not convinced by *Ogrel*'s assertion that "a contract providing for payment, for example, if 'at any point during the game one team leads another by at least 20 points' would fall squarely within the CEA's regulation of swaps." 2026 WL 474869, at *8. In this Court's view, such a sports-related event contract might not be a swap because it lacks any connection with a potential financial, economic, or commercial consequence. To find that it does would require the definition's words of limitation to have almost no limiting effect at all.

33

will make particular statements. Those are all categories of transactions that are prohibited by the Minnesota prediction market statute. Minn. Stat. § 609.7615, subd. 1(e). It is not difficult to see how contracts within these categories fit the CEA's definition of swaps. For example, a prediction market contract that pays out based on who wins an upcoming election for a seat in the United States Senate is closely associated with potential financial, economic, or commercial consequences. So too are trades that hinged on which NBA team would sign LeBron James, which team would win the World Cup, and when traffic in the Strait of Hormuz would return to normal. Because both Kalshi and Polymarket US facilitate transactions involving such event contracts on designated contract markets registered by the CFTC, the CFTC's jurisdiction over those transactions is exclusive.

Therefore, it appears likely that the Minnesota law will regulate transactions over which the CFTC has "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A). Accordingly, the Court finds that Plaintiffs are likely to succeed on the merits of their express-preemption claims. But the Court emphasizes that this is not a final determination of the merits, and there may be strong arguments that ultimately weigh against a conclusion that the CEA expressly preempts the statute.[23]

Making the issues more complex, the Court also notes that not *all* the trades offered by Kalshi and Polymarket US appear to fit the CEA's definition of "swaps." Some of those

---

[23] The Sixth Circuit has questioned whether the CEA's exclusive-jurisdiction provision expressly preempts enforcement of a state's gambling laws against Kalshi's sports-related event contracts even assuming those event contracts qualify as swaps. *KalshiEx LLC v. Schuler*, No. 26-3196, 2026 WL 1295806, at *4 (6th Cir. Apr. 24, 2026).

non-swap transactions are likely prohibited by the language of Minnesota's prediction market statute. For example, Kalshi's trades predicting which couple will win season eight of Love Island USA[24] seems to fall within the Minnesota law's prohibition on contracts involving "events in popular culture." Minn. Stat. § 609.7615, subd. 1(e)(8). Kalshi's markets concerning what announcers would say during broadcasts of World Cup games[25] also appear to be prohibited by the Minnesota statute. *Id.* § 609.7615, subd. 1(e)(9). However, one is hard pressed to imagine the financial, economic, or commercial consequence of the occurrence or outcome of these events unless the words of limitation in 7 U.S.C. § 1a(47)(A)(ii) are stretched so broadly that they impose no limit on the CFTC's jurisdiction at all.

Regrettably, although the briefing from all parties here is excellent, both sides have treated the issues before the Court as all-or-nothing propositions—either the CEA preempts any enforcement of the Minnesota law or it doesn't. That framing provides little guidance on how the Court ought to navigate the reality that Kalshi and Polymarket US list many event contracts likely falling within the CFTC's exclusive jurisdiction to regulate swaps on

---

[24]     https://kalshi.com/markets/kxliusawinners/who-will-win-love-island-usa/kxliusawinners-26 (last visited July 27, 2026).

[25]     https://kalshi.com/markets/kxwcmention/world-cup-mentions/kxwcmention-26jul10espbel (last visited July 27, 2026).

DCMs, and many falling outside of it.[26] How does the Court craft a precise preliminary injunction in such a scenario? It would be illusory to enjoin Defendants from enforcing Minnesota's prediction market statute to the extent that Kalshi and Polymarket US list event contracts that qualify as swaps. And providing no injunctive relief whatsoever because the Minnesota statute might have some permissible reach would, as discussed below, threaten Plaintiffs with irreparable harm.

Overall, at this stage, all the questions relevant to the merits of the Plaintiffs' preemption claims have certainly not been answered. But for now, Plaintiffs have shown that the CEA's grant of exclusive jurisdiction over transactions involving swaps likely preempts across-the-board enforcement of the Minnesota prediction market statute against Kalshi and Polymarket US for a considerable swath of the event-contract trades they host. The Court concludes that Plaintiffs are likely to prevail on their claims that Minnesota's

---

[26] At the hearing, counsel for Kalshi suggested that because the event contracts Kalshi offers are agreements or contracts that are traded on DCMs, whether those agreements are or are not "swaps" is irrelevant to the Court's analysis because it is for the CFTC and not the Court to determine whether Kalshi's offerings constitute swaps. *Kalshi* (Dkt. 44 at 26–28 ("Section 2(a) is written broadly to say that agreements that are traded on a [DCM] are within the exclusive jurisdiction of the CFTC. And what that means is that if it is a contract being traded, it is within the CFTC's exclusive authority.")). This argument, however, has not been developed in the briefing before the Court, so the Court expresses no opinion on it at this time. The Court notes that there is some disagreement in recent caselaw regarding the extent to which the Court ought to evaluate whether individual event contracts constitute swaps. *Compare Crypto*, 815 F. Supp. 3d at 1180 (rejecting the argument that "Congress intended the CFTC, not courts . . ., to decide what is a swap" and citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024)), *with Johnson*, 2026 WL 1223373, at *5 (noting that "Congress expressly delegated authority to the CFTC and SEC, in consultation with the Board of Governors, to further define the term swap" in 15 U.S.C. § 8302(d)(1) and declining, on the court's "own initiative, [to] mark where the periphery of the definition ends when event contracts fit within the core of the definition of swaps") (cleaned up).

prediction market statute is at least in part expressly preempted by 7 U.S.C. § 2(a)(1)(A)'s exclusive jurisdiction provision.[27]

### 2. Implied Preemption and First Amendment Claims

Because Plaintiffs have shown they are likely to succeed on the merits of their express-preemption claims and are otherwise entitled to preliminary injunctive relief, the Court finds it unnecessary to address, at this stage, whether Plaintiffs are also likely to prevail on their implied-preemption argument or their First Amendment claims. The First Amendment claims presented by Kalshi and Polymarket US have not arisen in the dozen or so other prediction-market cases explored by the parties. And the questions raised are complex. Similarly, the implied preemption arguments raised as alternative bases to invalidate Minnesota's law present closer questions than the express preemption issue explored above. And other courts have reached different conclusions on whether state gambling laws are impliedly preempted as applied to markets like Kalshi and Polymarket US. *Compare Flaherty*, 172 F.4th at 228–32 (finding Kalshi was likely to succeed on the merits of its claim that the CEA impliedly preempted New Jersey's enforcement of its state

---

[27] The CFTC confirmed at the hearing on the motions that it is raising a facial challenge to the prediction market statute, and it agreed with the Defendants' position that the CFTC must make the showing necessary to invalidate a statute under *United States v. Salerno*, 481 U.S. 739 (1987). *See CFTC* (Dkt. 68 at 38–39). Under *Salerno*, a plaintiff can prevail in a facial challenge by showing "that no set of circumstances exists under which the Act would be valid," such that the law is unconstitutional in all its applications. 481 U.S. at 745. Here, as discussed above, the Court's preliminary assessment suggests that the Minnesota statute may not be preempted in all its applications. But the Court finds the state law is likely preempted in many respects. Therefore, temporarily enjoining enforcement of the statute maintains the status quo while enabling further development on this issue and others.

gambling laws to Kalshi's sports-related event contracts), *with Martin*, 793 F. Supp. 3d at 676–86 (concluding that Kalshi was unlikely to succeed on either its field preemption or conflict preemption claims as applied to listing of sport-related event contracts). Because the Court finds it proper to enjoin the statute preliminarily based on the express preemption concern alone, both implied preemption and the First Amendment implication of the Minnesota statute are questions saved for another day.

## III. Irreparable Harm

A showing of irreparable harm is also necessary to obtain a preliminary injunction. *See Choreo, LLC v. Lors*, 164 F.4th 667, 671 (8th Cir. 2026) (explaining that a movant's failure to show irreparable harm is "an independently sufficient basis" to deny a preliminary injunction) (quotation omitted). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). To satisfy this factor, "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1017 (8th Cir. 2023) (quotation omitted). But this does not mean that the alleged harm must be "occurring or be certain to occur before a court may grant relief." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1037 (8th Cir. 2016) (quoting *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011)).

Here, the Court concludes that Kalshi and Polymarket US have demonstrated at least some threat of irreparable harm to support preliminary injunctive relief.[28] Defendants have not disavowed any intent to enforce the prediction market statute against Kalshi and Polymarket US once the Minnesota law goes into effect, so they face the possibility of criminal prosecution. While the Eighth Circuit has said that the "mere prospect of facing criminal prosecution is not per se irreparable injury," *Munson v. Gilliam*, 543 F.2d 48, 54 (8th Cir. 1976), the negative effects attendant to a prosecution under a state criminal statute that is likely at least partially preempted by federal law are fairly obvious. And, in any event, this case involves other threats of harm that weigh in favor of granting injunctive relief.

When enforcement of a likely preempted state law "would result in irreparable economic loss" a court may find irreparable harm. *Bank One, Utah v. Guttau*, 190 F.3d 844, 850–51 (8th Cir. 1999) (finding that in the absence of an injunction, enforcement of an Iowa law against the bank "would result in irreparable economic loss" supporting preliminary injunctive relief). That is the case here. If the Minnesota prediction market statute goes into effect and Defendants pursue enforcement against Kalshi and Polymarket US, the DCMs will either continue to offer their event contracts to Minnesota users and face potential felony charges, or they will need to take steps to exit the market for their trades in Minnesota. Given the preliminary showing that there is a large volume

---

[28] Other courts have found that states' efforts to enforce their existing gambling laws against DCMs presented a sufficient threat of irreparable harm. *See Flaherty*, 172 F.4th at 232 (affirming district court's irreparable harm determination); *Orgel*, 2026 WL 474869, at *10–11.

of activity on these platforms conducted by Minnesotans, Kalshi and Polymarket US could face substantial liability to Minnesota traders if they are forced to cancel Minnesota trades.[29] And even if Plaintiffs ultimately prevail in the lawsuit, there is no way for Kalshi and Polymarket US to recover damages from the State of Minnesota because of Defendants' sovereign immunity. *See Entergy, Ark., Inc. v. Nebraska*, 210 F.3d 887, 899–900 (8th Cir. 2000) (finding plaintiff showed a threat of irreparable harm where it could not recover damages from the state defendant due to sovereign immunity); *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994) (finding irreparable harm where the plaintiff "would be unable to recover damages" due to sovereign immunity).

Moreover, enforcement of the Minnesota prediction market statute against Kalshi and Polymarket US risks other intangible harms that cannot be compensated by money damages. If no preliminary injunctive relief is awarded, the DCMs would cancel Minnesota users' trades, which in turn would erode confidence of users in their platforms, potentially causing Minnesota users and others to leave the platforms, and deterring new users from entering event contracts. *See Kalshi* (Dkt. 25 ¶¶ 32, 41); *Polymarket* (Dkt. 23 ¶¶ 10–13). Such reputational harm and damage to the goodwill that Kalshi and Polymarket US have fostered with users of their platforms adds to the irreparable injury described above. *See United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) ("Loss of

---

[29] Kalshi represents that it had more than 90,000 verified users in Minnesota as of May 26, 2026, with millions of dollars' worth of open positions on Kalshi markets that were not, at that point, settled. *Kalshi* (Dkt. 25 ¶ 25); *see also id.* (Dkt. 25 ¶¶ 29–32 (explaining the threat of significant unrecoverable financial liability if Kalshi is forced to cancel a high volume of trades)).

intangible assets such as reputation and goodwill can constitute irreparable injury."); *Ogrel*, 2026 WL 474869, at \*10 (stating that "losing access to thousands of users and reputational harm suffice for irreparable harm"); *KalshiEx LLC v. Flaherty*, No. 25-cv-02152-ESK-MJS, 2025 WL 1218313, at \*6–7 (D.N.J. Apr. 28, 2025) (discussing reputational harm), *aff'd*, 172 F.4th 220 (3d Cir. 2026).

Finally, the Court also finds that the CFTC faces a threat of irreparable harm in the absence of preliminary injunctive relief. As discussed above, the Court has found that Minnesota's prediction market statute is likely at least partially preempted by the CEA because the CFTC has been given exclusive jurisdiction over transactions involving swaps traded on DCMs. Infringement on that exclusive authority can be irreparable harm. *Johnson*, 2026 WL 1223373, at \*8–9 (finding that the CFTC and the United States would "suffer irreparable harm absent a preliminary injunction" if the enforcement of a likely preempted state law was not enjoined); *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations.").

## IV.   Remaining Factors

The remaining *Dataphase* factors—the balance of the harms and the public interest—also weigh in favor of granting injunctive relief. These factors "merge" when a state or state officials are sued in their official capacities. *Eggers v. Enven*, 48 F.4th 561, 564–65 (8th Cir. 2022). To be clear, Minnesota's statute was enacted in response to perceived serious harms caused by prediction markets like those run by Kalshi and Polymarket US. But when a state law is likely preempted, the harm to the state by

temporarily enjoining enforcement of that law is diminished. *See, e.g.*, *Couser v. Shelby County*, 681 F. Supp. 3d 920, 948 (S.D. Iowa 2023) (finding that county officials "lack[ed] a meaningful equity in attempting to enforce a patently preempted ordinance"); *see also Orgel*, 2026 WL 474869, at *11 (finding that Tennessee "is likely to face no harm" in being enjoined from enforcing likely preempted state gambling laws). And while the public interest favors enforcement of valid state laws, that same interest is less significant when the state law is likely preempted. *See Craig v. Simon*, 980 F.3d 614, 618 (8th Cir. 2020) (per curiam) (finding that where a state law was likely preempted, the balance of harms and public interest did not "militate against an injunction"); *Flaherty*, 172 F.4th at 231–32.

A preliminary injunction prohibiting Defendants from enforcing Minnesota's prediction market statute strikes the right balance of harms while preserving the status quo. If Plaintiffs prevail on the merits, Defendants will not be harmed because the preliminary injunction would simply have prevented enforcement of a state law that is preempted by the CEA. And if Defendants ultimately prevail, the preliminary injunction will no longer be effective, and Defendants can begin enforcing the prediction market statute against those who violate it. But at this stage, because Plaintiffs have shown a likelihood of success on the merits and demonstrated a threat of irreparable harm, the balance-of-harms and public-interest factors support entry of a preliminary injunction. *See Cigna Corp. v. Bricker*, 1013 F.4th 1336, 1347 (8th Cir. 2024) (observing that consideration of these factors is a "tentative" balance that is intended "not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward" (quoting *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (per curiam))).

## V.    Bond

Under the Federal Rules of Civil Procedure, a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). District courts have discretion to set the amount of the bond, and although the language of Rule 65(c) is mandatory, the Eighth Circuit has approved of preliminary injunctions issued without a bond if the party being enjoined will not suffer damages and "where the defendant has not objected to the failure to require a bond." *Richland/Wilkin Joint Powers Auth.*, 826 F.3d at 1043 (finding that "it was permissible for the district court to waive the bond requirement based on its evaluation of public interest").

Polymarket US asks the Court to waive Rule 65(c)'s security requirement. *Polymarket* (Dkt. 21 at 39). Defendants have not objected to that request for waiver of bond, and the Court finds it appropriate to waive the security requirement under the circumstances. *Fantasyrsus 2, L.L.C. v. City of East Grand Forks*, 881 F. Supp. 2d 1024, 1033 (D. Minn. 2012) (waiving the bond requirement where the request for waiver was unopposed); *Iowans for Alts. to Smoking & Tobacco, Inc. v. Iowa Dep't of Revenue*, 781 F. Supp. 3d 724, 744 (S.D. Iowa 2025) (waiving bond requirement where the state law concerning sale of vaping products was likely preempted by federal law). Accordingly, the Court will not require Plaintiffs to give security to pay costs and damages sustained by Defendants if they are ultimately found to have been wrongfully enjoined.

*         *         *

43

For these reasons, the Court will preliminarily enjoin enforcement of Minnesota's prediction market statute. Doing so will preserve the status quo until the merits of Plaintiffs' claims can be fully adjudicated. The Court's determination is not a final determination of the merits of the parties' claims and defenses, but reflects a preliminary assessment of the issues.

## ORDER

For the reasons discussed above, **IT IS HEREBY ORDERED THAT**:

1. The Motions for Preliminary Injunction, *CFTC* (Dkt. 24), *Kalshi* (Dkt. 21), and *Polymarket* (Dkt. 19) are **GRANTED**.

2. Until a final decision on the merits is reached in these cases, Defendants are enjoined from enforcing Minn. Stat. § 609.7615, as amended and adopted by SF 3432, against entities that are registered as designated contract markets by the CFTC.

**Let Judgment be entered accordingly.**

Date: July 27, 2026

*s/Katherine Menendez*
Katherine Menendez
United States District Judge