**U.S. Department of Justice**

950 Pennsylvania Ave, NW
Washington, DC 20530

(202) 514-2000
John.Adams5@usdoj.gov

VIA CM/ECF September 30, 2026

Hon. Susan Richard Nelson
United States District Court
316 N. Robert Street
St. Paul, MN 55101

Re: Notice of Supplemental Authority in *United States of America, et al. v. State of Minnesota, et al.*, No. 26-cv-02456-SRN-DLM (D. Minn.)

Dear Judge Nelson:

The United States submits notice of *United States, et al. v. New York, et al.*, No. 1:25-cv-03656, Dkt. 117 (S.D.N.Y. Sept. 22, 2026) (Ex. A), in which the court granted the United States' motion for summary judgment against the New York Climate Change Superfund Act. The court held that the United States has standing to vindicate (1) its sovereign authority to create and enforce a regulatory scheme for interstate emissions under the Clean Air Act and (2) its exclusive authority to conduct foreign affairs. Turning to the merits, the court held that the law is preempted because it is not authorized by the Clean Air Act and it is field-preempted under the Foreign Affairs Doctrine.

This Court also inquired about *United States v. Michigan*, 817 F. Supp. 3d 630 (W.D. Mich. 2026). After the United States sued Michigan to prevent it from regulating global greenhouse gas emissions, Michigan abandoned its anticipated state-court lawsuit and instead sued energy producers in federal court. On September 22, the federal court dismissed Michigan's climate change lawsuit with prejudice. *See People of the State of Michigan v. BP, P.L.C., et al.*, No. 1:26-cv-254, Dkt. 46 (W.D. Mich. Sept. 22, 2026) (Ex. B).

Respectfully submitted,

/s/ John Adams
John K. Adams
Associate Deputy Attorney General
United States Department of Justice

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
UNITED STATES OF AMERICA and the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Plaintiffs,

-against-

STATE OF NEW YORK; KATHLEEN HOCHUL, in her official capacity as Governor of New York; LETITIA JAMES, in her official capacity as New York Attorney General; and AMANDA LEFTON, in her official capacity as Commissioner of the New York Department of Environmental Conservation,

Defendants.
-----------------------------------------------------------x

25-cv-3656 (PKC)

OPINION AND ORDER

CASTEL, U.S.D.J.

The United States and the United States Environmental Protection Agency ("EPA") (collectively, the "United States") bring this action challenging the constitutionality of New York's Climate Change Superfund Act (the "Climate Act" or the "Act"). The Act establishes a $75 billion fund for infrastructure projects in New York intended to mitigate the effects of climate change. To fund these projects, the Act imposes strict liability on businesses that engaged in fossil fuel extraction and oil refining from 2000 to 2024. The Act apportions the liability among such businesses based on the calculated share of global greenhouse gas emissions attributable to their products.

The United States moves for summary judgment on its claims that the Climate Act is violative of the Commerce Clause and the Due Process Clause and that it is preempted by the Clean Air Act and the federal government's authority to regulate foreign affairs. The State of

New York, Governor Kathleen Hochul, Attorney General Letitia James and Commissioner of the Department of Environmental Conservation Amanda Lefton (collectively, "New York") oppose the motion and contend that the United States lacks standing to bring this suit and, on the merits, has failed to establish any entitlement to relief.

The Court concludes that the United States has standing to assert its core claims that New York's Climate Act impinges on its sovereign authority (1) to create laws relating to the emission of greenhouse gases and to enforce those laws against violators; and (2) to declare and promote its interests in foreign affairs. The Court also concludes that the United States has demonstrated that New York's Climate Act intrudes upon these interests and is therefore preempted. Summary judgment will be granted to the United States declaring the Climate Act to be unconstitutional and permanently enjoining its enforcement.

New York's Climate Change Superfund Act

In December 2024, New York enacted the Climate Change Superfund Act, N.Y. Env't Conserv. Law §§ 76-0101 to -0105. The Act establishes "a climate change adaptation cost recovery program" intended "[t]o secure compensatory payments from responsible parties based on a standard of strict liability to provide a source of revenue for climate change adaptive infrastructure projects within the state." N.Y. Env't Conserv. Law § 76-0103(1), (2)(a).

"Responsible parties" under the Act—i.e., those obligated to make payments—are those "which, during any part of [the period from January 1, 2000 to December 31, 2024], w[ere] engaged in the trade or business of extracting fossil fuel or refining crude oil and [are] determined . . . to be responsible for more than one billion tons of covered greenhouse gas emissions." Id. § 76-0101(9), (21). Entities that "lack[] sufficient contacts with the state to

satisfy the due process clause of the United States Constitution" are not liable under the Act. Id. § 76-0101(21).

"Covered greenhouse gas emissions" under the Act are "the total quantity of greenhouse gas emissions . . . attributable to the total amount of fossil fuels extracted by that entity . . . as well as the total amount of crude oil refined by that entity" from 2000 to 2024. Id. § 76-0101(8). The statute reaches not just emissions emanating from New York but any "emissions attributable to all fossil fuel extraction and refining worldwide" by the responsible party. Id.

Payments to the fund reflect each fossil fuel producers' respective contribution to global greenhouse gas emissions and "shall be equal to an amount that bears the same ratio to the [$75 billion] cost recovery amount as the responsible party's applicable share of covered greenhouse gas emissions bears to the aggregate applicable shares of covered greenhouse gas emissions of all responsible parties." Id. § 76-0103(3)(b). The New York Department of Environmental Conservation ("DEC") is mandated to issue notices to producers of their calculated payment amount, so-called "cost recovery demands," no later than June 30, 2028. Id. §§ 76-0101(7), -0103(4)(a)(iv). "Payment of a cost recovery demand shall be made in full on the applicable payment date" but the DEC is empowered to permit an emitter to spread payments over a 24-year period, provided it pays 8% of the total in the first year. Id. § 76-0103(3)(e)(i). The parties agree that no notices of cost recovery demands have been issued to any fossil fuel companies, nor have any payments been made by any fossil fuel companies pursuant to the Act.

Procedural History of this Action

The United States filed this action on May 1, 2025. (ECF 1.) It pleads distinct claims for relief: the Climate Act is (a) preempted by the Clean Air Act (b) an unconstitutional extraterritorial regulation by New York, (c) violative of the dormant interstate Commerce Clause, (d) violative of the dormant foreign Commerce Clause and (e) preempted by the foreign affairs doctrine. The relief sought on each claim is common to all claims. The Complaint seeks a declaration that the Climate Act is unconstitutional and unenforceable and a permanent injunction prohibiting defendants from taking any action to implement or enforce the Act. (Compl't at 29.)

The United States sought to file a summary judgment motion before the start of discovery. (ECF 33 & 36.) The Court ordered briefing on the appropriate timing of a motion for summary judgment and was ultimately satisfied that the issues asserted in this facial challenge to the Climate Act could be resolved on a summary judgment motion without discovery. (ECF 50.) See Rule 16(c)(2)(E), Fed. R. Civ. P. (the Court may "determin[e] the appropriateness and timing of summary adjudication").

After the conclusion of the initial round of summary judgment briefing, the parties submitted supplemental briefs to address the implications of the United States' withdrawal from the United Nations Framework Convention on Climate Change and the EPA's rescission of an earlier finding that greenhouse gas emissions endanger human health and welfare. The parties also have advised the Court of certain supplemental authority. The City of New York (the "City") has submitted an amicus curiae brief in support of New York's position.

<u>Summary Judgment Standard</u>

Under Rule 56(a), Fed. R. Civ. P., summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party seeking summary judgment bears the burden of demonstrating there is no genuine dispute of material fact. <u>Jeffreys v. City of New York</u>, 426 F.3d 549, 553 (2d Cir. 2005). A fact is "material" when it "might affect the outcome of the suit under the governing law . . . ." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). There is a genuine issue of fact if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id</u>.

In reviewing a summary judgment motion, a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." <u>Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.</u>, 373 F.3d 241, 244 (2d Cir. 2004). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." <u>Rule v. Brine, Inc.</u>, 85 F.3d 1002, 1011 (2d Cir. 1996). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." <u>Anderson</u>, 477 U.S. at 247–48. The nonmoving parties "must do more than simply show there is some metaphysical doubt as to the material facts and they may not rely on conclusory allegations or unsubstantiated speculation." <u>Jeffreys</u>, 426 F.3d at 554 (internal citations and quotation marks omitted).

## I. THE UNITED STATES HAS ARTICLE III STANDING TO VINDICATE ITS SOVEREIGN INTERESTS.

"Under Article III of the U.S. Constitution, '[t]he judicial Power of the United States' extends only to certain 'Cases' and 'Controversies.'" <u>Lacewell v. Office of Comptroller</u>

of Currency, 999 F.3d 130, 141 (2d Cir. 2021) (quoting U.S. Const. art. III, §§ 1–2). "To satisfy the Constitution's 'case-or-controversy requirement,' a plaintiff in federal court 'must establish that they have standing to sue.'" Id. (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013)). Standing is a "jurisdictional requirement" and "must be assessed before reaching the merits." Calcano v. Swarovski N. Am. Ltd., 36 F.4th 68, 72, 74 (2d Cir. 2022) (internal quotation marks omitted) (quoting Byrd v. United States, 584 U.S. 395, 410–11 (2018)).

A. The Claimed Basis for Standing.

The United States has narrowed its claim of standing to the vindication of its "sovereign interests" in "ensuring that State laws like the [Climate] Act do not interfere with federal law, including the Clean Air Act, or with the federal government's exclusive authority over interstate and foreign commerce, greenhouse gas regulation, and national energy policy." (Compl't ¶ 10; see also ECF 99 at 10–13; ECF 49 at 5 (stating that, at the summary judgment stage, "the United States will rely solely on its sovereign interest in upholding the supremacy of federal law.").) The United States has thus abandoned its arguments in favor of standing premised on its purported proprietary and *parens patriae* interests. See, e.g., Palmieri v. Lynch, 392 F.3d 73, 87 (2d Cir. 2004) (a party who does not "raise [an] argument in his opposition to summary judgment" has waived that argument); see also Antonyuk v. James, 120 F.4th 941, 1007 n.63 (2d Cir. 2024) ("Although parties cannot waive arguments against jurisdiction, they are more than free to waive (or forfeit) arguments for it." (emphasis omitted)). The Court only considers whether the United States has standing based upon purported injury to its sovereign interests.

The Court concludes that the United States has standing to vindicate its sovereign authority to create and enforce a regulatory scheme pursuant to the Clean Air Act and its exclusive authority to conduct foreign affairs. On the merits of these claims, the Court concludes

that the Climate Act is preempted by the Clean Air Act and that the Climate Act intrudes on the exclusive right of the federal government to conduct foreign affairs. Because the grant of summary judgment to the United States on these two claims will afford it all the relief that it could obtain on any other claim asserted, it is not necessary to reach the constitutional standing or merits questions on any other claim. "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." Jean v. Nelson, 472 U.S. 846, 854 (1985) (quoting Spector Motor Service v. McLaughlin, 323 U.S. 101, 105 (1944)).[1]

The Court will first address its finding of standing to vindicate its sovereign interest in creating and enforcing the regulatory scheme under the Clean Air Act and in conducting foreign affairs. It will then address the merits of each of these claims.

B. Legal Standard for Standing.

"[T]he party invoking federal jurisdiction bears the burden of establishing the elements of Article III standing." Calcano, 36 F.4th at 74 (quoting Carter v. HealthPort Techs., LLC, 822 F.3d 47, 56 (2d Cir. 2016)). The plaintiff must show that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). "[A] plaintiff must demonstrate standing for each claim he seeks to press." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006).

At the summary judgment stage, "the plaintiff can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' which for

[1] Similar principles are applied in pure statutory or rule-based claims. See, e.g., Field v. Trump, 850 F.2d 938, 946 n.3 (2d Cir. 1988) ("Because full relief is available to plaintiff under Section 14(d)(7), we need not address the claim asserted under Rule 10b–13.").

purposes of the summary judgment motion will be taken to be true." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (citation omitted); see also Lugo v. City of Troy, 114 F.4th 80, 88 (2d Cir. 2024) (at summary judgment, "the plaintiff must produce evidence showing the presence of a genuine issue regarding standing that would warrant resolution by trial." (emphasis omitted)). But when the issue of standing presents purely a question of law, the Court is not required to consider record evidence even at the summary judgment stage. See Miller v. Lamanna, 169 F.4th 118, 127–31 (2d Cir. 2026).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, 578 U.S. at 339 (quoting Lujan, 504 U.S. at 560). A concrete injury is one that is "real and not abstract." Food & Drug Admin. v. Alliance for Hippocratic Medicine, 602 U.S. 367, 381 (2024). An injury is "particularized" if it "affect[s] the plaintiff in a personal and individual way." Lujan, 504 U.S. at 560 n.1. To be "actual or imminent," the injury must have "actually happened" or be "certainly impending." Soule v. Connecticut Ass'n of Schs., Inc., 90 F.4th 34, 46 (2d Cir. 2023) (quoting Clapper, 568 U.S. at 409). When a plaintiff is seeking prospective relief, such as an injunction or declaratory judgment, it "must show a likelihood that [it] will be injured in the future." Carver v. City of New York, 621 F.3d 221, 228 (2d Cir. 2010) (quoting Shain v. Ellison, 356 F.3d 211, 215 (2d Cir. 2004)).

"[G]eneral legal, moral, ideological, and policy concerns do not suffice on their own to confer Article III standing to sue in federal court." Alliance for Hippocratic Medicine, 602 U.S. at 386. Nonetheless, "the injury-in-fact necessary for standing need not be large; an identifiable trifle will suffice." In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,

725 F.3d 65, 105 (2d Cir. 2013) (brackets omitted) (quoting LaFleur v. Whitman, 300 F.3d 256, 270 (2d Cir. 2002)).

The question of standing is "resolved irrespective of the merits of the substantive claims." Soule, 90 F.4th at 45 (quoting United States v. Vazquez, 145 F.3d 74, 81 (2d Cir. 1998)); see also E.M. v. New York City Dep't of Educ., 758 F.3d 442, 450 (2d Cir. 2014) ("Whether a plaintiff has suffered an injury in fact" does not turn on "the merits of the plaintiff's contention that particular conduct is illegal." (internal quotation marks omitted)). Accordingly, "[f]or standing purposes, [courts] accept as valid the merits of [the plaintiff's] legal claims . . . ." Fed. Election Comm'n v. Cruz, 596 U.S. 289, 298 (2022).

C. The United States Has Standing to Assert Its Clean Air Act Preemption Claim.

The United States argues that the authority to regulate interstate and global air emissions is delegated exclusively to the federal government by the Clean Air Act, a federal enactment entitled to recognition under the Supremacy Clause. It urges that it will suffer an injury because New York's Climate Act intrudes on its authority to regulate in an exclusively federal area. New York responds that the United States has not shown that the Climate Act will interfere with its enforcement of the Clean Air Act, because the statute only redresses past contributions to greenhouse gas emissions.

A sovereign may sue to protect "the exercise of sovereign power over individuals and entities within the relevant jurisdiction," which includes "the power to create and enforce a legal code." Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 601 (1982). The United States and the states, as sovereigns, may assert standing to vindicate their interests. For example, Massachusetts was found to have standing to assert a petition to compel EPA rulemaking to regulate greenhouse gas emissions from motor vehicles under the Clean Air Act. Massachusetts

v. E.P.A., 549 U.S. 497 (2007). The Court found the risk of harm to the state from climate change was "actual" and "imminent," concrete, fairly traceable to the action of the EPA and redressable by the relief sought.[2] Id. at 519, 521–26. Indeed, the limited authority of Massachusetts to regulate emissions was a reason that counselled in favor of the finding that it had standing to petition a court to compel the EPA to issue regulations. Id. at 519 ("These sovereign prerogatives are now lodged in the Federal Government, and Congress has ordered EPA to protect Massachusetts (among others) by prescribing standards applicable to [emissions].").

According to the United States, the Climate Act will interfere with the EPA's authority to set and enforce a regulatory scheme that applies nationwide and is based on a federally-directed balancing of environmental, energy and economic considerations. The Court concludes that the harm asserted by the United States is concrete because New York's Climate Act provides for the levying of substantial fees on entities without regard to the manner in which the federal government has chosen to balance those competing interests and for a time period when those emissions were regulated by the EPA.

The harm is particularized because the United States, alone, will suffer an impairment of its sovereign "power to create and enforce" the regulatory scheme under the Clean Air Act and the implementing authority granted to the EPA. This injury is actual and imminent because the Climate Act provides that New York's DEC "shall issue notices of cost recovery demand to all responsible parties" "no later than" June 30, 2028. N.Y. Env't Conserv. Law § 76-0103(3)(e)(i), (4)(a)(iv); see Marcavage v. City of New York, 689 F.3d 98, 103 (2d Cir. 2012) ("To obtain prospective relief, such as a declaratory judgment or an injunction, a plaintiff . . .

[2] In Massachusetts v. EPA, the state's assertion of standing was premised on its quasi-sovereign interests as parens patriae, a basis of standing not at issue here. Massachusetts, 549 U.S. at 518–20.

must demonstrate a certainly impending future injury." (emphasis and internal quotation marks omitted)).

The purported harms to the United States' sovereign interests are fairly traceable to defendants, who are required to enforce New York's Climate Act. See N.Y. Env't Conserv. Law § 76-0103(1) (the "climate change adaptation cost recovery program [will] be administered by the [DEC]"). Finally, the United States' requested injunction would redress this harm by preventing any enforcement of the Climate Act. See Alliance for Hippocratic Medicine, 602 U.S. at 381 ("If a defendant's action causes an injury, enjoining the action . . . will typically redress that injury."). Thus, as to its Clean Air Act preemption claim, the United States has established standing.

D. The United States Has Standing as to Its Foreign Affairs Preemption Claim.

The United States has also established standing as to its foreign affairs preemption claim. The Supreme Court has recognized that a sovereign may sue to enforce "the demand for recognition from other sovereigns," which "most frequently . . . involves the maintenance and recognition of borders." Snapp, 458 U.S. at 601. Relatedly, the Second Circuit has held that the United States suffers a concrete injury sufficient to confer standing when a defendant's actions interfere with its interest in "protecting its authority to conduct foreign affairs" and "ensuring that the United States does not violate its treaty obligations," pursuant to the President's Article II powers "to make Treaties." Tachiona v. United States, 386 F.3d 205, 212–14 (2d Cir. 2004) (citing U.S. Const. art. II, § 2, cl. 2).

According to the United States, the Climate Act, if enforced, would interfere with the work of the federal government in forging international agreements consistent with national policy addressing climate change and greenhouse gas emissions. For instance, the United States

asserts that enforcement of the Climate Act would interfere with its obligations under the Global Climate Protection Act of 1987, Pub. L. No. 100–204, Title XI, 101 Stat. 1407 (codified at 15 U.S.C. § 2901 note). That statute "directed EPA to propose to Congress a 'coordinated national policy on global climate change,' and ordered the Secretary of State to work 'through the channels of multilateral diplomacy' and coordinate diplomatic efforts to combat global warming." Massachusetts, 549 U.S. at 508 (citations omitted) (quoting Global Climate Protection Act § 1103(b)–(c)). To the United States, the state-imposed liability scheme of the Climate Act would obstruct such a coordinated national policy.

The United States also asserts that New York's imposition of monetary liability on foreign fossil fuel companies is contrary to, and therefore would undermine, its longstanding foreign policy position against liability and compensation schemes for emissions. As explained by a then American envoy, the federal government "[does not] accept the idea[] of compensation and liability and never accepted" it. Todd Stern, Special Envoy for Climate Change, Special Briefing (Oct. 28, 2015), https://2009-2017.state.gov/s/climate/releases/2015/248980.htm, cited in City of New York v. Chevron Corp., 993 F.3d 81, 103 n.11 (2d Cir. 2021).

Under the foreign affairs preemption theory advanced by the United States, those harms would amount to an "interfer[ence] in a direct, articulable way" with "the executive's constitutional authority to conduct foreign affairs." Tachiona, 386 F.3d at 214. This is a cognizable and concrete injury sufficient to confer standing.

Because the conduct of foreign affairs is delegated to the executive under Article II, that injury is particularized to the United States. And again, such an injury is actual and imminent given the timeline set out in the Climate Act for its enforcement. This purported harm to the United States is fairly traceable to defendants, and the United States' requested injunction

would redress this claimed harm. The United States has therefore established standing as to its foreign affairs preemption claim.

Having determined that the United States has standing to raise its Clean Air Act preemption claim and foreign affairs preemption claim, as an aspect of its sovereign interest in vindicating its authority, the Court now turns to the merits of those claims.

## II. THE CLEAN AIR ACT PREEMPTS NEW YORK'S CLIMATE ACT.

The United States asserts that New York's Climate Act is preempted by the Clean Air Act, 42 U.S.C. § 7401 et seq. The United States, relying on the Second Circuit's decision in City of New York v. Chevron Corp., 993 F.3d 81, urges that the field of regulation of interstate greenhouse gas emissions is occupied by federal law. It argues, therefore, that New York's attempt to enforce compliance under its own laws is not permitted by the Clean Air Act. The United States further contends that the Climate Act is preempted because it conflicts with the objectives of the Clean Air Act that delegated responsibility for regulation (or non-regulation) of interstate greenhouse gas emissions to the EPA.

New York, in response, argues that the Climate Act does not regulate greenhouse gas emissions but instead merely provides for a compensatory remedy to address the harms of past emissions. True, the Climate Act does not set a numerical standard for future emissions, but it does impose liability on entities whose historical emissions exceeded a 24-year aggregate standard, retroactively imposed. Specifically, the Climate Act imposes strict liability on a "[r]esponsible party," who is defined as "any entity (or a successor . . .), which, during any part of the covered period, was engaged in . . . extracting fossil fuel or refining crude oil and is determined by the [DEC] to be responsible for more than one billion tons of covered greenhouse gas emissions." N.Y. Env't Conserv. Law § 76-0101(21). The Climate Act's covered period,

2000 to 2024, encompasses the period when such entities' activities were governed by EPA regulations.

As discussed more fully, the Court agrees with the United States that, under decisions binding on this Court, the Climate Act impermissibly regulates interstate greenhouse gas emissions and is thus preempted. The Court will therefore grant summary judgment in favor of the United States on its Clean Air Act preemption claim.

The Supreme Court has acknowledged the need in a "few and restricted" areas to recognize or formulate "federal common law." Texas Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 640 (1981) (quoting Wheeldin v. Wheeler, 373 U.S. 647, 651 (1963)). It exists where it is "necessary to protect uniquely federal interests." Id. (quoting Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 426 (1964)). When such "uniquely federal interests" are at play, "state law is pre-empted and replaced, where necessary, by federal law of a content prescribed . . . by the courts." Starr Int'l Co. v. Fed. Rsrv. Bank of New York, 742 F.3d 37, 40 (2d Cir. 2014) (quoting Boyle v. United Techs. Corp., 487 U.S. 500, 504 (1988)).

Generally, courts may only resort to federal common law to the extent that "Congress has not spoken to a particular issue." City of Milwaukee v. Illinois, 451 U.S. 304, 313 (1981) (Milwaukee II); see also Hencely v. Fluor Corp., 146 S. Ct. 1086, 1094 (2026) (federal common law is "fashioned by federal courts in the absence of congressional action"). In turn, when a statute enacted by Congress "speaks directly to the question at issue," any applicable federal common law rule is displaced. American Electric Power Co. v. Connecticut, 564 U.S. 410, 424 (2011) (AEP) (brackets and internal quotation marks omitted) (quoting Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 625 (1978)).

The Supreme Court has recognized that "a federal common law" governed suits "deal[ing] with air and water in their ambient or interstate aspects." Illinois v. City of Milwaukee, 406 U.S. 91, 103 (1972) (Milwaukee I); see also City of New York, 993 F.3d at 91 ("For over a century, a mostly unbroken string of cases has applied federal law to disputes involving interstate air or water pollution."). It observed that "[f]ederal common law and not the varying common law of the individual States" could provide a "uniform standard [for] the environmental rights of a State against improper impairment by sources outside its domain." Milwaukee I, 406 U.S. at 107 n.9 (quoting Texas v. Pankey, 441 F.2d 236, 241 (10th Cir. 1971)). This was "imperative in the present era of growing concern on the part of a State about its ecological conditions and impairments of them." Id. (quoting Pankey, 441 F.2d at 241–42). "[T]he implicit corollary" to such recognition that federal common law governed interstate air and water pollution "was that state common law was preempted." Int'l Paper Co. v. Ouellette, 479 U.S. 481, 488 (1987) (citing Milwaukee I, 406 U.S. at 107 n.9).

In 1963, Congress enacted the Clean Air Act, which established "an intricate regulatory regime intended to 'protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population.'" New York Public Interest Research Group v. Whitman, 321 F.3d 316, 319–20 (2d Cir. 2003) (quoting 42 U.S.C. § 7401(b)(1)). Then, in 1970, the EPA was established to "implement programs to regulate pollution . . . under the Clean Air Act and other related statutes." City of New York, 993 F.3d at 87.

The modern Clean Air Act "regulates pollution-generating emissions from both stationary sources, such as factories and powerplants, and moving sources, such as cars, trucks, and aircraft." Utility Air Regulatory Group v. E.P.A., 573 U.S. 302, 308 (2014). The statute

"envisions extensive cooperation between federal and state authorities" and takes a so-called "cooperative federalist" approach to tackling air pollution. City of New York, 993 F.3d at 87–88 (brackets omitted) (quoting New York Public Interest Research Group, 321 F.3d at 320). Indeed, the statute explains that Congress envisioned "air pollution control at its source" to be "the primary responsibility of States and local governments" guided by "Federal . . . leadership." 42 U.S.C. § 7401(a)(3)–(4).

As to stationary sources, the Clean Air Act provides that the EPA "shall . . . publish . . . a list of categories of stationary sources" that it determines "cause[], or contribute[] significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7411(b)(1)(A). For new sources within each category, the EPA is required to "establish[] Federal standards of performance" that "reflect[] the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the [EPA] determines has been adequately demonstrated." Id. § 7411(a)(1), (b)(1)(B). States are permitted to develop their own procedures for enforcing these standards. Id. § 7411(c)(1). For existing stationary sources within each category, except those regulated by other provisions,[3] the Clean Air Act requires "each State [to] submit to the [EPA] a plan which [] establishes standards of performance" for those existing sources, the enforcement of which is subject to federal approval. Id. § 7411(d)(1)–(2); City of New York, 993 F.3d at 88. Regardless of the actions the states do or do not take with respect to enforcement, the EPA "retains the power to inspect and monitor regulated sources, to impose

[3] Section 7411(d) does not apply to existing sources that are regulated under the national ambient air quality standard program or the hazardous air pollutants program. 42 U.S.C. § 7411(d)(1) (citing id. §§ 7408(a), 7412); see AEP, 564 U.S. at 424 n.7.

administrative penalties for noncompliance, and to commence civil actions against polluters in federal court." AEP, 564 U.S. at 425 (citing 42 U.S.C. §§ 7411(c)(2), (d)(2), 7413, 7414).

The question of whether greenhouse gas emissions are within the EPA's authority under the Clean Air Act has been resolved. The Supreme Court construed that the Clean Air Act's definition of "air pollutant," as used in section 7521's provisions governing air pollution from motor vehicles, to encompass greenhouse gas emissions. Massachusetts, 549 U.S. at 528–32 (interpreting 42 U.S.C. § 7602(g)). Following that decision, the EPA promulgated a regulation (the "endangerment finding") pursuant to section 7521 that concluded that "the combined emissions of these greenhouse gases from new motor vehicles and new motor vehicle engines contribute to the greenhouse gas air pollution that endangers public health and welfare." 74 Fed. Reg. 66496 (Dec. 15, 2009). The EPA subsequently promulgated regulations as to greenhouse gas emissions from stationary sources that were premised on the EPA's earlier endangerment finding. See 80 Fed. Reg. 64510, 64529–31 (Oct. 23, 2015); 81 Fed. Reg. 35824, 35833 (June 3, 2016).

The Supreme Court has considered the continued viability of the federal common law as applied to the regulation of greenhouse gas emissions. In AEP, the Court held that "the Clean Air Act and the EPA actions it authorizes displace any federal common-law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired powerplants." 564 U.S. at 424. The Court reasoned that the Clean Air Act, by requiring the promulgation of standards of performance for emissions and methods of enforcement of those standards, "speaks directly to emissions of carbon dioxide from [fossil-fuel fired] plants" and "provides a means to seek limits on emissions of carbon dioxide from domestic powerplants." Id. at 424–25 (internal quotation marks omitted). The Court also explained that "Congress delegated to EPA the decision whether

and how to regulate carbon-dioxide emissions from powerplants" and therefore assigned to it the authority to make "informed assessment[s] of competing interests" including "the environmental benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption" from such regulations. Id. at 426–27. Thus, the Court held that there was "no room for a parallel track" for federal common law actions to halt greenhouse gas emissions. Id. at 425. The Court, however, left open the question of "the availability *vel non*" of such suits premised on state, rather than federal, common law. Id. at 429.

The Second Circuit addressed the availability of a state common law remedy for greenhouse gas emissions in City of New York. There, the City brought a state law nuisance suit against five oil companies for their role in producing and selling fossil fuels. 993 F.3d at 86. The Court first determined that the suit, the object of which was "to hold the [defendants] liable, under New York law, for the effects of emissions made around the globe," "would effectively regulate the [defendants'] behavior far beyond New York's borders" and therefore could only be brought under the federal, and not state, common law. Id. at 92, 95. The Court, relying on AEP, then held that the Clean Air Act preempted the City's claims when brought under the federal common law because "Congress ha[d] already spoken directly to th[e] issue by empowering the EPA to regulate" greenhouse gas emissions. Id. at 96 (brackets and internal quotation marks omitted). Finally, the Court rejected the City's argument that the displacement of federal common law permitted the City to bring its claims under state law; instead, the City's state law claims could proceed "only to the extent authorized by" the Clean Air Act. Id. at 98–99 (brackets and internal quotation marks omitted). Concluding that they were not so authorized, the Court held that the City's state law nuisance claims were barred. Id. at 100.

In sum, controlling precedent teaches that (1) federal common law, not state law, traditionally governed the regulation of interstate air pollution; (2) the Clean Air Act has displaced attempts to abate greenhouse gas emissions under federal common law; and (3) state common law suits seeking to regulate interstate greenhouse gas emissions are also barred. It is against this backdrop that the Court must assess whether the Clean Air Act preempts New York's Climate Act.

The Supremacy Clause of the Constitution provides that the "Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "Consistent with that command, . . . state laws that conflict with federal law are without effect." Altria Grp., Inc. v. Good, 555 U.S. 70, 76 (2008) (internal quotation marks omitted).

Under a traditional preemption analysis, courts recognize three species of preemption: "(1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives." National Shooting Sports Foundation, Inc. v. James, 144 F.4th 98, 108 (2d Cir. 2025) (internal quotation marks omitted) (quoting N.Y. SMSA Ltd. Partnership v. Town of Clarkstown, 612 F.3d 97, 104 (2d Cir. 2010)).

"Because the States are independent sovereigns in our federal system, courts start with the assumption that the historic police powers of the States were not meant to be superseded by [federal statutes] unless that was the clear and manifest purpose of Congress." New York State Telecommunications Ass'n, Inc. v. James, 101 F.4th 135, 147 (2d Cir. 2024) (brackets and

internal quotation marks omitted) (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996)). This presumption against preemption applies with particular force where "Congress has legislated in a field which the States have traditionally occupied." Wyeth v. Levine, 555 U.S. 555, 565 (2009) (internal quotation marks and ellipsis omitted). In light of the presumption against preemption, "the party asserting that federal law preempts state law bears the burden of establishing preemption." MTBE Prods., 725 F.3d at 96.

The challenge to the Climate Act in this action is a facial one. (See ECF 99 at 40–41.) "[W]hen plaintiffs bring a facial preemption challenge to a state law, they 'must demonstrate that there is no possible set of conditions under which the challenged state regime could be constitutional.'" Restaurant Law Center v. City of New York, 90 F.4th 101, 117 (2d Cir. 2024) (internal brackets omitted) (quoting Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n, 634 F.3d 206, 210 (2d Cir. 2011)); see also Antonyuk, 120 F.4th at 983 ("To mount a successful facial challenge, the plaintiff must establish that no set of circumstances exists under which the law would be valid, or show that the law lacks a plainly legitimate sweep." (internal quotation marks and brackets omitted)).

The parties disagree over the appropriate preemption test. New York argues that the traditional preemption test used by courts when determining whether a federal statute preempts state law—i.e., conflict and field preemption—should be applied. The United States in its initial brief relies primarily on the traditional test as well, but also submits that the Court may apply the same analysis as that in City of New York: in short, because the Climate Act treads on the same ground as the federal common law governing interstate air pollution disputes, the Court need only determine that the Clean Air Act does not authorize the Climate Act to find the latter

preempted. (See ECF 99 at 14 (advocating for a "preempted-unless-authorized rule"); id. at 21–22 (arguing that "the 'traditional statutory preemption analysis' does not apply").)

The analysis in City of New York controls here. The Second Circuit concluded that the City's nuisance claims were the province of the historical federal common law that governed interstate air pollution disputes and could only proceed if authorized by federal statute. The application of this analysis leads to the conclusion that, because the Clean Air Act has not authorized states to adopt legislation of the sort challenged here, New York's Climate Act is preempted.

The Second Circuit observed that the City's suit was, when "[s]tripped to its essence," one to "recover damages for the harms caused by global greenhouse gas emissions . . . under New York law." City of New York, 993 F.3d at 91. Thus, the suit was squarely a dispute over interstate and global air pollution that "implicat[ed] the conflicting rights of [s]tates" and if successful would "undermine important federal policy choices." Id. at 92–93. Such a suit, therefore, "must be brought under federal common law." Id. at 95.

The Second Circuit held that the City's damages claims, if brought under federal common law, were displaced by the Clean Air Act and therefore "barred." Id. at 96. Such claims "would operate as a de facto regulation on greenhouse gas emissions," as to which "Congress has already spoken directly . . . by empowering the EPA to regulate those very emissions." Id. (brackets and internal quotation marks omitted) (quoting Native Village of Kivalina v. ExxonMobil Corp., 696 F.3d 849, 857–58 (9th Cir. 2012)).

Finally, the Second Circuit rejected the City's argument that its state law tort claims were effectively revived by the Clean Air Act's displacement of federal common law. The Clean Air Act did not "vaporize[] any preemptive effect that federal common law had on

state law" and thus the traditional preemption analysis did not apply; as the Court explained, "state law does not suddenly become presumptively competent to address issues that demand a unified federal standard simply because Congress saw fit to displace a federal court-made standard with a legislative one." Id. at 98. Therefore, because federal common law has previously preempted the type of state law claims brought by the City, those claims could proceed "only to the extent authorized by" the Clean Air Act. Id. at 98–99 (internal quotation marks and brackets omitted) (quoting Illinois v. City of Milwaukee, 731 F.2d 403, 411 (7th Cir. 1984)).

The Clean Air Act contains two savings clauses that were addressed in City of New York and are potentially relevant here. First, the statute contains a states' rights savings clause that specifically permits states to adopt and enforce their own air pollution emissions standards, so long as those standards are not "less stringent" than those set by federal law. 42 U.S.C. § 7416. Second, it includes a citizen-suit savings clause that provides that "[n]othing in this section shall restrict any right which any person . . . may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief . . . ." Id. § 7604(e).

Reviewing the two savings clauses, the Second Circuit concluded that those provisions did not contain any such authorization for state law nuisance suits against interstate greenhouse gas emissions. City of New York, 993 F.3d at 99–100. The savings clauses only permit states to create and enforce their own emissions standards for in-state polluters; state lawsuits therefore may only be brought "under the law of the pollution's source state." Id. (brackets, emphasis and internal quotation marks omitted) (quoting Ouellette, 479 U.S. at 497).

Because the Clean Air Act did not authorize the City's state law tort suits, those claims were foreclosed.

New York and amicus the City of New York contend that City of New York is distinguishable from this case and its preemption analysis is therefore inapplicable. Defendants' primary argument against applying City of New York to the Climate Act is that the New York statute merely provides for compensation for the harms caused by global greenhouse gas emissions and thus does not regulate or control greenhouse gas emissions. Specifically, defendants argue that the Climate Act will have no effect on fossil fuel producers' emission-generating activities because it requires payments to the state based on past fossil fuel production and only imposes a one-time fixed cost without instituting any ongoing legal obligations. (See generally ECF 85, Fullerton Decl.) Thus, they contend, the Act falls squarely within the state's traditional police powers to "protect the health and safety of [its] citizens." (ECF 84 at 32 (quoting Medtronic, 518 U.S. at 475).) In other words, New York argues that the Climate Act does not implicate the area of interstate air pollution regulation that was traditionally governed by federal common law.

A similar argument was unsuccessfully raised in City of New York. There, the City argued that its state-law tort claims for damages concerned "only the production, promotion, and sale of fossil fuels, not the regulation of emissions," and that because it sought "damages rather than abatement . . . its claims w[ould] not result in the regulation of global emissions." 993 F.3d at 91 (internal quotation marks omitted). The Second Circuit rejected that attempt at "[a]rtful pleading." Id. The Court explained that "regulation can be effectively exerted through an award of damages." Id. at 92 (quoting Kurns v. R.R. Friction Prods. Corp., 565 U.S. 625, 637 (2012)). Therefore, "a substantial damages award like the one requested by the City would

effectively regulate the [defendants]' behavior far beyond New York's borders" because emission-generating activities anywhere in the world contribute to climate change. Id. The imposition of strict liability for the historical sale and production of fossil fuels was a de facto regulation of those activities:

> [W]hile the City is not expressly seeking to impose a standard of care or emission restrictions on the Producers, the goal of its lawsuit is perhaps even more ambitious: to effectively impose strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them). If the Producers want to avoid all liability, then their only solution would be to cease global production altogether. And even if some level of ongoing liability were deemed palatable, a significant damages award would no doubt "compel[]" the Producers to develop new "means of pollution control."

Id. at 93 (quoting Ouellette, 479 U.S. at 495, 498 n.19.)

The Climate Act works much the same way as the tort claims in City of New York. Like those tort claims, the Climate Act is aimed at fossil fuel producers and not downstream emitters. N.Y. Env't Conserv. Law § 76-0101(21). The Act seeks to "secure compensatory payments from [those producers] based on a standard of strict liability." Id. § 76-0103(2)(a). And, on the face of the Act, those producers are liable for "emissions attributable to all fossil fuel extraction and refining worldwide . . . not limited to such emissions within the state." Id. § 76-0101(8).

That the Climate Act is backward-looking and assigns liability based only on emissions between 2000 and 2024 is not a controlling difference. The tort claims in City of New York sought inherently backward-looking damages but those damages encompassed the City's future costs. See City of New York v. BP P.L.C., 325 F. Supp. 3d 466, 470 (S.D.N.Y. 2018) (Keenan, J.) (explaining that the plaintiffs in the suit in City of New York sought "compensatory damages for past and future costs incurred by the City to protect its infrastructure and property,

and to protect the public health, safety, and property of its residents from the impacts of climate change." (emphasis added)). New York's Climate Act seeks to apply the $75 billion maximum recovery amount for both remediation projects and "projects designed . . . to assist communities, households, and businesses in preparing for future climate change-driven disruptions." N.Y. Env't Conserv. Law § 76-0101(3)(a) (definition of "[c]limate change adaptive infrastructure project"). Indeed, the statute does not expressly tether those "future climate change-driven disruptions" to emissions occurring in the 2000–2024 period.

Defendants' expert opines that the fixed costs imposed by the "one-time retroactive assessment" in the Climate Act would have no impact on the national or global energy markets and "it will not change any fossil fuel company's behavior." (ECF 85, Fullerton Decl. ¶¶ 31, 38.) The expert's opinion is premised upon the expected future actions of yet-to-be-identified actors, including actors who are owned or controlled by foreign governments, and do not necessarily follow the patterns of rational economic actors. It also does not endeavor to provide meaningful differentiation of strict liability under the Climate Act from the type of damage award sought in City of New York. As the Second Circuit noted, "regulation can be effectively exerted through an award of damages, and the obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." 993 F.3d at 92 (internal quotation marks omitted) (quoting Kurns, 565 U.S. at 637).

Nor does it matter that the Climate Act is a state statute rather than a suit for damages under state common law. Any preemptive effect of federal common law and the Clean Air Act applies equally to either. See Milwaukee I, 406 U.S. at 105 ("The question of apportionment of interstate waters is a question of 'federal common law' upon which state statutes or decisions are not conclusive."); Geier v. American Honda Motor Co., 529 U.S. 861,

869 (2000) (noting that "ordinary pre-emption principles" may "instruct us to read [federal] statutes as pre-empting state laws (including common-law rules)").

The Climate Act also raises the same concerns as the City's tort claims in City of New York. It "implicate[s] two federal interests that are incompatible with the application of state law: (i) the 'overriding . . . need for a uniform rule of decision' on matters influencing national energy and environmental policy, and (ii) 'basic interests of federalism.'" City of New York, 993 F.3d at 91–92 (quoting Milwaukee I, 406 U.S. at 105 n.6). More specifically, the Act "effectively impose[s] strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them)" and does so "all without asking what the laws of . . . other states (or countries) require." Id. at 92–93. "To permit [the Climate Act's 'cost recovery demands'] to proceed under state law would . . . risk upsetting the careful balance that has been struck between the prevention of global warming, a project that necessarily requires national standards and global participation, on the one hand, and energy production, economic growth, foreign policy, and national security, on the other." Id. at 93.

In City of New York, the Second Circuit explained that the City's state tort claims were "permissible only to the extent authorized by" the Clean Air Act. Id. at 99 (brackets and internal quotation marks omitted). Concluding that they were not so authorized, the Court held that those claims were preempted. Id. at 100. Here, New York makes no argument that the Clean Air Act authorizes a state to adopt a law imposing strict liability upon fossil fuel producers for historical emissions. The Court concludes that City of New York controls and the Climate Act is preempted.

Nothing in the Supreme Court's recent decision in Hencely v. Fluor Corp., 146 S. Ct. 1086 (2026), undermines this Court's conclusion that the Climate Act is preempted. There,

the Supreme Court assessed "whether a state-law suit premised on a military contractor's activities in a war zone is preempted even when the contractor was not required or authorized to take the action at issue." 146 S. Ct. at 1093. In holding that such a suit was not preempted, the Court reaffirmed that there are "a few areas, involving uniquely federal interests, [that] are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law, fashioned by federal courts in the absence of congressional action"—i.e., that some areas are governed by federal common law. Id. at 1094 (internal quotation marks omitted). The Court further elaborated that such areas are "rare" and state law is only preempted "when there is a significant conflict between an identifiable federal policy or interest and the operation of state law, or when specific objectives of federal legislation would be frustrated." Id. (brackets and internal quotation marks omitted).

New York contends that the United States has failed to identify any such "significant conflict." But as the Court has already explained, City of New York exhaustively described why federal interests and federal law must govern disputes over interstate greenhouse gas emissions. There is an "'overriding . . . need for a uniform rule of decision' on matters influencing national energy and environmental policy," City of New York, 993 F.3d at 91–92 (quoting Milwaukee I, 406 U.S. at 105 n.6), and a "real risk that subjecting [fossil fuel producers]' global operations to a welter of different states' laws could undermine important federal policy choices." Id. at 93.

Nor does the United States' rescission of its endangerment finding as to greenhouse gas emissions from motor vehicles have any effect on the Court's analysis. See 91 Fed. Reg. 7686 (Feb. 18, 2026) (determining that section 7521 of the Clean Air Act does not supply EPA with the legal authority to regulate greenhouse gas emissions from motor vehicles).

City of New York did not rely on the EPA's conception or use of the regulatory powers delegated to it by the Clean Air Act. Again, because the Climate Act operates in an area traditionally governed by federal common law, the principal issue in the preemption analysis set out in City of New York is whether the statutory text of the Clean Air Act affirmatively authorizes the application of state law in the way that the Climate Act prescribes. As the Second Circuit explained, the Clean Air Act does not contain any such authorization.

The Court notes that its conclusion here is in accord with a recent and well-reasoned decision of Chief Judge Sannes of the Northern District of New York in a case challenging the Climate Act brought by several states and business associations. See West Virginia v. James, 25-cv-168 (BKS), 2026 WL 2568355 (N.D.N.Y. Aug. 31, 2026). Like the Court here, Judge Sannes held that the tort claims in City of New York and the Climate Act's imposition of strict liability against fossil fuel producers were indistinguishable. Id. at *21. And, as here, Judge Sannes concluded that, because the Clean Air Act does not authorize New York's enforcement of the Climate Act, the Climate Act is preempted. Id. at *24.

The Court will grant summary judgment in favor of the United States on its Clean Air Act preemption claim.

## III. THE FEDERAL GOVERNMENT'S EXCLUSIVE AUTHORITY IN FOREIGN AFFAIRS PREEMPTS NEW YORK'S CLIMATE ACT.

"[T]he Constitution entrusts foreign policy exclusively to the National Government." American Insurance. Association v. Garamendi, 539 U.S. 396, 419 n.11 (2003). Indeed, "the historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations.'" Id. at 414 (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 610–11 (1952)

(Frankfurter, J., concurring)). Accordingly, state laws "must give way if they impair the effective exercise of the Nation's foreign policy." Zschernig v. Miller, 389 U.S. 429, 440 (1968); see also United States v. Belmont, 301 U.S. 324, 331 (1937) ("[T]he external powers of the United States are to be exercised without regard to state laws or policies.").

In deciding whether a state law is preempted by the federal government's foreign affairs powers, courts apply the doctrines of conflict preemption and field preemption. See Garamendi, 539 U.S. at 419 n.11. A state law is conflict-preempted "where there is evidence of clear conflict between the policies adopted by" the state and the federal government. In re Assicurazioni Generali, S.P.A., 592 F.3d 113, 117–18 (2d Cir. 2010) (internal quotation marks omitted) (quoting Garamendi, 539 U.S. at 420–421). "Yet, even in absence of a treaty" or other express foreign policy, "a State's policy may disturb foreign relations." Zschernig, 389 U.S. at 441. Thus, "the Supreme Court has made clear that, even in the absence of any express federal policy, a state law still may be [field-]preempted . . . if it intrudes on the field of foreign affairs without addressing a traditional state responsibility." Movsesian v. Victoria Versicherung AG, 670 F.3d 1067, 1072 (9th Cir. 2012); see also Garamendi, 539 U.S. at 419 n.11.

The United States contends that, regardless of whether the Court applies conflict preemption or field preemption, the Climate Act is preempted. In particular, the United States argues that the Climate Act conflicts with a variety of statutory provisions—including those in the Clean Air Act and the Global Climate Protection Act of 1987, Pub. L. No. 100–204, Title XI, 101 Stat. 1407 (codified at 15 U.S.C. § 2901 note), as well as longstanding positions taken by the federal government as to climate change such as opposing liability and compensation schemes. See City of New York, 993 F.3d at 103 n.11. The United States also contends that the Climate Act is field-preempted because its requirement that fossil fuel producers pay for global

greenhouse gas emissions intrudes into foreign affairs without implicating any traditional state interests.

New York, in turn, argues that the United States has failed to identify any specific non-speculative conflict between American foreign policy and the Climate Act. It maintains that the Climate Act invokes the traditional state interest in compensating in-state injuries caused by global emissions, foreclosing the application of field preemption.

In City of New York, the Second Circuit acknowledged that the Clean Air Act does not have extraterritorial effect and "regulates only domestic emissions." 993 F.3d at 100–01 (citing 42 U.S.C. § 7415 (contemplating that the EPA would only act to mitigate air pollution affecting other nations if those nations implemented reciprocal actions in favor of the United States)). But despite the Clean Air Act's non-displacement of federal common law as to emissions outside the United States, the Second Circuit concluded that the federal common law also could not be extended to regulate such emissions. The Court reasoned that federal common law claims as to such emissions would raise foreign policy concerns by "bypass[ing] the various diplomatic channels that the United States uses to address" climate change and "circumvent[ing] Congress's own expectations and carefully balanced scheme of international cooperation." Id. at 103. Accordingly, the preemptive effect of the Clean Air Act and the federal common law does not foreclose the Climate Act's de facto regulation of greenhouse gas emissions abroad. The United States, to satisfy its burden in showing that the Climate Act is unconstitutional in all of its applications, thus points to the foreign affairs doctrine as the source of field preemption.

As the Ninth Circuit has observed, "field preemption [in the realm of foreign affairs] is a rarely invoked doctrine." Movsesian, 670 F.3d at 1075. However, two decisions of the Supreme Court shed light on the applicable rule. In Zschernig, the Supreme Court

considered a challenge to an Oregon probate statute that permitted inheritance by foreign heirs on condition that they could demonstrate that their country of residence provided reciprocal rights of inheritance to Oregonians. 389 U.S. at 430–31. The Court noted that "the several States . . . have traditionally regulated the descent and distribution of estates." Id. at 440. Nonetheless, the Court precluded the probate statute's application. It reasoned that, in applying the statute, Oregon courts—informed by the "attitudes of the '[C]old [W]ar'"—performed "minute inquiries concerning the actual administration of foreign law" and "into the credibility of foreign diplomatic statements." Id. at 435. Such matters, the Court held, were those "which the Constitution entrusts solely to the Federal Government." Id. at 436. In so holding, the Court did not identify any specific treaty or other express statement of foreign policy with which the Oregon statute conflicted. It instead explained that "a State's policy may disturb foreign relations" "even in absence of a treaty." Id. at 441.

In Garamendi, the Court applied the foreign affairs doctrine to California's Holocaust Victim Insurance Relief Act, which required insurers to disclose to the state certain information about insurance policies sold in Europe before and during the Second World War. 539 U.S. at 401, 409. In doing so, the Court briefly outlined when courts should apply conflict and field preemption. It explained that where "a State has acted within . . . its traditional competence but in a way that affects foreign relations, it might make good sense to require a conflict, of a clarity or substantiality that would vary with the strength or the traditional importance of the state concern asserted." Garamendi, 539 U.S. at 419 n.11 (citation and internal quotation marks omitted). However, "field preemption might be the appropriate doctrine" "[i]f a State were simply to take a position on a matter of foreign policy with no serious claim to be addressing a traditional state responsibility . . . ." Id.

Accordingly, Zschernig and Garamendi support the proposition that a court should apply the doctrine of field preemption "when a state law (1) has no serious claim to be addressing a traditional state responsibility and (2) intrudes on the federal government's foreign affairs power." Movsesian, 670 F.3d at 1074. And a court should not accept at face value the purported state interest invoked by a state defending its statute from a foreign affairs preemption challenge; instead, a court must discern "the state interest actually underlying" the at-issue statute. Garamendi, 539 U.S. at 426; see also Von Saher v. Norton Simon Museum of Art at Pasadena, 592 F.3d 954, 964 (9th Cir. 2010) ("Courts have consistently struck down state laws which purport to regulate an area of traditional state competence, but in fact, affect foreign affairs.").

The Court concludes, consistent with City of New York, that the Climate Act does not regulate an area of traditional state responsibility. The harm caused by global warming "presents a uniquely international problem" that is "not well-suited to the application of state law." City of New York, 993 F.3d at 85–86. The issue "implicates the conflicting rights of states and our relations with foreign nations," and so "poses the quintessential example" of when state law does not apply. Id. at 92 (brackets and internal quotation marks omitted). Accordingly, the Court comfortably concludes that New York has "no serious claim to be addressing a traditional state responsibility" through the Climate Act. Garamendi, 539 U.S. at 419 n.11.

The Climate Act also intrudes on the federal government's foreign affairs powers. As the Second Circuit explained in City of New York, "global warming . . . is a global problem that the United States cannot confront alone." City of New York, 993 F.3d at 88. Addressing that issue requires that "the United States . . . work[] cooperatively with foreign governments

through diplomatic channels to coordinate a global response to climate change and greenhouse gas emissions." Id.

Both Congress and the executive have long recognized such a "national position" favoring cooperation and diplomacy with other nations to address the issue of global warming. Garamendi, 539 U.S. at 421. For instance, Congress passed the Global Climate Protection Act of 1987 which "ordered the Secretary of State to work 'through the channels of multilateral diplomacy' and coordinate diplomatic efforts to combat global warming." Massachusetts, 549 U.S. at 508 (quoting Pub. L. No. 100–204, Title XI, § 1103, 101 Stat. 1407 (codified at 15 U.S.C. § 2901 note)). President George H.W. Bush signed and the Senate unanimously ratified the United Nations Framework Convention on Climate Change (the "Framework Convention"), a non-binding agreement among nations to work together "to reduce atmospheric concentrations of carbon dioxide and other greenhouse gases." Id. at 509 (citing S. Treaty Doc. No. 102–38, Art. 2, p. 5, 1771 U.N.T.S. 107 (1992)). The United States has announced its intention to withdraw from the Framework Convention, but that withdrawal does not make the regulation of greenhouse gases emitted from extraterritorial sources any less a matter falling within the sphere of the foreign policy of the United States.

Because addressing global greenhouse gas emissions is the subject of foreign policy, New York's application of the Climate Act to emissions-generating activity that occurred outside of the United States intrudes on that policy. "To hold [fossil fuel] [p]roducers accountable for purely foreign activity (especially [] [f]oreign [p]roducers) would . . . bypass the various diplomatic channels that the United States uses to address this issue . . . ." City of New York, 993 F.3d at 103. "Such an outcome would obviously sow confusion and needlessly complicate the nation's foreign policy." Id. Permitting New York to enforce the Climate Act

and levy cost recovery demands on fossil fuel companies for their foreign activities "would not only risk jeopardizing our nation's foreign policy goals but would also seem to circumvent Congress's own expectations and carefully balanced scheme of international cooperation on a topic of global concern." Id. The Constitution does not permit such an "intrusion by the State into the field of foreign affairs." Zschernig, 389 U.S. at 432.

The Court concludes that the Climate Act, as applied to foreign activities of fossil fuel producers, is field-preempted under the foreign affairs doctrine.[4] The Court will grant summary judgment in favor of the United States on its foreign affairs preemption claim.

## CONCLUSION

The motion of the United States for summary judgment is GRANTED as to its Clean Air Act preemption claim (Count I) and foreign affairs preemption claim (Count V). The Court has not found it necessary to reach the other claims of the movant.

The Clerk is respectfully requested to enter judgment for plaintiffs on Counts I and V, dismissing Counts II, III and IV without prejudice, declaring New York's Climate Change Superfund Act to be unconstitutional and permanently enjoining defendants in their official capacities from enforcing it. The Clerk is also requested to terminate the motions at ECF 73 & 100.

[4] Chief Judge Sannes also concluded that the Climate Act is field-preempted under the foreign affairs doctrine. See West Virginia v. James, 2026 WL 2568355, at *26–28.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
September 23, 2026

# Exhibit B

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff,

v.

BP, P.L.C., et al.,

Defendants.

Case No. 1:26-cv-254

HON. JANE M. BECKERING

**OPINION AND ORDER**

Defendants BP,[1] Chevron,[2] Exxon,[3] and Shell[4] (collectively, the Fossil Fuel Defendants) are four of the largest energy companies in the world. Defendant American Petroleum Institute (API) is the energy industry's largest trade association. The People of the State of Michigan (Michigan) filed this antitrust action alleging that in the 1970s, the Fossil Fuel Defendants realized that renewable energies would replace fossil fuels under normal market conditions. So, Michigan claims, the Fossil Fuel Defendants agreed, through API, to suppress renewable energies to maintain supracompetitive prices in the transportation and primary energy markets. According to Michigan, this conspiracy manifested itself in many ways, from suppressing renewable energy technology to hacking nonprofit climate activism organizations. And the conspiracy allegedly culminated in many harms to Michigan and its residents: among others, overpriced energy, a lack

[1] BP Defendants include BP, P.L.C., BP America, Inc., BP Energy Company, BP Energy Retail Company, LLC, and BP Products North American, Inc.
[2] Chevron Defendants include Chevron Corporation and Chevron U.S.A., Inc.
[3] Exxon Defendants include Exxon Mobil Corporation and ExxonMobil Oil Corporation.
[4] Shell Defendants include Shell, P.L.C., Shell USA, Inc., Shell Oil Products Company, LLC, Equilon Enterprises, LLC, and Shell Trading (US) Company.

of options in the energy market, increased insurance premiums for households and depressing home values, and increased costs to implement measures mitigating the negative externalities of fossil fuel use. Michigan asks for treble damages for these injuries and an injunction to prevent future injuries. Michigan additionally requests the Court to impose civil penalties on Defendants and order them to disgorge the profits they earned from the alleged conspiracy.

Now pending before the Court are Defendants' Joint Motion to Dismiss (ECF No. 30) and API's Motion to Dismiss (ECF No. 32). The Court concludes that even if Michigan has adequately pled a conspiracy, the antitrust laws protect against none of the injuries for which Michigan seeks a remedy, except for overcharges for energy. Moreover, the distance is too great between the alleged conspiracy and Michigan's and its residents' overcharges to find that the conspiracy proximately caused the overcharges. The Court therefore holds that Michigan lacks antitrust standing to pursue its federal antitrust claims. The Court grants in part and dismisses as moot in part the Joint Motion and dismisses as moot API's Motion.

## I. BACKGROUND

### A. Factual Allegations

The Fossil Fuel Defendants are four of the largest energy companies in the world, and API is their industry's largest trade association (Compl. [ECF No. 1] ¶ 2). The Fossil Fuel Defendants produce fossil fuels and have at times invested in clean energy products and related technologies, such as solar power and batteries, that could provide energy to power buildings, infrastructure, and cars as an alternative to fossil fuels (*id.*). But, as Michigan alleges, for decades Defendants have conspired with each other, through API, to forestall meaningful competition from renewable energy and maintain their dominance in the energy market (*id.* ¶ 3).

### 1. Energy Markets

Historically, the energy market has primarily consisted of fossil fuels, which are nonrenewable energy sources like crude oil, natural gas, and coal that emit carbon dioxide and other greenhouse gases (GHGs) when combusted (*id.* ¶ 36). In contrast, "renewable energy" refers to any form of energy from solar, geophysical, or biological sources that is replenished by natural processes at a rate that equals or exceeds its rate of use (*id.* ¶ 37). These energy sources include bioenergy, photovoltaic solar, concentrated solar, geothermal energy, hydropower, ocean or tidal energy, and wind energy, as well as the storage of electricity derived from such sources (*id.*).

The U.S. energy system consists of three components: (1) primary energy sources, (2) secondary energy sources, and (3) end-use sectors (*id.* ¶ 38). Primary energy sources are extracted or captured directly from the environment (*id.* ¶ 39). Examples include fossil fuels (e.g., crude oil, natural gas, and coal), renewable sources (e.g., solar radiation, wind power, hydro power, and geothermal), and nuclear power (*id.*).

Secondary energy sources are forms of energy derived from primary energy sources (*id.* ¶ 40). They do not occur naturally and must be produced for end-use applications (*id.*). Examples include gasoline, fuel oil, and propane (refined typically from crude oil or natural gas, or both), as well as electricity (generated from primary energy sources like nonrenewable fossil fuels and renewable solar radiation, wind, or hydropower) (*id.*). Electricity is delivered to U.S. consumers primarily through regional power grids—interconnected transmission networks that draw electricity from a mix of sources, including from fossil fuel plants and renewable energy facilities (*id.* ¶ 41). As of 2025, no U.S. regional power grid supplies 100% renewable electricity on a continuous basis (*id.*).

End-use energy sectors are segments of the economy where secondary energy sources are consumed, including the transportation, residential, commercial, and industrial sectors (*id.* ¶ 42). The end-use sector with the greatest share of energy consumption is the transportation sector (*id.*). The residential and commercial sectors also demand considerable energy for purposes including heating, cooling, and lighting (*id.*).

Defendants have allegedly implemented their conspiracy to target two markets: the U.S. market for transportation energy products such as gasoline, and the U.S. market for primary energy products used to heat and cool residential and public buildings (*id.* ¶ 5). The Complaint further defines the markets (and submarkets) as follows:

- The geographic market is defined as the State of Michigan, or in the alternative, the eighty-three counties that make up the State of Michigan (*id.* ¶ 43).
- The Michigan "transportation energy" market is defined as the market for individual consumer and state retail purchases of energy products for fully or partially enclosed personal ground transportation vehicles (i.e., automobiles, including sedans, vans, sport utility vehicles (SUVs), and small, non-diesel trucks)—where consumers and the state have two principal options: (1) gasoline, used to fuel conventional internal combustion engine vehicles and certain hybrid-electric vehicles; and (2) electricity, used to fuel fully electric vehicles and plug-in hybrid vehicles that draw power from both gasoline and external electricity. "Electric vehicles" (EVs) refers to any vehicle that can be fueled with electricity—including both fully electric vehicles and plug-in hybrid-electric vehicles (*id.*).
- The Michigan "primary energy" market is defined as the market for individual consumer purchases of primary energy products for residential or commercial heating or cooling purposes, and state purchases of primary energy products for use and not for resale, for public heating and cooling purposes, where purchasers have two principal options: (1) primary energy from fossil fuel sources, such as crude oil and natural gas; and (2) primary energy from renewable energy sources, such as solar, wind, hydro power, and geothermal (*id.*).

Relating to the transportation energy market, Michigan alleges that gasoline is widely available at retail gas stations across the country, while public charging stations that supply electricity for automobile transportation use remain limited (*id.* ¶ 47). Only five percent of gas

stations in the United States are owned or operated by companies with large oil refining operations, such as the Fossil Fuel Defendants (*id.* ¶ 49). Instead, the vast majority of branded gas stations are owned and operated by independent retailers, who are often licensees or franchisees of the oil refiners' brands (*id.*). These retailers purchase and resell gasoline from those brands to consumers (*id.*). In Michigan, all Exxon and BP branded gas stations are independently owned (*id.* ¶ 50). However, some TravelCenters of America gas stations in Michigan are owned by BP (*id.*). Gasoline, mixed-source electricity, and clean electricity are substitutes in the U.S. and Michigan transportation energy markets (*id.* ¶ 51).

Relating to the primary energy market, Michigan alleges that most energy that Michiganders consume is generated from fossil fuels (*id.* ¶ 53). Renewable primary energy sources are substitutes for fossil fuel primary energy sources in the Michigan primary energy market and serve the same end-use needs (*id.* ¶ 54). Many of Michigan's municipalities (subdivisions of the state) own public energy utilities (*id.* ¶ 56). There are dozens of electric utilities in the state that are community owned and run as a division of the local government and receive state funding from taxpayers (*id.*). Many of these municipal electric utilities have their own power plants that run with primary energy (including from fossil fuel sources) purchased from big energy companies (including the Fossil Fuel Defendants and other energy companies) (*id.*).

Gasoline, natural gas, fuel oil, and propane create significant negative externalities: fossil fuel combustion accounts for approximately eighty percent of manmade GHGs globally (*id.* ¶ 59). Those GHGs impose negative externalities in the form of environmental harms, economic costs such as rising insurance premiums, and other costs such as the depression of home values in the state (*id.*). The state incurs costs to mitigate these harms (*id.*). According to Michigan, under competitive conditions, electricity—especially clean electricity—would displace a substantial

share of gasoline consumption in the transportation energy market (*id.* ¶ 61). Similarly, renewable sources of primary energy would displace a substantial share of fossil fuel consumption in the primary energy market, including in Michigan (*id.*). But, in Michigan's telling, this displacement has not occurred because Defendants have conspired to artificially eliminate the prerequisite natural competitive conditions, thereby preserving gasoline's and other fossil fuels' dominance despite technological progress and growing consumer interest in cleaner alternatives (*id.*).

### 2. Defendants' Alleged Collusion and Coordinated Conduct

Following the Supreme Court's dissolution of the Standard Oil trust in 1911, Standard Oil's successors and other major oil companies formed API in 1919 to coordinate efforts to promote the proliferation of fossil fuels (*id.* ¶ 62). Michigan alleges that, but for the Fossil Fuel Defendants' coordination through API and other means, competitive market conditions would have cultivated renewable energy output and increased competition in the automobile transportation energy market much earlier than has occurred (*id.* ¶ 63).

Defendants' alleged conspiracy to suppress competition from renewable energy began to take shape in 1979, when Defendant Exxon's internal studies concluded that to avoid catastrophic global warming it would be necessary to have renewable energy sources supply at least fifty percent of global energy by 2010 (*id.* ¶ 64). Instead of using this information to gain a competitive advantage, Exxon shared it with competitors, including the other Fossil Fuel Defendants, through the API (*id.* ¶ 71). Around the same time, Exxon and the other Fossil Fuel Defendants began retreating from renewable energy investments and instead adopting climate denial strategies (*id.* ¶ 74). Defendants expanded the alleged conspiracy through other industry groups and other means throughout the 1980s and 1990s (*id.* ¶¶ 77–81). Michigan claims the conspiracy continues to this day (*id.* ¶ 82).

In addition to sharing information, Defendants engaged in a range of activities that Michigan alleges targeted the transportation and primary energy markets (*id.* ¶ 87). For instance, starting in the early 1980s, the Fossil Fuel Defendants stopped internal research on advanced battery chemistries and hybrid electric motors, withheld market-ready prototypes, and engaged in patent litigation related to renewable energy development (*id.* ¶ 89).

With respect to the transportation energy market, Exxon and companies later acquired by Chevron were early developers of key EV technologies, including lithium and nickel-metal hydride batteries and hybrid gas-electric motors (*id.* ¶ 90). But instead of advancing these innovations, they delayed their development (*id.* ¶¶ 90–110). Also, Defendants withheld investments in charging networks and limited the ability of other market entrants to develop them, while prioritizing investments in fossil fuel infrastructure such as new fueling stations and refinery upgrades (*id.* ¶¶ 111–19).

With respect to the primary energy market, Michigan alleges that Defendants suppressed solar panel technology and invested to foreclose renewables from competing in the primary energy market; engaged in marketing campaigns to undermine the popularity of renewable energies; influenced educational and information-producing institutions; and used hackers to surveil and intimidate watchdogs, advocates, and attorneys general (*id.* ¶¶ 120–214).

### 3. **Anticompetitive Effects and Injuries**

Michigan's Complaint states that in a competitive transportation energy market, EVs would have entered the market sooner, achieved broader adoption, and been supported by more accessible charging infrastructure, and that clean electricity sources like solar would have reduced charging costs and increased convenience (*id.* ¶ 247). This transition would have shifted vehicle power sources significantly toward electricity, reducing gasoline demand and prices (*id.* ¶ 248).

However, between 1980 and 1992, renewable primary energy production declined by nearly ten percent nationally (*id.* ¶ 250). Moreover, charging infrastructure remains inconsistent across the United States and Michigan, limiting access for consumers without home-charging systems (*id.* ¶ 251). As a result, EV adoption in the United States lags behind EV adoption in many other countries (*id.*), further eliminating competitive price pressure on gasoline (*id.* ¶ 252).

Similarly, Michigan alleges that in a competitive primary energy market, other primary energy types, such as solar energy, would have entered the market sooner, achieved broader adoption, and been supported by more accessible infrastructure (*id.* ¶ 255). Clean electricity sources like solar power for homes would have reduced costs and increased convenience, offering the state and consumers meaningful alternatives to fossil fuels (*id.*). This transition would have shifted primary energy sources significantly toward renewables, such as solar and wind, reducing demand for fossil fuels and lowering prices of renewable energy for Michigan and consumers (*id.* ¶ 256). Instead, Michigan uses more propane in the residential sector than any other state in the country and an estimated 320,000 Michigan households must rely on propane as their primary heating fuel (*id.* ¶ 257). According to Michigan, in a competitive market, even modest reductions in demand for primary energy from fossil fuels would have lowered prices in not just the primary energy market, but also in downstream end-use sectors (*id.* ¶ 259).

Michigan claims that Defendants' conduct has led to negative externalities including climate related harms, rising insurance premiums to account for the impacts of climate events, depressed home values in areas of the state most susceptible to climate harms, and damage to Michigan's general economy (*id.* ¶ 261). Michigan incurs expenses to address or mitigate the negative externalities allegedly resulting from Defendants' conduct (*id.*). Additionally, Michiganders face rising home and automobile insurance premiums, which are increasing to

account for the risks, uncertainties, and increasingly harmful weather events associated with climate impacts that insurers have been seeing (*id.* ¶ 263). Michigan alleges that it has incurred and will incur substantial costs to implement measures to address and mitigate the negative externalities allegedly resulting from Defendants' conduct (*id.* ¶ 268).

**B. Procedural Posture**

On January 23, 2026, Michigan filed a Complaint (ECF No. 1) against Defendants, claiming that they violated § 1 of the Sherman Act (Count I) and § 2 of the Michigan Antitrust Reform Act (MARA) (Count II) (Compl. ¶¶ 272–99). Michigan seeks compensatory and treble damages for harms suffered by it and its residents, a permanent injunction, civil penalties, and disgorgement of profits (*id.* at PageID.123–124).

On May 1, 2026, Defendants filed their Motions (ECF Nos. 30, 32[5]), in support of which the United States filed a Statement of Interest (ECF No. 35). The Court issued an Order directing Michigan to either file an amended complaint or respond to the Motions (ECF No. 34). Michigan did not file an amended complaint, instead filing Responses in Opposition to the Motions (ECF Nos. 36, 37) and a Response to the United States' Statement of Interest (ECF No. 45). Defendants filed Replies (ECF Nos. 42, 43). Having considered the parties' submissions, the Court concludes that oral argument is unnecessary to resolve the issues presented. *See* W.D. Mich. LCivR 7.2(d).

[5] API joined Defendants' omnibus Motion to Dismiss in full (ECF No. 30) and filed its own Motion (ECF No. 32) to address what it deems to be particular deficiencies in Michigan's claims against API.

## II. ANALYSIS

### A. Motion Standard[6]

Defendant's Motions are filed under Federal Rule of Civil Procedure 12(b)(6), which authorizes a court to dismiss a claim for relief in any pleading if it "fail[s] to state a claim upon which relief can be granted . . . ." FED. R. CIV. P. 12(b)(6). To survive a motion to dismiss, a complaint must present "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In deciding a motion to dismiss for failure to state a claim, the court must construe the complaint in the light most favorable to the non-movant and accept all well-pleaded factual allegations in the complaint as true. *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 750 (6th Cir. 2014). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

---

[6] Defendants move under Federal Rule of Civil Procedure 12(b)(1) and (6) (Defs.' Mot., ECF No. 30 at PageID.253). Because the Court does not reach Defendants' argument that the Court lacks Article III jurisdiction, the Court sets forth only the standard under Rule 12(b)(6).

**B. Discussion**

Defendants argue that Michigan fails to state a claim for relief in Counts I and II because (1) Michigan lacks antitrust and Article III standing, (2) Michigan fails to plausibly allege a conspiracy or anticompetitive effects in a relevant antitrust market, and (3) Michigan's claims are time barred and preempted (Defs.' Br. Supp., ECF No. 31 at PageID.258). Defendant API additionally asserts that (1) Michigan does not allege that API joined any conspiracy, (2) its conduct is legitimate pro-competitive activity, and (3) its petitioning activity is immune under the *Noerr–Pennington* doctrine (API's Memo. Supp., ECF No. 33 at PageID.329). The United States supports Defendants' argument on antitrust standing and preemption (U.S. Statement of Interest, ECF No. 35 at PageID.352). Michigan resists dismissal on any ground (Pl.'s Memo. Opp., ECF No. 36 at PageID.370–371).

The Court concludes that Michigan lacks antitrust standing under federal law to seek any relief requested in the Complaint. "[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (en banc) (affirming dismissal on antitrust standing alone). The Court therefore does not address any argument in Defendants' or API's Motions except for antitrust standing. Moreover, because the Court dismisses the Sherman Act claim in Count I, the Court declines to exercise supplemental jurisdiction over Michigan's MARA claim in Count II, which the Court dismisses without prejudice.

**1. <u>Michigan Lacks Antitrust Standing</u>**

Under the Clayton Act, Michigan may seek monetary and injunctive relief for violations of the antitrust laws on its own behalf and on behalf of its resident natural persons. 15 U.S.C. §§ 15c(a)(1), 26; *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262 (1972) (authorizing a state to sue

"in its proprietary capacity for three times the damages it has suffered"); *id.* at 261 ("[T]he governments of each State . . . may . . . sue for injunctive relief against violations of the antitrust laws . . . ."); *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 216 (6th Cir. 1990) (citing 15 U.S.C. § 15c(a)(1)). Defendants do not contest Michigan's authority in this respect (Defs.' Br. Supp., ECF No. 31 at PageID.278–289). The parties also agree that Michigan must nevertheless prove antitrust standing to sue for itself and its residents (*id.* at PageID.277–278; Pl.'s Memo. Opp., ECF No. 36 at PageID.395).

The doctrine of antitrust standing springs from §§ 4 and 16 of the Clayton Act. Under § 4, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . ." 15 U.S.C. § 15(a). Section 16 similarly provides that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . ." *Id.* at § 26.

Notwithstanding these seemingly expansive authorizations for private rights of action, the Supreme Court has interpreted the Clayton Act to require that plaintiffs demonstrate "antitrust standing." *See Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters (AGC)*, 459 U.S. 519, 529–46 (1983) (interpreting § 4); *Cargill, Inc. v. Monfort, Inc.*, 479 U.S. 104, 109–13 (1986) (interpreting § 16). Plaintiffs must (plausibly) plead antitrust standing to state a claim for relief. *NicSand, Inc. v. 3M Co.*, 507 F.3d at 450. The Sixth Circuit has distilled the antitrust standing inquiry into two elements: antitrust injury and proximate causation. *Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tenn., Inc. (AAACP)*, 155 F.4th 795, 808 (6th Cir. 2025). The Court analyzes each element in turn.

*(a) Michigan Plausibly Alleges Just One Antitrust Injury: Overcharges for Energy*

The antitrust-injury element comes from the general principle "that Congress enacts legislation with knowledge of the presumption that only plaintiffs who 'fall within the zone of interests protected by' a law may invoke its protections." *Id.* (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014)). Thus, a plaintiff's injury must grow out of the rationale for why the antitrust laws made the challenged conduct illegal. *Id.* (citing *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990)).

The antitrust laws are aimed at protecting consumer welfare by prohibiting anticompetitive business practices that increase price and reduce output. *Id.* As a result, consumers suffer antitrust injury when they purchase overpriced products from a cartel or monopolist. *Id.* at 808–09. Courts have been more cautious when evaluating asserted antitrust injuries suffered by a defendant's competitors or other businesses less connected to the market. *Id.* at 809–10. "When third-party harm is mere 'collateral damage' to (or 'a tangential byproduct of') the anticompetitive conduct, the harm does not count as an antitrust injury." *Id.* at 110 (citations omitted).

Michigan has plausibly pled just one antitrust injury: overcharges for energy. According to Michigan, Defendants conspired to artificially preserve market dominance by suppressing renewable energy (Compl. ¶¶ 3–5, 63–64, 76, 86–87, 120–21, 215–19, 222–25). This conspiracy (if plausible and then proven) is the type of anticompetitive conduct—leveraging market power to reduce product variety and quality and consequently increase price—that the antitrust laws sought to outlaw. *See In re Cardizem CD Antitrust Litigation (Cardizem)*, 332 F.3d 896, 911 (6th Cir. 2003) (holding that horizontal agreement not to compete caused antitrust injury because it "reduc[ed] competition in the market" and increased price). Furthermore, Michigan has alleged that Defendants' conspiracy not only reduced the mix of products available to Michigan and its residents in the transportation and primary energy markets, but also increased energy prices in

these markets (Compl. ¶¶ 252–54, 258–60). Price hikes are paradigmatic antitrust injuries. *See AAACP*, 155 F.4th at 808.

Nevertheless, Michigan seeks an antitrust remedy for many harms that do not qualify as antitrust injuries. Michigan alleges that Defendants' conspiracy decreased the EV supply, delayed infrastructure for other EVs and renewable energies, increased insurance premiums for households, depressed home values, and caused Michigan to expend resources to address negative externalities associated with fossil fuel use (Compl. ¶ 279). These harms are, at most, "collateral damage" with respect to the markets in which Michigan alleges Defendants conspired: the transportation and primary energy markets. Therefore, Michigan cannot invoke the antitrust laws to remedy these harms, lest "the list of harmed parties . . . go on and on." *AAACP*, 155 F.4th at 806. Michigan's only antitrust injuries are the overcharges that it and its residents allegedly paid in the transportation and primary energy markets.

Both Michigan and Defendants disagree with this conclusion. Michigan believes that it has suffered an antitrust injury besides overcharges: output reduction (Pl.'s Memo. Opp., ECF No. 36 at PageID.397 (quoting *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 107–08 (1984)). Although Michigan has alleged a reduction in renewable energy output (*see, e.g.*, Compl. ¶¶ 247–52, 255–58), it has not alleged an output reduction in the markets it defined: the transportation and primary energy markets, which include both renewable energy and fossil fuel based energy (*id.* ¶ 43). Consequently, Michigan cannot claim output reduction as an antitrust injury.

Michigan additionally asserts that it has suffered antitrust injury because Defendants' conspiracy reduced product variety and innovation (Pl.'s Memo. Opp., ECF No. 36 at PageID.397). But even if Defendants' alleged conspiracy had this effect, Michigan has cited no

case where reduction in product variety and innovation qualified as an antitrust injury absent an overcharge or output reduction. For example, *Cardizem* did not hold that lack of competition alone constituted an antitrust injury; rather, it found an antitrust injury from "*paying higher prices* for a product due to lack of competition in the market." 332 F.3d at 911 (emphasis added). Thus, Michigan is double counting when it claims antitrust injury from both overcharges and suppression of competition.

With respect to the remaining harms for which Michigan seeks a remedy, Michigan contends that they are recoverable as consequential damages (Pl.'s Memo. Opp., ECF No. 36 at PageID.398–399), conceding that they do not independently qualify as antitrust injuries. *See Am. Elec. Power Serv. Corp. v. Fitch*, No. 22-3005, 2022 WL 3794841, at *6 (6th Cir. Aug. 30, 2022) ("[A] litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority, forfeits the point."). Hence, Michigan has allegedly suffered just one antitrust injury: overcharges in the transportation and primary energy markets.

Defendants, on the other hand, argue that not even the alleged overcharges qualify as an antitrust injury (Defs.' Br. Supp., ECF No. 31 at PageID.278). According to Defendants, Michigan's overcharge allegations are "conclusory" (*id.*). The Court disagrees. Michigan has plausibly alleged that Defendants' actions—among others, underinvesting in renewables, leaving promising patents fallow, and diverting resources away from green energies (Compl. ¶¶ 87–214)—stifled innovation in and adoption of renewable energies, a substitute for fossil fuels (*id.* ¶¶ 51, 54). It is not conclusory or implausible that energy prices would increase as a result. *See Cardizem*, 332 F.3d at 911 ("[H]ere there is no question that the alleged injury—paying higher prices for a product due to a lack of competition in the market—is the type of injury that can, and

the plaintiffs have alleged did, flow from the anticompetitive effects of the Agreement (a horizontal market allocation agreement).").

Defendants also contend that Michigan cannot suffer an antitrust injury in a different market from the market in which Defendant allegedly formed a conspiracy (Defs.' Br. Supp., ECF No. 31 at PageID.280). To be sure, Michigan and its residents overpaid for transportation and primary energy in markets that Defendants, as participants in primary and secondary energy markets, did not directly restrain (Compl. ¶¶ 36–43, 49, 53–56). Nonetheless, the Sixth Circuit has instructed that an injury's directness should be analyzed under the proximate cause element, not the antitrust injury element. *AAACP*, 155 F.4th at 808 (quoting *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 268–69 (1992)) ("[T]he Supreme Court has since made clear that these directness questions form part of the proximate-cause calculus."). Thus, the Court next analyzes whether Defendants' alleged conspiracy proximately caused Michigan's alleged overcharges.

*(b) Michigan Fails to Plausibly Allege that Defendants' Conspiracy Proximately Caused the Overcharges Michigan and Its Resident Paid for Energy.*

The proximate cause element comes from "the common-law rule that plaintiffs may recover only if a defendant 'proximately caused' their injuries" and the Clayton Act's requirement that injury occur "by reason of" an antitrust violation. *AAACP*, 115 F.4th at 811 (citations omitted). "Antitrust causation is much more limited than Article III standing." *Static Control*, 697 F.3d at 405. Generally, a defendant's conduct does not proximately cause a plaintiff's injury if the defendant could not reasonably foresee the plaintiff's injury, a superseding cause separates the defendant's conduct and the plaintiff's injury, or the defendant's conduct did not "directly" cause the plaintiff's injury. *AAACP*, 115 F.4th at 811–12. In some circumstances, a defendant does not proximately cause derivative harms that flow out of a third party's injury. *Id.*; *S. Pac. Co. v.*

*Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533 (1918) (Holmes, J.) ("The general tendency of the law, in regard to damages at least, is not to go beyond the first step.").

In the antitrust context, only direct purchasers can recover damages for overcharges paid because of a cartel's or monopolist's restraint in a vertical chain of distribution. *AAACP*, 155 F.4th at 812–13; *see also Ill. Brick Co. v. Illinois*, 431 U.S. 720 (1977). The Supreme Court established this bright-line rule in *Illinois Brick* because permitting recovery by a participant at each level of the distribution chain would result in multiple liability for defendants, damages allocation problems, and long and complicated proceedings to sort out damages. *Ill. Brick Co.*, 431 U.S. 736–47.

However, *Illinois Brick* does not bar multiple liability that is unrelated to passing an overcharge down a chain of distribution. *AAACP*, 155 F.4th at 813 (citing *Apple Inc. v. Pepper*, 587 U.S. 273, 287 (2019)). For example, when a defendant contracts with two parties in a vertical chain of distribution, *Illinois Brick* bars neither party's antitrust suit. *Id.* Moreover, some courts have recognized exceptions to *Illinois Brick* when a defendant owns, controls, or conspires with its direct purchasers and when an overcharged indirect purchaser had a pre-existing cost-plus contract with the direct purchaser. *See In re Auto. Parts Antitrust Litig.*, 997 F.3d 677, 683 (6th Cir. 2021); *Ill. Brick Co.*, 431 U.S. at 724 n.2, 736 n.16 (citations omitted); *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1158 (9th Cir. 2019).

Even if *Illinois Brick* does not preclude an antitrust suit, a plaintiff may still fail to allege proximate cause for antitrust standing. *AAACP*, 155 F.4th at 813–14. Injured parties escaping *Illinois Brick* but failing the proximate-cause test include employees whose injuries derive from harm to their employers, plaintiffs who would have purchased a product if the market price were unhindered by anticompetitive conduct, and businesses that would have started but for monopoly

prices. *Id.* at 814. "In sum, '[n]o single formula captures the required proximity.'" *Id.* (citing IIA AREEDA & HOVENKAMP, ANTITRUST LAW § 339a (5th ed. 2021)).

Michigan correctly concedes that *Illinois Brick* defeats much of its overcharge theory under federal law (Pl.'s Memo. Opp., ECF No. 36 at PageID.405, 406). As alleged, the transportation and primary energy markets are retail markets in vertical distribution chains (Compl. ¶¶ 36–43). Michigan alleges that the Fossil Fuel Defendants conspired to restrain trade not in these retail markets, but in the wholesale markets in which the direct purchasers are usually transportation and primary energy retailers, generally not Michigan or its residents (*id.* ¶¶ 36–43, 49, 53–56). Michigan has neither plead nor asserted any exception to *Illinois Brick*. Hence, as indirect purchasers from the Fossil Fuel Defendants, *Illinois Brick* bars Michigan and its residents from recovering most of the overcharge damages Michigan seeks from Defendants under federal law.

Nonetheless, Michigan also alleges that the Fossil Fuel Defendants own some retailers in the transportation energy market in Michigan (*id.* ¶ 49) and that many of Michigan's municipalities purchased primary energy directly from the Fossil Fuel Defendants (*id.* ¶ 56). In these transactions, Michigan and its residents are direct, not indirect, purchasers from the Fossil Fuel Defendants. Therefore, *Illinois Brick* does not preclude Michigan from recovering overcharge damages for these purchases.

Furthermore, it is unclear whether *Illinois Brick* forecloses Michigan's request for injunctive relief under § 16 of the Clayton Act. The Supreme Court has explained that "because standing under § 16 raises no threat of multiple lawsuits or duplicative recoveries, some of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are not relevant under § 16." *Cargill*, 479 U.S. at 111 n.6 (citing *Ill. Brick Co.*, 431 U.S. 720). Several circuit courts have accordingly held that *Illinois Brick* does not apply to injunctive relief under

§ 16, and that courts should tailor their proximate cause analysis to the injunction context. *See McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 856 (3d Cir. 1996); *Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1172 (8th Cir. 1998); *Or. Laborers-Emps. Health & Welfare Tr. Fund v. Philip Morris, Inc.*, 185 F.3d 957, 966 (9th Cir. 1999); *Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*, 156 F.4th 68, 80 (2d Cir. 2025). But the Sixth Circuit has not decided whether *Illinois Brick* forecloses a request for injunctive relief under § 16 of the Clayton Act. *See Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tenn., Inc.*, 164 F.4th 529, 544 (6th Cir. 2026) (Murphy, J. concurring from denial of rehearing en banc) (citation omitted) ("Perhaps there are good reasons to extend *Illinois Brick*'s rule to the injunction context because that rule flows out of the proximate-causation requirement that the Court presumptively reads into all private rights of action. But that question must await a case in which the parties litigate it."). Because *Illinois Brick* does not bar Michigan from recovering overcharge damages for indirect purchases and may not prevent an injunction, the Court evaluates proximate cause for these forms of relief without considering *Illinois Brick*.

To start, the "chain of causation between [Michigan's injury] and the alleged restraint in" the transportation and primary energy markets "contains several somewhat vaguely defined links." *AGC*, 459 U.S. at 540. The alleged conspiracy is Defendants' agreement, first made in 1979, "to reduce the production and distribution of electricity from renewable sources and to restrain the emergence of [EVs] and renewable primary energy technologies" (Compl. ¶¶ 3, 64). Michigan and its residents are allegedly injured by overpaying for transportation and primary energy in the 2020s. To connect the causal chain from the 1979 agreement to overpayments for energy decades later, Michigan asks the Court to infer that because Defendants agreed to reduce renewable

energies, they succeeded in doing so, and that "entrenched demand [for fossil fuels] sustained supracompetitive fossil-fuel prices" for decades (Pl.'s Memo. Opp., ECF No. 36 at PageID.408).

But the alleged conspiracy's success at entrenching supracompetitive fossil fuel prices depends on numerous market forces besides Defendants, such as technological developments, other investors, and the public's interest in renewable energy, as well as the supply of fossil fuels. To award Michigan monetary relief, the Court would need to disentangle these market forces from Defendants' decades-old conspiracy to determine how much lower energy prices would be if Defendants had not engaged in the conspiratorial conduct Michigan alleges. *See Kloth v. Microsoft Corp.*, 444 F.3d 312, 325 (4th Cir. 2006) (citation omitted) ("It would be entirely speculative and beyond the competence of a judicial proceeding to create in hindsight a technological universe that never came into existence."); *cf. Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013)) ("[W]e have 'been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment.'"). For example, the Court would need to measure how much higher gas prices are in the 2020s because Defendants "abruptly hit the brakes on . . . EV and clean energy technology research and development programs" in 1981 (Compl. ¶ 96). The Court would further need to determine the marginal primary energy price increase from the "55 distinct relationships between universities and fossil fuel companies, representing an estimated $1.3 to $2.2 billion in industry funding over ten years" (*id.* ¶ 186). For each alleged conspiratorial act, the Court would need to make a similar calculation, while simultaneously integrating other market forces into the analysis.[7]

---

[7] The Court declines Michigan's invitation to defer its analysis of the chain of causation until after discovery has taken place (Pl.'s Memo. Opp., ECF No. 36 at PageID.409–410). *See NicSand, Inc.*, 507 F.3d at 442 ("[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law . . . .").

The Court concludes that these damages calculations are sufficiently speculative to suggest that Defendants' alleged conspiracy did not proximately cause Plaintiff's overcharges. *See Bodie-Rickett & Assocs. v. Mars, Inc.*, 957 F.2d 287, 292 (6th Cir. 1992). Moreover, the tenuous causal connection described above similarly cuts against proximate cause for an injunction, especially as nearly thirty years have passed since the alleged 1979 agreement, and most of Defendants' conduct alleged in the Complaint occurred decades ago. *See Cargill, Inc.*, 479 U.S. at 112 ("It would be anomalous, we think, to read the Clayton Act to authorize a private plaintiff to secure an injunction against a threatened injury for which he would not be entitled to compensation if the injury actually occurred.").

Additionally, there exist "[several] identifiable class[es] of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement" against Defendants. *AGC*, 459 U.S. at 542. Most obviously, Defendants' direct customers would be motivated to sue Defendants for violating antitrust laws if Defendants were overcharging them because of a conspiracy to suppress renewable energies. Also, the developers of and investors in renewable energy technology and infrastructure would have a strong incentive to recover damages from Defendants for suppressing their business, and to enjoin them from continuing to do so. Michigan correctly notes that these potential plaintiffs may bring damages claims that do not perfectly overlap with Michigan's damages claims (*see* Pl.'s Memo. Opp., ECF No. 36 at PageID.411). But these plaintiffs can sue to enjoin the same conspiracy that Michigan sues to enjoin. *See Standard Oil Co.*, 405 U.S. at 262 ("[T]he fact is that one injunction is as effective as 100, and, concomitantly, that 100 injunctions are no more effective than one."). Hence, the existence of other potential plaintiffs to challenge Defendants' alleged conspiracy indicates that Michigan and its residents' injuries were not proximately caused by Defendants' conduct.

Michigan points to several factors it claims support a proximate cause finding. For one, Michigan argues that Defendants could reasonably foresee that conspiring to suppress renewable energy alternatives would increase energy prices (Pl.'s Memo. Opp., ECF No. 36 at PageID.407–408). For another, Michigan contends that the Complaint alleges Defendants' express aim to preserve supracompetitive prices (*id.* at PageID.408). It is true that reasonable foreseeability and alleged intent to cause harm indicate that Defendants' alleged conspiracy may have proximately caused Michigan and its residents' overcharges. *See AAACP*, 155 F.4th at 812; *Static Control*, 697 F.3d at 402. Nevertheless, "improper motive . . . is not a panacea that will enable any complaint to withstand a motion to dismiss," *AGC*, 459 U.S. at 537, and ultimately, the Court must account for "all the facts," *AAACP*, 155 F.4th at 813 (citation omitted). Thus, while the Court considers the factors Michigan highlights, it does not consider them dispositive. Instead, the Court finds that other proximate cause factors—the indirectness of the injury, the uncertain causal chain, and the existence of other potential plaintiffs—outweigh the factors in favor of proximate cause. The Court therefore determines that Michigan has not plausibly alleged that Defendants' alleged conspiracy proximately caused Michigan's and its residents' injuries resulting from overcharges. Michigan lacks antitrust standing to pursue an injunction or to recover damages for overcharges, regardless of *Illinois Brick*.

In sum, Michigan has alleged just one antitrust injury—overcharges for transportation and primary energy—and *Illinois Brick* bars Michigan from recovering damages as indirect purchasers under federal law. Nor can Michigan recover damages for the direct purchases it and its residents made from Defendants or enjoin them from continuing any alleged conspiracy because Michigan fails to plausibly plead that this conspiracy proximately caused and continues to cause overcharges.

Because Michigan lacks antitrust standing to pursue any remedy under federal antitrust law, the Court dismisses Count I in Michigan's Complaint for failure to state a claim for relief.

**2. <u>Supplemental Jurisdiction</u>**

Having dismissed Michigan's federal antitrust claim, the Court, in its discretion, declines to exercise supplemental jurisdiction over Michigan's remaining state-law claim under MARA. *See* 28 U.S.C. § 1367(c)(3) ("[D]istrict courts may decline to exercise supplemental jurisdiction over a claim under subsection . . . if . . . the district court has dismissed all claims over which it has original jurisdiction"); *Gamel v. City of Cincinnati*, 625 F.3d 949, 952 (6th Cir. 2010) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims...."); *see, e.g.*, *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009) ("Upon dismissing Brooks' federal claims, the district court properly declined to exercise supplemental jurisdiction over Brooks' remaining state-law claims.").

**3. <u>Amendment</u>**

"Ordinarily, if a district court grants a defendant's 12(b)(6) motion, the court will dismiss the claim without prejudice to give parties an opportunity to fix their pleading defects." *CNH Am. LLC v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers (UAW)*, 645 F.3d 785, 795 (6th Cir. 2011). However, the Sixth Circuit has repeatedly held that a "request for leave to amend almost as an aside, to the district court in a memorandum in opposition to the defendant's motion to dismiss is . . . not a motion to amend." *Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 444 (6th Cir. 2014) (quoting *La. Sch. Emps. Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 486 (6th Cir. 2010)); *id.* at 444 (examining the phrase "Plaintiffs request leave to amend the Complaint in the event that the Court finds that it falls short of the applicable pleading standards in any respect," which the plaintiffs included in their response to a motion to dismiss, and finding

no abuse of discretion by the district court in refusing to allow the plaintiffs to amend their complaint where the plaintiffs did not present an adequate motion and did not attach a copy of their proposed amended complaint).

In a footnote in its Memorandum in Opposition, Michigan states that "[i]f the Court concludes that [its] market allegations require clarification, the State could promptly amend the Complaint to clarify them without changing the nature of its claims" (Pl.'s Memo. Opp., ECF No. 36 at PageID.403 n.5). The Court finds that this footnote is the type of "throwaway language," *Kuyat*, 747 F.3d at 444, "almost as an aside, to [the Court] in its memorandum in opposition to [Defendants'] motion[s] to dismiss," that the Sixth Circuit has held is "not a motion to amend." *Id.* Furthermore, the Court gave Michigan an opportunity to amend its Complaint (ECF No. 34), which Michigan declined (Pl.'s Memo. Opp., ECF No. 36). Therefore, the Court dismisses Michigan's federal antitrust claims with prejudice.

## III. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss (ECF No. 30) is GRANTED in part and DISMISSED in part as moot; specifically, the Motion is GRANTED with respect to Count I, which is DISMISSED with prejudice, and the Motion is otherwise DISMISSED as moot.

**IT IS FURTHER ORDERED** that the Court declines to exercise supplemental jurisdiction over Michigan's MARA claim in Count II, which is DISMISSED without prejudice.

**IT IS FURTHER ORDERED** that Defendant API's Motion to Dismiss (ECF No. 32) is DISMISSED as moot.

Because this Opinion and Order resolves all pending claims, the Court will also enter a Judgment to close this case. *See* FED. R. CIV. P. 58.

Dated: September 22, 2026

/s/ Jane M. Beckering
JANE M. BECKERING
United States District Judge